No. 27761
Vancouver Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Between

**The Attorney General of Canada,**

**on behalf of the United States of America**

And

**WANZHOU MENG**

## REVISED CASE MANAGEMENT MEMORANDUM OF PERSON SOUGHT FOR EXTRADITION

1. **Introduction**

- There have been six prior Case Management Conferences ("CMC"s) in relation to these proceedings: May 8, 2019, June 6, 2019, January 17, 2020, March 30, 2020, April 27, 2020, and June 3, 2020.

- The main issues identified in the early CMCs were:

    **I. Abuse of Process (two branches)**

    a. Political Abuse and Statements of President of USA ("1st Branch of Abuse"); and
    b. Unlawful Detention, Search and Interrogation at YVR ("2nd Branch of Abuse").

    **II. Double Criminality;** and

    **III. Sufficiency of the Evidence of Fraud**

- As a result of the first two CMCs, a preliminary schedule was set by this Honourable Court to hear evidence and arguments from the parties on the issues.  That schedule has since been substantially affected by the intervention of the Covid-19 pandemic and its effect on normal court operations.

No. 27761<br>Vancouver Registry

**2. Subsequent Developments**

   **i. Disclosure Motion**

- Further to the 2nd Branch of Abuse, in September of 2019 Ms. Meng argued a motion seeking additional disclosure, relying on *R. v. Larosa*, (2002) 166 C.C.C. (3d) 449.

- On December 9, 2019 this Court issued a Ruling granting Ms. Meng's disclosure motion (the "Disclosure Order").

- Following a third CMC held on January 17, 2020, the Attorney General of Canada ("AGC") undertook to make best efforts to comply with the Disclosure Order by February 28, 2020, including identifying any documents over which it would assert privilege.

   **ii. Privilege Claims**

      **a. Before the British Columbia Supreme Court**

- On February 28, 2020, the AGC provided further disclosure pursuant to the Disclosure Order. The additional disclosure includes approximately 400 documents spanning between 1,200 and 1,500 pages. The AGC claimed privilege over all or part of approximately half the documents produced. In addition, a *Laporte* list was supplied for documents wholly withheld based on privilege. The privilege claims rely on solicitor/client privilege, litigation privilege and public interest immunity pursuant to s. 37 of the *Canada Evidence Act* ("*CEA*"). There are multiple redactions based on irrelevance and/or non-responsiveness.

- Since obtaining and reviewing the new disclosure, counsel for Ms. Meng has written letters to the AGC dated April 14 and 23, 2020, seeking further undisclosed documents, challenging the correctness of the privilege claims and redactions, and seeking clarification regarding other issues.

- The AGC responded to the defence letters on June 5, 2020. At present, there are approximately 200 documents that are the subject of privilege claims in this Court

- As explained below, the parties are jointly proposing the appointment of *amicus curiae* to assist the Court and expedite the determination of the privilege claims in this Court by the end of August 2020.

### b. Before the Federal Court of Canada

- On April 23, 2020, the AGC disclosed one additional document deemed relevant to the Disclosure Order, over which the AGC has asserted a claim of national security privilege under s. 38 of the *CEA* (the "S. 38 Doc").

- On April 24, 2020, the AGC's National Security Group brought an Application before the Federal Court of Canada ("FCC") under s. 38.04(1) of the *CEA* for an Order regarding disclosure of the S. 38 Doc (the S. 38 Application). On June 2, 2020, the AGC disclosed five additional documents that are now part of the S. 38 Application (i.e.: six documents in total).

- Three CMC's have been held before the Honourable Justice Kane of the FCC in respect of the s. 38 Application: May 5, May 19 and June 9, 2020.

- On June 9, 2020, the Court appointed Mr. Anil Kapoor as *amicus curiae* in relation to the S. 38 Application. The dates of July 16-17, 2020 were set for the hearing of the public phase of the S. 38 Application. August 5-6, 2020 were set for the hearing of the private phase (i.e.: *ex parte, in camera*) of the S. 38 Application.

### c. Effect of Privilege Claims on Scheduling of Abuse of Process Litigation

- Ms. Meng's respectful position is that, until all contested privilege issues are resolved regarding the disclosures made further to the Disclosure Order, she will not be able to perfect her materials on the 2nd Branch of Abuse motion.

- It is Ms. Meng's submisson that the litigation regarding the three branches of abuse of process should be heard together, *ie*.: one after another with the different branches heard seriatim, starting after Labour Day, and the Court reserving rulings, if necessary, until all matters are completed. This is because the jurisprudence on abuse directs that, where appropriate, the effect of multiple forms of abuse may be considered cumulatively.

- Ms. Meng has proposed a detailed Schedule that is attached as Appendix "A", that includes a comprehensive list of filing and hearing dates. It is colour coded to assist the Court in distinguishing the filing and hearing dates proposed for the different motions involved.

