UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

- v. –

HUAWEI TECHNOLOGIES CO., LTD, *et al.*,

Defendants.

---

18 CR 457 (S-3) (AMD) (CLP)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW #3 IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS FRAUD CHARGES (COUNTS 4–9)**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD................................................................................................................ 2

ARGUMENT ............................................................................................................................. 3

    I.    Counts 4–9 Are Based on a Right-to-Control Theory of Property Fraud That Has Now Been Abrogated by *Ciminelli v. United States*. ............................ 3

        A.    The Supreme Court Has Rejected the Second Circuit's Right-to-Control Doctrine. ....................................................................... 3

        B.    Counts 4–9 Rest Entirely on the Now-Abrogated Right-to-Control Theory. ....................................................................... 7

        C.    Counts 4–9 Must Be Dismissed. ............................................................... 8

    II.    Counts 4, 6, 7, and 9 Impermissibly Seek to Apply U.S. Law to Extraterritorial Conduct. ....................................................................... 10

        A.    The Wire Fraud Charges Are Impermissibly Extraterritorial. ................. 11

        B.    The Bank Fraud Charges Are Impermissibly Extraterritorial................... 17

        C.    The RICO Conspiracy Count Must Be Narrowed to Exclude These Impermissibly Extraterritorial Predicate Acts. .......................................... 20

CONCLUSION................................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Page(s)

*Abitron Austria GmbH v. Hetronic Int'l, Inc.,*
   600 U.S. 412 (2023)..................................................................................................12, 14, 17

*Bascunan v. Elsaca,*
   927 F.3d 108 (2d Cir. 2019)............................................................................ *passim*

*Ciminelli v. United States,*
   598 U.S. 306 (2023)........................................................................................ *passim*

*Cleveland v. United States,*
   531 U.S. 12 (2000)....................................................................................................3

*Eur. Cmty. v. RJR Nabisco, Inc.,*
   764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016)..........................11

*Kelly v. United States,*
   590 U.S. 391 (2020)..................................................................................................4

*McNally v. United States,*
   483 U.S. 350 (1987)...............................................................................................3, 4

*Neder v. United States,*
   527 U.S. 1 (1999).....................................................................................................9

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.,*
   572 F. App'x 60 (2d. Cir. 2014) .....................................................................11, 12, 13

*RJR Nabisco, Inc. v. Eur. Cmty.,*
   579 U.S. 325 (2016)..........................................................................................10, 11, 21

*United States v. Binday,*
   804 F.3d 558 (2d Cir. 2015).......................................................................................5

*United States v. Carlo,*
   507 F.3d 799 (2d Cir. 2007).......................................................................................5

*United States v. Halkbank,*
   2020 WL 5849512 (S.D.N.Y. 2020)......................................................................19, 20

*United States v. Mermelstein,*
   487 F. Supp. 2d 242 (E.D.N.Y. 2007) ........................................................................3

*United States v. Napout,*
   963 F. Supp. 2d 163 (2d Cir. 2020) ..........................................................................15

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007)...............................................................................3

*United States v. Rossomando*,
144 F.3d 197 (2d Cir. 1998)...............................................................................5

*United States v. Scully*,
108 F. Supp. 3d 59 (E.D.N.Y. 2015) ..................................................................3

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007)..............................................................................7, 8

*United States v. Sidorenko*,
102 F. Supp. 3d 1124 (N.D. Cal. 2015) ............................................................11

*United States v. Stavroulakis*,
952 F.2d 686 (2d Cir. 1992).........................................................................9, 17

*United States v. Thomas*,
274 F.3d 655 (2d Cir. 2001)...............................................................................3

*United States v. Wallach*,
935 F.2d 445 (2d Cir. 1991)...............................................................................1

*United States v. Weisberg*,
2011 WL 4345100 (E.D.N.Y. 2011)..................................................................2

*Worldwide Directories v. Yahoo! Inc.*,
2016 WL 128987 (S.D.N.Y 2016)....................................................................14

*United States v. Yates*,
16 F.4th 256 (9th Cir. 2021) .............................................................................10

*United States v. Zarrab*,
2016 WL 6820737 (S.D.N.Y. 2016)............................................................19, 20

**Statutes**

18 U.S.C. § 1341 .................................................................................................3

18 U.S.C. § 1343 .............................................................................................3, 9

18 U.S.C. § 1344 .......................................................................................3, 9, 17

**Other Authorities**

Andrew R. Johnson, *5 Things on Dollar Clearing and BNP Paribas*, The Wall
Street Journal (June 30, 2014), https://tinyurl.com/yfwyvyrk ..............................15

Hong Kong Monetary Authority, *Assessment of US Dollar CHATS against the Principles for Financial Market Infrastructure*, 4 (June 2016), https://tinyurl.com/46taybk4 ...........................................................................................................15

Defendant Huawei Technologies Co., Ltd. ("Huawei") respectfully moves for an order dismissing Counts 4–9 of the Third Superseding Indictment ("S3 Indictment") because those counts—the full set of sanctions-related wire and bank fraud charges—rest on a right-to-control theory that was invalidated last year by the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). In addition, Counts 4, 6, 7, and 9 are impermissibly extraterritorial and must be dismissed for that reason as well.