### d. *Amicus Curiae* Proposal

- Through the cooperative efforts of the AGC and counsel for Ms. Meng, the parties will present to the Court, subject to its direction and approval, a draft protocol for the appointment of Mr. Anil Kapoor as *amicus curiae* to assist this Court in the fair

3

and expeditious resolution of the AGC's claims of solicitor-client privilege, litigation privilege and s. 37 CEA public interest privilege.

- Subject to the Court's direction, a formal protocol can be provided that sets out the role and responsibilities of *amicus* curiae, which the parties would propose be made the subject of a consent Order.

### iii.     Additional Branch of Abuse Identified Since Original Dates Set

- Ms. Meng wishes to provide notice[1] that, in addition to seeking a stay of the proceedings based on the two branches of abuse summarized in paragraphs 1(I)(a) and (b) above, she will seek a stay of the extradition proceedings on a third branch of abuse.

- Ms. Meng will submit that the Requesting State's summary of evidence in the Record of the Case ("ROC") and Supplemental Record of the Case ("SROC") is grossly inaccurate and based on deliberate and/or reckless misstatements of fact and material omissions, thereby constituting a serious abuse of the extradition process that should disentitle the Requesting State to proceed, as found by this Court in *United Kingdom of Great Britain and Northern Ireland v. Tarantino*, 2003 BCSC 1134 ("*Tarantino*") and subsequent related jurisprudence in Canada and internationally ("3rd Branch of Abuse").

- Ms. Meng will submit that the ROC and SROC contain false statements and material omissions which, when considered cumulatively, substantiate that the ROC and SROC are so replete with intentional or reckless error that the conduct of the Requesting State in certifying them under s. 33 of the *Extradition Act* and submitting them as the basis for Ms. Meng's extradition constitutes a violation of her s. 7 *Charter* rights and an abuse of process justifying a stay of the proceedings.[2]  The misrepresentations and omissions in the ROC/SROC include the following:

---

[1] After briefly summarizing the two branches of abuse of process at the outset of her *Larosa* Memorandum of Law, the following was added in footnote 5: "The Applicant continues to investigate the conduct of both Canadian and American authorities to determine whether further grounds may be advanced for the abuse of process motion.  The Applicant should not be taken to have limited herself to the two branches of abuse identified in this Application given the early stage of the proceeding.  Any additional ground of abuse raised by the Applicant will be the subject of advance notice to the Respondent and the Court".
[2] *Tarantino*, at para. 38.

No. 27761<br>Vancouver Registry

### a. Material Omissions in Summary of PowerPoint in ROC

- In relation to the PowerPoint ("PPT") presentation delivered by Ms. Meng on August 22, 2013 to a HSBC banker in Hong Kong, paragraph 28 of the ROC purports to summarize the key aspects of the PPT that allegedly misled HSBC into continuing to provide banking services to Huawei, including processing U.S. dollar transactions, which allegedly exposed HSBC to a risk of civil and criminal monetary penalties in the United States under U.S. sanctions laws against Iran.

- It will be submitted that the summary of the PPT in paragraph 28 of the ROC is grossly misleading because it omitted to include reference to critical disclosures that Ms. Meng made in the PPT regarding Huawei's ongoing business operations in Iran including the following statements:

    - *As a business partner of Huawei, Skycom works with Huawei in sales and service in Iran.* (PPT, p. 6)

    - *Huawei conducts normal business activities in Iran and provides civilian telecommunications solutions…* (PPT, p. 6)

- Ms. Meng will submit that these key disclosures in the PPT, that were omitted from the summary in the ROC, provided HSBC with the material facts it needed to know in order to assess whether there was any risk to HSBC in continuing to provide banking services to Huawei, including processing U.S. dollar transactions related to Huawei's commerce in Iran. The conduct of the Requesting State in excluding these disclosures in the PPT from the ROC, made the summary of the PPT in the ROC materially misleading. As the PPT is the foundation for the fraud allegation against Ms. Meng, such omissions constitute, at best, gross negligence by the Requesting State in ensuring that the certified ROC/SROC accurately summarized the relevant facts and evidence available for trial and, at worst, an intentional effort to misled.[3]

### b. Material Misstatements Re Junior/Senior Employees of HSBC

- The Requesting State asserted in the ROC that only "junior" HSBC employees knew of the relationship between Huawei and Skycom, including that:

    - Huawei employees had significant involvement in trying to secure a loan for Skycom's Iranian operations in 2011; and

---

[3] *Extradition Act*, s. 33(3)(a).