## **PRELIMINARY STATEMENT**

Until last year, Second Circuit precedent considered it criminal fraud under the federal mail, wire, and bank fraud statutes for an individual to engage in a scheme or artifice to deprive a victim of the "right to control" its money or property through "the withholding or inaccurate reporting of information that could impact on economic decisions." *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991). This was true even though the perpetrator otherwise had no objective to deprive the victim of money or property. But recently, the Supreme Court overruled "the Second Circuit's longstanding 'right to control' theory of fraud." *Ciminelli v. United States*, 598 U.S. 306, 308 (2023). Specifically, per the Supreme Court: "[T]he wire fraud statute reaches only traditional property interests. The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest. Accordingly, the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 316.

Counts 4–9 of the S3 Indictment—which constitute all of the bank and wire fraud counts relating to the alleged scheme to defraud financial institutions—must be dismissed because they rest on this now-rejected right-to-control theory. The government alleges that Huawei made three categories of misrepresentations to several banks for the purpose of influencing the banks to continue their relationships with Huawei and continue selling their banking services to Huawei: (1) misrepresenting Huawei's relationship with a company called Skycom that operated in Iran;

(2) misrepresenting Huawei's compliance with U.S. sanctions laws; and (3) misrepresenting to a particular U.S. bank the reason why Huawei's relationship with a prior bank ended. Even accepting those allegations as true, nobody disputes that Huawei intended to—and did—pay the banks exactly what the banks charged for their services. By the S3 Indictment's own terms, therefore, all Huawei is accused of doing through its supposed misrepresentations is depriving the banks of information that, had they known it, would allegedly have factored into their decision about whether to sell their services to Huawei. *See, e.g.*, S3 Indict. ¶¶ 71, 75. While this may have been a valid prosecution theory when the fraud charges were initiated in 2018, the Supreme Court's subsequent decision in *Ciminelli* now forecloses this theory.

In addition, Counts 4, 6, 7, and 9 fail for the independent reason that they charge a purely extraterritorial scheme to defraud. Those counts concern statements by non-U.S. citizens to non-U.S. citizens, made outside of the United States, relating to Huawei's business in non-U.S. markets. The S3 Indictment does not allege the involvement of a single U.S. person in any of these counts, nor does it allege that money or property in the United States was an intended or anticipated object of the scheme. Indeed, the only connection between these charges and the United States is that the government has chosen to bring this case in a U.S. court. Second Circuit precedent is clear that the federal fraud statutes do not police such purely foreign transactions. Therefore, even if these counts survive *Ciminelli*, they should be dismissed because U.S. law does not reach the conduct alleged.

## LEGAL STANDARD

An indictment must set forth facts that, if "taken as true, are sufficient to establish a violation of the charged offense." *United States v. Weisberg*, 2011 WL 4345100, at *1 (E.D.N.Y. 2011). If a charge within an indictment "fails to allege each material element of the offense, it fails to charge that offense" and should therefore be dismissed. *United States v. Thomas*, 274

F.3d 655, 665 (2d Cir. 2001) (en banc). Further, a charge in an indictment may be dismissed in part, to the extent one or more theories advanced by the government fail to state an offense. *See, e.g.*, *United States v. Mermelstein*, 487 F. Supp. 2d 242, 256–59 (E.D.N.Y. 2007). In considering a motion to dismiss, the court must "accept all the factual allegations in the indictment as true," but should not "look beyond the face of the indictment [or] draw inferences as to proof to be adduced at trial." *United States v. Scully*, 108 F. Supp. 3d 59, 117 (E.D.N.Y. 2015). Additional allegations made outside the complaint, such as in a bill of particulars, "cannot save an invalid indictment." *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007).

## ARGUMENT

I.    **Counts 4–9 Are Based on a Right-to-Control Theory of Property Fraud that Has Now Been Abrogated by *Ciminelli v. United States*.**

A.    **The Supreme Court Has Rejected the Second Circuit's Right-to-Control Doctrine.**

In a series of decisions dating back nearly 40 years, the Supreme Court has consistently rejected creative attempts by prosecutors to expand the federal fraud statutes to cover depriving victims of interests beyond what the statutes actually protect: "money or property." 18 U.S.C. §§ 1341, 1343; *see also* 18 U.S.C. § 1344 ("moneys, funds, credits, assets, securities, or other property"). In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court rejected the notion that the wire fraud statute prohibited "schemes to … deprive individuals, the people, or the government of intangible rights" like the right to honest services. *Id.* at 358. Thereafter, in *Cleveland v. United States*, 531 U.S. 12 (2000), the Supreme Court held that although a state-issued video poker license might be property in the hands of the licensee, a scheme to corrupt the licensing process and thereby deprive the state of its control over the issuance of such a license did not deprive the state of property. More recently, in *Kelly v. United States*, 590 U.S. 391 (2020), the Supreme Court held that a scheme by public officials to reallocate the traffic lanes on

the George Washington Bridge as political payback against a disfavored local mayor might have involved the *use* of some money or property—as anything will—but it did not violate the federal fraud statutes because money or property was not the *object* of the scheme. *Id.* at 402 (holding "property must play more than some bit part in a scheme" and instead "must be an object of the fraud").