- o In 2013, Huawei employees were involved in aspects of the administration of Skycom's bank account at HSBC.[4]

- The ROC asserts that these "junior" employees did not relay this information to "senior" executives at HSBC, leaving the latter reliant only on the information provided in the PPT. The ROC then asserts that, following the release of the Reuters articles in December 2012 and January 2013, HSBC closed the Skycom account. The effect of the presentation of the facts in the ROC is to suggest that senior banking executives at HSBC were unaware of the relationship between Huawei and Skycom and of the bank accounts for those entities located in the "Huawei Master Group" at HSBC.

- On the abuse motion, Ms. Meng will seek to adduce evidence that will demonstrate that these statements in the ROC are false. That evidence will demonstrate that it is inconceivable that any decision to modify or terminate HSBC's relationship with Skycom or Huawei would not have been reviewed by the most senior management of HSBC following a detailed internal review of its total enterprise wide client relationship within its self described "Huawei Master Group". That high-level review, which would have preceded the closing of the Skycom account, would necessarily have revealed the interconnectedness of the Huawei, Skycom (and Canicula) accounts.

- The implausibility of senior management of HSBC not being aware of the relationship between Huawei, Skycom and the nature of the commerce that Huawei and Skycom conducted in Iran, is further underscored by the fact that, in December 2012, HSBC paid a US$1.9 billion dollar fine and entered into a Deferred Prosecution Agreement ("DPA") with the U.S. Department of Justice ("USDOJ") related to its own independent misconduct, including in relation to violations of U.S. sanctions law regarding Iran.

- Ms. Meng will lead evidence that will demonstrate that, in the DPA, HSBC assured the USDOJ that it was remediating the Know Your Client ("KYC") for its customers group-wide, adopting enhanced risk standards and adopting U.S. anti-money laundering standards. This remedial measure would have required HSBC to review accounts to ensure that HSBC "knew its customer(s)" and therefore, would have identified the relationship between Huawei, Skycom and Canicula.

- Ms. Meng will adduce further evidence that will demonstrate that a customer of Huawei's size (being HSBC's Global Liquidity and Cash Management Department's 17th largest customer[5]) and importance globally (being the world's largest telecom

---

[4] ROC, paras. 31-32.
[5] ROC, p. 7, para. 15.

6

equipment manufacturer and a Fortune 500 company since 2010) would necessarily be serviced by senior representatives of HSBC. Moreover, any issue with the client that involved a potential violation of U.S. law while the bank was under a DPA, would be addressed by the most senior members of HSBC management to ensure that the institution was protected and was not, in any way, assisting in violations of U.S. law that would have constituted a breach of its DPA.

- It will be submitted that these strategic misrepresentations in the ROC regarding the "junior/senior" distinction constitute a further failure of the Requesting State to accurately summarize the relevant facts and evidence in the certified ROC.

### c. False Statements in SROC Regarding US$900 Million Credit Facility

- The ROC does not refer to any loans or credit facilities between HSBC and Huawei, nor any loan-loss risk arising from the alleged misrepresentations in the PPT. The SROC refers to certain loans and credit facilities, including the fact of Huawei having negotiated a "<u>proposed</u>" US$900 million credit facility with HSBC, but also makes no allegation that any loan or credit facility was at risk of default or non-payment.[6]

- However, the Requesting State articulated, for the first time, the following theory of culpability in its Responding Submission on the *Larosa* application filed in this Court on September 19, 2019, at paras. 1 and 27:

  [1]   …As a result of the misrepresentations, <u>HSBC extended US$900 million of credit to Huawei</u> and processed transactions for a Huawei subsidiary. These transactions put HSBC's economic interests at risk by: (1) <u>jeopardizing repayment of the US$900 million loan to HSBC</u>; and, (2) exposing HSBC to fines or prosecution for violations of US sanctions law. [Emphasis added.]
  …
  [27]   …As a result of the deception, <u>HSBC's loans were put at risk because Huawei was exposed to criminal penalties for violating sanctions</u> and HSBC itself risked fines and penalties for violating Iranian sanctions law by doing business with Skycom. This risk to HSBC was recognized by the fact that it entered into a deferred prosecution agreement with US authorities. [Emphasis added.]

- It will be Ms. Meng's position that the statements to this Court in the Requesting State's *Larosa* submissions are grossly inaccurate and not supported by any

---

[6] SROC, paras. 5-6.

7

evidence. In fact, there *never* was a US$900 million credit facility between Huawei and HSBC. On the abuse motion, Ms. Meng will seek to adduce evidence that the following are the true facts:

- o  On April 30, 2014, HSBC, along with eight other banks, each proposed to work towards a credit facility arrangement with Huawei for US$900 million, with each participating bank participating to the extent of US$100 million. The proposal stated that should there be oversubscription to the syndicate that the credit facility could exceed US$900 million. The proposal ultimately led to a July 25, 2014 US$1.6 billion credit facility arrangement that included twenty-six banks including HSBC (the "Facility"). HSBC's total contribution in the Facility was limited to <u>US$80 million</u>.