Despite these clear instructions from the Supreme Court, the Second Circuit "unmoored" itself from this line of precedent and clear text of the fraud statutes—and from the rulings of many of the other circuits, *Ciminelli*, 598 U.S. at 313–15 & n.3 (describing circuit split)—by creating yet another exception from the requirement that obtaining money or property must be the object of a fraud scheme. Specifically, in a line of cases that espoused what came to be known as the "right to control" theory of fraud, the Second Circuit held that deception aimed merely at influencing the economic decisions of a supposed victim, without the object of depriving that victim of money or property, was federal fraud.

Starting in 1991 in *Wallach*—shortly "after *McNally* prevented the Government from basing federal fraud convictions on harms to intangible interests unconnected to property"—a theory was "developed by the Second Circuit … hold[ing] that, since a defining feature of most property is the right to control the asset in question, the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *Id.* at 313 (cleaned up). The central tenet of this theory was that "the concrete harm contemplated by the defendant" to be guilty of fraud did not need to be to obtain (or deprive the victim of) any traditional property, but only "to deny the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions" involving those assets. *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998).

4

The Second Circuit adhered to this theory of fraud over the course of three decades, in a string of decisions that upheld fraud convictions even though the defendant did not set out to obtain money or property from any victim. For example, in *United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007) (per curiam), the Second Circuit upheld the conviction of a real estate financing broker who "gave false and misleading information to real estate developers about the status of funding he was trying to arrange for them in the hope that they would continue their projects, at great risk and expense, while he pursued an ever-dwindling chance of actually securing funding." *Id.* at 802. According to the Second Circuit, "[b]y causing the developers to make economic decisions about the viability of their real estate projects based on misleading information, [the defendant] harmed the developers' property interests." *Id*. Similarly, in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015), the Second Circuit affirmed the convictions of insurance brokers who procured life insurance policies on strangers as an investment—a type of transaction that the insurance companies, although paid what they asked for the policies, claimed they would not have engaged in with the defendants if they were aware of who would own the policy. *Id.* at 565. The Second Circuit held that if a defendant's "deceit affected the victim's economic calculus or the benefits and burdens of" a transaction, that deprived the victim of the right to control its assets and violated the federal property fraud statutes. *Id.* at 569–71.[1]

---

[1] The effect of the right-to-control doctrine was, in anyone's analysis, to lessen the government's burden as to the money-or-property element in fraud cases. As the Department of Justice's Office of the Solicitor General candidly admitted in distancing itself from the doctrine during oral argument before the Supreme Court in *Ciminelli*: "[I]t's, to be perfectly candid … an easier way for courts or potentially prosecutors just to get at … some of these things because, if you just say right to control or deprivation of economic information is enough, maybe it's a slightly easier route to prove to a jury. …. But … it is possible for that theory to encompass too much." Oral Argument Tr. 60, *Ciminelli v. United States*, No. 21-1170 (Nov. 28, 2022); *see also id.* at 61 (Justice Kavanaugh noting that the government's affinity for right-to-control theory was that "it's easier to convict people").

*Ciminelli* expressly abrogated this line of cases. Considering the conviction of a general contractor and his co-conspirators who schemed to obtain through deception—and then to perform—development contracts awarded by a state-funded nonprofit, the Supreme Court observed that "[t]he Second Circuit affirmed the convictions based on its longstanding right-to-control precedents, holding that, by rigging the [requests for proposal] to favor their companies, defendants deprived [the nonprofit] of potentially valuable economic information." *Ciminelli*, 598 U.S. at 311 (cleaned up). The Supreme Court reversed. Returning once again to the core principle that a conviction under federal property fraud statutes requires a scheme to obtain or deprive a victim of "traditional property interests," the Supreme Court held: "The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest. Accordingly, the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 316. Although Ciminelli had engaged in deception to cause the supposed victim to enter into a business relationship with his company to build a $750 million project, *id.* at 310, tricking a victim into entering a relationship was not a scheme to obtain a traditional property interest, and treating it as federal fraud would "vastly expand[] federal jurisdiction" and make "almost any deceptive act … criminal," *id.* at 315.[2]

---

[2] This summer, the U.S. Supreme Court granted certiorari to address the Department of Justice's latest effort to expand the federal fraud statutes beyond their meaning. In *Kousisis v. United States*, the Supreme Court will address whether "a scheme to induce a transaction in property through deception, but which contemplates no harm to any property interest, constitutes a scheme to defraud under the federal wire fraud statute." Br. of Pet'r at i, *Kousisis v. United States,* No. 23-909 (Aug. 19, 2024). The Second Circuit, though, has already answered this question in the negative. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (wire fraud statute "can not apply to situations where the alleged victims received exactly what they paid for").

### B.    Counts 4–9 Rest Entirely on the Now-Abrogated Right-to-Control Theory.

Counts 4 through 9 of the S3 Indictment—which charge violations of and conspiracies to violate the wire fraud statute (Counts 6 and 9) and the bank fraud statute (Counts 4, 5, 7, and 8)—are based on the now-abrogated right-to-control theory. Those counts, which are based on factual allegations set forth at paragraphs 64 through 86 of the S3 Indictment under the heading "The Scheme to Defraud Financial Institutions," charge that Huawei deceived various banking partners in one or more of the following three ways:

- By "repeatedly misrepresenting … that, although HUAWEI conducted business in Iran, it did so in a manner that did not violate applicable U.S. law," when "[i]n reality, HUAWEI conducted its business in Iran in a manner that violated applicable U.S. law." S3 Indict. ¶ 71; *see also*, *e.g.*, *id.* ¶¶ 76–77.