- o  Further, the SROC and the Requesting State's *Larosa* submissions are also materially misleading in that they fail to inform the Court that the Facility was *never drawn on by Huawei*. It was, in fact, cancelled by Huawei in June 2017 without ever being utilized in any way.

- It will be submitted that these factual misrepresentations by the Requesting State in the SROC and its *Larosa* submissions, regarding the non-existent US$900 million credit facility constitute a further failure of the Requesting State to accurately summarize the relevant facts and evidence in the certified ROC.

### d.  Misstatements re Networkers Transactions

- In the ROC, the Requesting State described that HSBC cleared dollar transactions through its U.S.-based subsidiary, HSBCUS, and that between 2010 and 2014, HSBC and HSBCUS cleared over US$100 million worth of transactions related to Skycom through the United States. The ROC added that between 2010 and 2014, US$7.5 million of those transactions were from payments made by Skycom to a customer of HSBC, Networkers International ("Networkers"), that provided employees to work on Skycom/Huawei telecom projects in Iran. The ROC described that, when Skycom paid Networkers, HSBC cleared its customer's payments in U.S. dollars through HSBCUS and other USA banks. Between 2010 and 2013, the payments were sent from Skycom's account at HSBC. After the Skycom account was closed by HSBC in January 2013, the payments to Networkers were sent from a Skycom account in a bank in China, but the payments continued to be cleared through the United States with the involvement of HSBC, and accepted by HSBC into Networkers' account at HSBC.[7]

---

[7] ROC, p. 2 (summary, para. 3) and paras. 15-16 and 74-75.

No. 27761<br>Vancouver Registry

- On the Third Branch of Abuse motion, Ms. Meng will seek to adduce evidence to demonstrate that the foregoing explanation of the dollar clearing process undertaken by HSBC is highly misleading, based on the following facts:

    o How HSBC chose to process inbound payments to its customer (Networkers) was within HSBC's control.

    o HSBC was fully aware that the payments to Networkers (also HSBC's customer) came from Skycom (HSBC's customer whose account was closed in early 2013), yet HSBC chose to process the Skycom U.S. dollar payments to Networkers through the U.S. banking system, even after it closed the Skycom account. (The SROC acknowledged that, even though HSBC went under a DPA in December 2012, HSBC independently chose not to block all transactions related to Skycom.[8])

    o Ms. Meng could not have had any role, influence or control over how, or whether, HSBC chose to process the Skycom U.S. dollar payments to Networkers. HSBC could have established a policy to automatically reject payments from Skycom to Networkers (or to any HSBC customer or account). Had HSBC taken this step, it would have detected and rejected any payments from Skycom to Networkers.

    o Nor did Ms. Meng decide whether HSBC or any other bank accessed the U.S. financial system to process U.S. dollar payments, including Skycom's payments to Networkers. Foreign banks may use alternative mechanisms for processing U.S. dollar transactions that do not involve the U.S. financial system. In particular, instead of using the U.S. banking system to process U.S. dollar payments, Hong Kong-based banks and their partners had the option of using the U.S. dollar Clearing House Automated Transfer System ("USD CHATS"), an alternative currency settlement system based in Hong Kong. In 2000, HSBC was appointed by the Hong Kong Monetary Authority as the settlement institution for USD CHATS. In turn, HSBC appointed Hong Kong Interbank Clearing Limited ("HKICL") as the system operator. As of February 2020, there are over 200 banks utilizing the USD CHATS in Hong Kong.

    o USD CHATS permits the efficient settlement of U.S. dollar transactions in the Asian time zone *without* involving any correspondent U.S. banks. The

---

[8] SROC, para. 22.

significance of the USD CHATS system, which the ROC and SROC misleadingly omit to describe was available for use by HSBC and other Hong Kong banks, is that a U.S. dollar-denominated transaction that does not involve a U.S. financial institution does <u>not</u> violate U.S. sanctions laws. And a bank, rather than the customer of a bank, typically decides which clearing method is best for processing a particular transaction. This is why banks such as HSBC can be held accountable for violating extraterritorial U.S. sanctions laws against Iran, rather than customers of banks, much less individual employees of customers of banks such as Ms. Meng.

iv.  **Effect on Hearing Dates**

- In light of the need to reassess and compress the schedule for the orderly litigation of the issues in the case, Ms. Meng proposes a detailed litigation filing and hearing proposal in Appendix "A".

### 3. Conclusion

Ms. Meng respectfully offers this CMC Memorandum and its Appendix "A" in order to assist the AGC and Court in identifying the issues to be litigated in these proceedings and for scheduling purposes.

Date: __June 12, 2020__



Richard C.C. Peck, QC     David J. Martin

Scott K. Fenton     Eric V. Gottardi