- By falsely telling the banks that media "allegations regarding HUAWEI's ownership and control of SKYCOM"—a company that serviced Huawei products in Iran— "were false." *Id.* ¶ 75; *see also*, *e.g.*, *id.* ¶¶ 76–77.

- By making misrepresentations to a prospective banking partner "regarding the reason for the termination of [Huawei's] relationship with [a prior] Financial Institution … and the party responsible for the termination, claiming that HUAWEI, not [the prior] Financial Institution … had initiated the termination." *Id.* ¶ 84.

But the S3 Indictment does not allege or identify *any* traditional property interest that Huawei allegedly sought to obtain or to deprive the banks of through this deception. Instead, the harm resulting from each category of misrepresentation is expressly alleged to be that, if the banks had known the truth, they would have reevaluated their banking relationship with Huawei. *See id.* ¶ 71 ("Had the Victim Institutions known about HUAWEI's repeated violations of [U.S. sanctions law], they would have reevaluated their banking relationships with HUAWEI, including their provision of U.S.-dollar and Euro clearing services to HUAWEI."); *id.* ¶ 79 ("Based in part on the false representations … Financial Institution 1 continued its banking relationship with HUAWEI and its subsidiaries and affiliates"); *id.* ¶ 85 ("Had the defendants told U.S. Subsidiary 4 the truth about Financial Institution 1's decision to terminate its

relationship with HUAWEI, U.S. Subsidiary 4 would have reevaluated its relationship with HUAWEI and its subsidiaries and affiliates.").

This is unmistakably a right-to-control theory. The S3 Indictment does not allege that Huawei attempted to obtain any property from the banks or deprive the banks of any traditionally recognized property interest; *e.g.*, by not paying full value for the services the banks provided. Rather, consistent with right-to-control fraud as it existed in the Second Circuit when the original Indictment was brought in 2018, the S3 Indictment alleges that Huawei deprived the banks of the "right to valuable economic information needed to make discretionary economic decisions" about whether to keep doing business with Huawei as a paying customer. *Ciminelli*, 598 U.S. at 316.[3]

### C.    Counts 4–9 Must Be Dismissed.

Because Counts 4 through 9 allege a right-to-control theory of fraud, and that theory has been abrogated by the Supreme Court, they must be dismissed. As to Counts 6 and 9, which charge conspiracy to commit wire fraud and wire fraud, *Ciminelli* is directly controlling. *Ciminelli* was, itself, a wire fraud case. *Ciminelli*, 598 U.S. at 309 ("[W]e now hold that the right-to-control theory is not a valid basis for liability under § 1343.").

---

[3] The S3 Indictment alleges several other acts of deception beyond the three mentioned above— for example, that Huawei lied about its supposed business in North Korea. S3 Indict. ¶¶ 80–82. As to these, the S3 Indictment offers no theory of harm *at all*—*i.e.*, not even that these misrepresentations deprived the banks of information relevant to evaluating their relationship with Huawei. Thus, the allegations seem to have been included for prejudicial value alone, rather than as part of any charged fraud scheme; to wit, to suggest that Huawei was generally deceptive, even where no fraudulent objective is alleged. In any event, since no objective is alleged at all— much less a traditional property objective—these other alleged misrepresentations cannot support these counts. *See*, *e.g.*, *Shellef*, 507 F.3d at 107 (holding that the government "is *required to allege* that the defendant contemplated actual harm that would befall victims due to his deception in order to meet the 'scheme to defraud' prong" of the fraud statutes) (emphasis added).

Likewise, although Counts 4, 5, 7, and 8 charge conspiracy to commit bank fraud and bank fraud, the result is no different. "Congress modeled the bank fraud statute upon the mail and wire fraud statutes," *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992); *see also Neder v. United States*, 527 U.S. 1, 20–21 (1999) ("The bank fraud statute … was modeled on the mail and wire fraud statutes"), and the language of the wire and bank fraud statutes is nearly identical.[4] For that reason, courts have held that all three federal fraud statutes carry a money-or-property requirement, and have therefore rejected the same right-to-control theory as a basis for bank fraud. *See United States v. Yates*, 16 F.4th 256, 264–66 (9th Cir. 2021) (rejecting right-to-control prosecution under bank fraud statute because mail, wire, and bank fraud statutes all require scheme to deprive the victim of "money or property").

Indeed, the Supreme Court made this conclusion clear in *Ciminelli*, saying, "[T]he right-to-control theory cannot form the basis for a conviction *under the federal fraud statutes*," 598

---

[4] *Compare* § 1343 (numbered brackets added):

> Whoever, having devised or intending to devise any scheme or artifice [1] to defraud, or [2] for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

*With* § 1344:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

U.S. at 316 (emphasis added), and that applies in full force to the bank fraud statute. Accordingly, because Counts 4, 5, 7, and 8 charge bank fraud and conspiracy to commit bank fraud based on the recently abrogated right-to-control theory of fraud, they too must be dismissed.

In sum, the Supreme Court's *Ciminelli* decision requires that Counts 4 through 9 be dismissed.

## II.    Counts 4, 6, 7, and 9 Impermissibly Seek to Apply U.S. Law to Extraterritorial Conduct.

Four of the fraud related charges must also be dismissed for the independent reason that they are impermissibly extraterritorial. "It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). Applying that premise, the Second Circuit has squarely held that wire fraud and bank fraud are not extraterritorial offenses, *i.e.*, they do not reach conduct that is predominantly foreign. That rule requires the dismissal of several wire fraud and bank fraud counts in this case because they allege foreign conduct that is, at most, only incidentally connected to the United States.

Counts 4, 6, 7, and 9 are the fraud and conspiracy counts relating to Huawei's alleged scheme to defraud financial institutions with respect to (1) its relationship with Skycom and (2) its compliance with U.S. sanctions.[5] In asserting these charges, however, the S3 Indictment

---

[5] Counts 5 and 8 concern Huawei's supposed false statements during meetings and correspondence with a U.S. bank about how Huawei's relationship with a prior bank ended, for the alleged purpose of expanding Huawei's relationship with the U.S. bank. *See* S3 Indict. ¶¶ 83–86, 101–02, 107–08. Huawei is not moving to dismiss those two counts on extraterritoriality grounds.

identifies no statement that Huawei made within the United States, that Huawei made from outside the United States to a person in the United States, or even that Huawei made from outside the United States to any American individual or American entity located anywhere. Because a foreign defendant's statement made overseas to foreigners about a foreign company operating in a foreign country lacks any meaningful connection to the United States, the government's allegations are an impermissible attempt to "rule the world." *See, e.g.*, *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1125 (N.D. Cal. 2015) (dismissing fraud counts on extraterritoriality grounds). Accordingly, 4, 6, 7, and 9 must be dismissed. And to the extent the RICO Conspiracy charged in Count 1 relies on these same allegations as predicate acts, that count must be narrowed as well. *See RJR Nabisco*, 579 U.S. at 339.

### A.    The Wire Fraud Charges Are Impermissibly Extraterritorial.

**1.**    The wire fraud statute "do[es] not indicate an extraterritorial reach" and therefore reaches only "domestic" schemes. *Bascuñan v. Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019); *see also Eur. Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016). A wire fraud scheme is domestic only where two requirements are satisfied. First, the scheme must involve the use of "domestic" wires. *Id.* Where the "use of wires d[oes] not reach or pass through the United States," the wire cannot establish a domestic offense. *Sidorenko*, 102 F. Supp. at 1127. Second, those domestic wires must be "a core component of the scheme to defraud" alleged in the indictment; domestic wires that are "merely incidental" to the alleged scheme are insufficient to establish a domestic offense. *Bascuñan*, 927 F.3d at 122 (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 416 (2018)).

Courts in this circuit have strictly policed this boundary. For example, in *Petroleos Mexicanos v. SK Engineering & Construction Company*, the Second Circuit affirmed the dismissal of a civil RICO wire fraud predicate despite allegations of some domestic contacts. 572

F. App'x 60, 61 (2d Cir. 2014). The case involved a foreign conspiracy against a foreign victim conducted by foreign defendants participating in foreign enterprises that nonetheless had multiple domestic contacts: the foreign defendants obtained financing in the United States, transmitted seven false invoices for over $159 million via facsimile through New York, and made payments through a trust in New York. *Id.* The court rejected those domestic contacts, finding them "minimal" relative to the broader scheme, which was not "directed from (or to) the United States." *Id.*

The Supreme Court recently rejected the notion that a domestic law could apply to foreign conduct based solely on the domestic *effect* of that conduct—and that is so even if the domestic effect was *intended*. *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 421–28 (2023). In *Abitron*, the Court applied that principle to the Lanham Act—a non-extraterritorial statute, like the wire and bank fraud statutes—reasoning that an effects-based approach "would give the [statute] an untenably broad reach that undermines [the] extraterritoriality framework." *See id.* at 424–25. The Court held that domestic *conduct*—not a domestic *effect*—is always a prerequisite for a violation of a non-extraterritorial statute. *See id.* at 425 ("[C]ourts do not need to determine a statute's focus when all conduct regarding the violations took place outside the United States.") (cleaned up). The majority rejected the view (endorsed by four Justices) that the Lanham Act applies to foreign acts of trademark infringement based on the domestic confusion brought about by those foreign acts, which ultimately caused the relevant goods to travel through domestic commerce. *See id.* at 437 (Sotomayor, J., concurring in the judgment). As in *Abitron*, absent domestic conduct, the alleged wire and bank fraud charges here are impermissibly extraterritorial, regardless whether the charged conduct had any domestic effect.

**2.** Counts 6 (conspiracy to commit wire fraud) and 9 (wire fraud) allege a fundamentally foreign scheme to obtain financial services, in which foreign defendants are alleged to have sent exclusively foreign wires for the purpose of obtaining banking services that had no necessary connection to the United States. To begin, the defendants charged in these counts are foreign entities and persons. S3 Indict. ¶¶ 1, 4–5. The S3 Indictment alleges not a single communication made by any defendant within the United States related to these counts. For example, the S3 Indictment alleges that Huawei Tech (located in China) issued statements denying certain claims in newspaper articles. S3 Indict. ¶¶ 73–74. The S3 Indictment does not allege that Huawei Tech issued those statements in or aimed them at the United States. The S3 Indictment further alleges, in vague terms, that Huawei Tech made misrepresentations to financial institutions and the public—but again, the S3 Indictment contains no allegation that Huawei Tech made those communications in the United States, nor does it identify any communication by any Defendant to any American bank. S3 Indict. ¶ 75. Finally, the S3 Indictment alleges that Huawei's chief financial officer met with and made misrepresentations to a representative of Financial Institution 1, a foreign bank. The government has acknowledged that meeting took place in Hong Kong. S3 Indict. ¶¶ 76–77; *see* Gov't Opp'n to Mot. for Bill of Particulars, Ex. A at 9, Dkt. 209. None of these allegations comes close to establishing that the purported "scheme was directed from (or to) the United States." *Petroleos*, 572 F. App'x at 61.

Apparently recognizing that these purely foreign wires and activities are beyond the ambit of U.S. law, the government attempts to ground its jurisdiction in sparse allegations relating to three types of supposed domestic wires. But, as discussed below, these alleged domestic wires are facially irrelevant to the offenses charged—by their own description, they are both "minor" and "peripheral" to the alleged scheme to fraudulently obtain banking services,

*Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, 2016 WL 1298987, at \*10 (S.D.N.Y. 2016)—and, in any event, the charged defendants did not send, cause to be sent, or receive these alleged wires. Nor is *any* domestic conduct relevant to these charges alleged.

The government's theory for why the alleged conduct here constitutes a domestic violation of the wire fraud statute is entirely inconsistent with *Abitron*. There, the Supreme Court held that a defendant could not violate a non-extraterritorial statute through foreign conduct even if the defendant could have *expected* that its foreign acts would cause a domestic effect, and even if protecting against that effect was Congress' principal concern in the statute at issue. *Abitron*, 600 U.S. at 425. Here, the government does not even allege that the charged defendants *expected* their foreign acts to trigger any use of U.S.-based wires or banks—instead, the government's theory is that the defendants' alleged foreign conduct *incidentally* led to use of domestic infrastructure. Allowing these charges to go forward on such a theory would restore the ill-advised view of extraterritoriality that *Abitron* rejected. And doing so would permit "almost any claim involving exclusively foreign conduct [to] be repackaged as a 'domestic application.'" *Id.*

***Retransmission of Statements to Foreign Press.*** The S3 Indictment alleges that press statements (a press release and a statement to Reuters denying wrongdoing) that Huawei allegedly made from outside the United States were subsequently retransmitted by *others* to the United States. *See* S3 Indict. ¶¶ 104, 110; *see also* Gov't Opp'n to Mot. for Bill of Particulars at 17, Dkt. 209 (explaining that Huawei made allegedly false "statements in the news" and those "news articles containing Huawei's misstatements were disseminated to the United States by wire") (citing S3 Ind. ¶ 74). The government seems to contend that this makes an otherwise foreign scheme something that can be prosecuted in the United States. This Court should reject that argument, which would give the wire fraud statute an essentially unlimited geographic

14

scope. If merely responding to the foreign press were sufficient to establish a domestic offense, then essentially every foreign activity of any interest to the media would fall within the reach of the statute. The Second Circuit has explicitly warned against broadening the wire fraud statute such that "incidental domestic wire transmissions" may be used to "haul essentially foreign allegedly fraudulent behavior into American courts." *United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020).

***Dollar-Clearing Wires.*** The government further alleges that financial transactions in dollars that Huawei executed from outside the United States with counter-parties also located outside the United States involved intermediate wires connected to the transaction that the processing banks routed through the United States. *See* Gov't Opp'n to Mot. for Bill of Particulars at 17–18, Dkt. 209. But those domestic wires were facially incidental to the alleged scheme. Dollar-clearing (converting a foreign currency payment into dollars) is not intrinsically a U.S. domestic activity. Foreign entities and their foreign banks need not involve a U.S. bank to complete that conversion. Foreign banks can and frequently do make use of well-established foreign dollar clearinghouses, such as those located in Hong Kong, Singapore, and the Philippines.[6] Indeed, the only entity the S3 Indictment identifies as having engaged in any dollar-clearing for Huawei—Financial Institution 1, *see* S3 Indict. ¶ 72—was, during the relevant period, the operator of a dollar clearinghouse in Hong Kong, where most of the relevant transactions were initiated.[7]

---

[6] Andrew R. Johnson, *5 Things on Dollar Clearing and BNP Paribas*, The Wall St. J. (June 30, 2014), https://tinyurl.com/yfwyvyrk.

[7] Hong Kong Monetary Authority, *Assessment of US Dollar CHATS against the Principles for Financial Market Infrastructure*, 4 (June 2016), https://tinyurl.com/4k3nu7u3.

Moreover, it is the *bank* that chooses where dollar-clearing takes place, absent express direction from the customer, which is not alleged here. Put simply, Huawei could have accomplished the transactions in question without causing the use of any domestic wires, and the S3 Indictment contains no allegation that Huawei was aware that domestic rather than foreign dollar-clearing services would be involved, made any effort to seek such domestic services, or had any motive to do so. Again, under the Second Circuit's wire fraud case law, the bank's choice to use U.S. wires for certain transactions therefore cannot transform an otherwise foreign scheme into a domestic one.

***Retransmission of Statements to Financial Institutions.*** Although the S3 Indictment alleges generally that Huawei made false statements to financial institutions, it does not allege that Huawei made any of those false statements in the United States or made them to individuals and entities in the United States. Instead, the S3 Indictment alleges that certain of Huawei's statements made outside the United States to individuals and entities outside the United States were then retransmitted over domestic wires in the United States. As the government put it in its bill of particulars briefing, Huawei CFO's "misrepresentations to [Financial Institution 1] caused email and other electronic communications at the financial institutions propagating these statements, including in the United States." *See* Gov't Opp'n to Mot. for Bill of Particulars at 17, Dkt. 209.

These statements are incidental for substantially the same reasons articulated above. Any domestic connection arises not from the charged defendants using domestic wires, but only through the conduct of others in retransmitting the statements. And the retransmission of statements to the United States was itself "peripheral" to the scheme's core objectives: because the involvement of U.S. banks in the dollar-clearing services was incidental, any wire

16

communications that accompanied that incidental involvement must also be incidental. *Cf. Abitron*, 600 U.S. at 416–17, 425–26 (goods traveling from abroad to the United States and causing downstream effect of domestic confusion was insufficient to implicate a non-extraterritorial statute).

**B.     The Bank Fraud Charges Are Impermissibly Extraterritorial.**

Count 7, alleging bank fraud, and Count 4, alleging a conspiracy to commit bank fraud, are similarly impermissible extraterritorial applications of the domestic bank fraud statute.

**1.**     Like the wire fraud statute, the bank fraud statute, 18 U.S.C. § 1344, "does not purport to apply to extraterritorial conduct." *Bascunan*, 927 F.3d at 124; *accord Stavroulakis*, 952 F.2d at 694 (noting that bank fraud statute's definition of "financial institution" is limited to U.S. banks). An indictment for bank fraud must therefore allege a domestic application of the statute.

As in the wire fraud context, a domestic application of the bank fraud statute requires that the conduct relevant to the focus of the statute occur domestically. In *Bascunan*, the Second Circuit explained that a course of conduct amounts to domestic bank fraud "when a core component of the scheme to defraud was the use of domestic mail or wires to direct the theft or misappropriation of property located within the United States and held by a domestic bank." 927 F.3d at 124. Thus, three domestic features of the conduct in *Bascunan* were relevant to finding a domestic application: (1) use of domestic wires (the means); (2) property held by a domestic bank (the victim); and (3) property located in the United States (the funds). Finally, as with wire fraud, it is not enough for *some* relevant conduct to occur domestically. The domestic conduct must be a "core component of the scheme to defraud." *Id.*

**2.**     Counts 4 and 7 must be dismissed as impermissible extraterritorial applications of the bank fraud statute because the S3 Indictment fails to allege that *any* conduct relevant to the

scheme occurred domestically. The S3 Indictment describes a fraud carried out abroad, by foreign defendants, against a foreign bank. The crux of the alleged scheme is a conversation between Huawei's CFO and a representative of Financial Institution 1. S3 Indict. ¶¶ 76–77. But that conversation took place abroad, the Huawei CFO is a foreign person, Huawei is a foreign company, and the person to whom the CFO spoke was a foreign person who represented a foreign bank. The supposed purpose of that scheme was to obtain continued international banking services from that foreign bank.

None of the domestic features of the scheme identified in *Bascunan*—(1) use of domestic wires (the means); (2) property held by a domestic bank (the victim); or (3) property located in the United States (the funds)—are present here. The charged defendants did not (1) use U.S. wires or (2) communicate with a domestic bank. Instead, according to the S3 Indictment, Huawei's CFO communicated directly with a representative of Financial Institution 1 while both were abroad. As to (3)—property located in the United States—as explained in the first section of this Motion, the alleged scheme was not directed at obtaining property at all, *supra* § I.; per the government's allegations, the purpose of the scheme was to deprive a foreign bank of its right to control whether to use its foreign assets in service of a banking relationship with Huawei. It thus necessarily does not involve property located in the United States.

Moreover, even the dollar-clearing transaction services underlying the alleged right-to-control theory do not demonstrate domestic conduct central to the scheme. Non-U.S. defendants paid non-U.S. banks to process payments to non-U.S. entities that were made in exchange for services performed outside the United States. That the payments were ultimately routed through the United States was not part of the charged defendants' plan and was not within their control; the banks—not the charged defendants—decided how to route the transactions.

The fact that the government has alleged that the victim of this scheme was a U.S. bank does not change the analysis because that bank's role was, as charged, not a "core component" of the scheme. *Bascunan*, 927 F.3d at 124. To be sure, if an otherwise foreign dollar-clearing scheme to defraud is *designed* to involve U.S. banks, that domestic conduct might provide for a permissible domestic application. That sort of scheme was at issue in *United States v. Halkbank*, 2020 WL 5849512 (S.D.N.Y. 2020), *aff'd sub nom. United States v. Turkiye Halk Bankasi*, 16 F.4th 336 (2d Cir. 2021), *aff'd in part, rev'd in part*, 598 U.S. 264 (2023), and *United States v. Zarrab*, 2016 WL 6820737 (S.D.N.Y. 2016). Those cases, which both arose from the same set of underlying facts, involved a scheme to take Iranian oil and gas proceeds held at Halkbank and launder them through front companies so that they could be used to make international payments on behalf of Iran. In that scheme, the involvement of U.S. banks was a key feature of the scheme's design—the government alleged that those defendants "knew that these U.S.-dollar transactions on behalf of and for the benefit of Iranian entities and the Government of Iran would be processed by U.S. financial institutions." *See* Gov't Surreply to Mot. for Bail at 8, *Zarrab*, 1:15-cr-867, Dkt. 28 (citing Indict. ¶ 14). Further, the government alleged that Zarrab "knew that U.S. banks would block his transactions if the Iranian nexus were revealed, and, in fact, sometimes did block his transactions." *Zarrab*, 2016 WL 6820737, at *7 (citations omitted). In other words, the allegation was that the scheme was designed for the purpose of deceiving U.S. financial institutions, making the involvement of domestic banks a "core component" of the ultimate scheme to defraud.[8] Conversely, where, as here, there is no allegation of any intent to

---

[8] To the extent the Court disagrees with this distinction, Huawei respectfully submits that *Halkbank* and *Zarrab* were wrongly decided because they impermissibly expand what counts as a "core component of the scheme" to render conduct "domestic." *See Bascunan*, 927 F.3d at 124. In *Halkbank*, the court lumped its analysis of the bank fraud charge together with the IEEPA and

(*continued on next page*)

obtain funds from the United States or otherwise involve U.S. banks, the involvement of domestic banks is not a core component of the scheme and the application of the bank fraud statute to the alleged conduct is extraterritorial not domestic. Again, in *Abitron*, too, U.S. consumers were the victims of the foreign acts at issue. That was insufficient there, and it is insufficient here.

Indeed, a contrary rule would unjustly expand the reach of the government's prosecutorial power. Prosecutors could drag non-U.S. persons operating abroad into federal court based solely on their use of the U.S. dollar as a transaction currency, even though they have no contacts in the United States or with any U.S. persons, and they had no involvement in directing how those transactions were routed. The fact that a U.S. bank may be incidentally involved at some point down the payment chain is insufficient to sustain such charges.

### C. The RICO Conspiracy Count Must Be Narrowed to Exclude These Impermissibly Extraterritorial Predicate Acts.

The RICO conspiracy alleged in Count 1 of the S3 Indictment must be narrowed because the impermissibly extraterritorial application of the bank and wire fraud statutes in connection with Counts 4, 6, 7, and 9 means those alleged offenses likewise cannot serve as predicates for the charged RICO conspiracy. In *RJR Nabisco*, the Supreme Court held that criminal RICO, set out in 18 U.S.C. § 1962(a)–(c), "applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." 579 U.S. at

---

money laundering charges. *Halkbank*, 2020 WL 5849512, at *6–7. But the focus of the bank fraud statute is the location of the fraud, not where services were allegedly directed to or from or the movement of property. And *Zarrab* does not even address extraterritoriality in the context of bank fraud. 2016 WL 6820737, at *8–10. If either case is read to hold that an entirely foreign transaction, which later in the chain involves dollar-clearing services due to a foreign bank's decision, counts as sufficient domestic conduct for bank fraud, that runs afoul of the binding *Bascunan* framework.

339. Therefore, if a particular statute does not apply extraterritorially, then conduct committed abroad is not "indictable" under that statute and so cannot be included in a RICO prosecution as part of an alleged pattern of racketeering activity. *Id.* The same is true for a RICO conspiracy. *See Bascunan*, 927 F.3d at 125 (applying the same analysis to the RICO violation and RICO conspiracy counts); *RJR Nabisco*, 579 U.S. at 341 ("assum[ing] without deciding that § 1962(d)'s extraterritoriality tracks that of the provision underlying the alleged conspiracy").

Because Counts 4, 6, 7, and 9 represent impermissible extraterritorial applications of domestic statutes, the conduct charged in those counts cannot establish a RICO conspiracy. Accordingly, Count 1 should be narrowed to exclude those alleged predicate acts.

## CONCLUSION

For the foregoing reasons, Huawei respectfully requests that the Court dismiss Counts 4–9 of the Third Superseding Indictment.

Dated: November 8, 2024

Respectfully submitted,

/s/ Douglas A. Axel
Douglas A. Axel
Michael A. Levy
Jennifer Saulino
Daniel Rubinstein
Ellyce R. Cooper
Frank Volpe
Melissa Colón-Bosolet
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
Tel.: 212-839-5300
Email: daxel@sidley.com

/s/ David Bitkower
David Bitkower
Matthew S. Hellman
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
Tel: 202-639-6048
Email: dbitkower@jenner.com

*Counsel for Huawei Technologies Co., Ltd.*