NJM:CF/AAS/MJC
F. #2017R05903

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

HUAWEI TECHNOLOGIES CO., LTD., ET AL.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>UNDER SEAL</u>

18-CR-457 (S-4) (AMD)


**GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' MOTION TO EXCLUDE
OR LIMIT THE TESTIMONY OF THE GOVERNMENT'S PROPOSED EXPERTS**


| | | |
|---|---|---|
| JOSEPH NOCELLA, JR.<br>United States Attorney<br>Eastern District of New York | MARGARET A. MOESER<br>Chief<br>Money Laundering, Narcotics<br>and Forfeiture Section<br>Criminal Division<br>U.S. Department of Justice | CHRISTIAN NAUVEL<br>Acting Chief<br>Counterintelligence and Export<br>Control Section<br>National Security Division<br>U.S. Department of Justice |
| ALEXANDER A. SOLOMON<br>MEREDITH A. ARFA<br>ROBERT M. POLLACK<br>MATTHEW SKURNIK<br>MATTHEW F. SULLIVAN<br>Assistant U.S. Attorneys<br>(Of Counsel) | TAYLOR G. STOUT<br>MORGAN J. COHEN<br>JASMIN SALEHI FASHAMI<br>Trial Attorneys | CHRISTOPHER FENTON<br>Trial Attorney |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD .......................................................................................................... 1

ARGUMENT........................................................................................................................ 2

I.    ███████ Proposed Expert Testimony Is Admissible................................................. 2

    A. ███████ Is Qualified to Testify About OFAC Compliance Programs ................... 3

    B. ███████ Will Provide Background, Not Legal Conclusions ................................. 5

    C. Expert Testimony About the Defendants' Licensing History Is Proper ..................... 7

    D. Testimony About North Korean Sanctions Is Relevant ............................................... 8

II.    ███████ and ███████ Proposed Expert Testimony Is Admissible.................. 10

    A. Factual Background.................................................................................................... 10

    B. ███████ Does Not Intend to Offer an Impermissible Legal Conclusion .............. 13

    C. ███████ Will Not Offer State-of-Mind Testimony ................................................ 13

    D. ███████ Opinions Are Proper Subjects of Expert Testimony ............................. 15

III.    ███████ Proposed Expert Testimony Is Admissible.......................................... 16

IV.    ███████ Proposed Expert Testimony Is Admissible................................. 19

CONCLUSION.................................................................................................................... 23

i

## TABLE OF AUTHORITIES

**Cases**

*Bancor Grp. Inc. v. Rodriguez*,
No. 22-CV-20201-GAYLES/TORRES, 2023 WL 6310233 (S.D. Fla. June 13, 2023) ............ 6

*In re Bittrex, Inc.*,
674 B.R. 271 (D. Del. 2025) ................................................................................................... 6

*Cacciola v. Selco Balers, Inc.*,
127 F. Supp. 2d 175 (E.D.N.Y. 2001) ................................................................................... 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ............................................................................................................ 1, 2

*Highmark Dig., Inc. v. Casablanca Design Ctrs., Inc.*,
No. 18-CV-6105 (SJO) (JPR), 2020 WL 2114940 (C.D. Cal. Mar. 26, 2020) ...................... 18

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) ................................................................................................... 6

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .......................................................................................................... 15, 16

*Liberty Mut. Ins. Co. v. Day to Day Imps. Inc.*,
No. 22-CV-02181 (AT) (RFT), 2025 WL 2117897 (S.D.N.Y. July 29, 2025) ...................... 6

*Life Spine, Inc. v. Aegis Spine, Inc.*,
No. 19-CV-7092, 2023 WL 2933044 (N.D. Ill. Apr. 13, 2023) ....................................... 14, 17

*In re M/V MSC FLAMINIA*,
No. 12-CV-8892 (KBF), 2017 WL 3208598 (S.D.N.Y. July 28, 2017) ................................. 20

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
593 F. Supp. 2d 549 (S.D.N.Y. 2008) ................................................................................... 15

*Ramirez v. Trans Union, LLC*,
No. 12-CV-632 (JSC), 2017 U.S. Dist. LEXIS 80636, (N.D. Cal. May 25, 2017) .................... 5

*Scentsational Tech., LLC v. Pepsi, Inc.*,
No. 13-CV-8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ............................ 13, 20

*In re Terrorist Attacks on September 11, 2001*,
No. 03-MD-1570 (GBD) (SN), 2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023) ........................ 5

*United States v. Amuso*,
21 F.3d 1251 (2d Cir. 1994) ................................................................................................... 4

ii

*United States v. Banki*,
No. 10-CR-08 (JFK), 2010 WL 1875690 (S.D.N.Y. May 10, 2010) ........................................ 6

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) .............................................................................. 5, 6, 7

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2002) ...................................................................................... 8

*United States v. Jin*,
No. 23-CR-91 (CKK) (D.D.C. July 29, 2025)......................................................... 5, 7

*United States v. Offill*,
666 F.3d 168 (4th Cir. 2011) ................................................................................. 6, 7

*United States v. Parasmo*,
--- F.4th ---, 2026 WL 1391995 (2d Cir. May 19, 2026)....................................... 14, 16

*United States v. Pena*,
No. 21-CR-176 (AMD), 2024 WL 4132379 (E.D.N.Y. Sept. 9, 2024) ..................................... 2

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007) ...................................................................................... 2

*United States v. Won*,
No. 18-CR-184 (RJD) (E.D.N.Y.) ............................................................................. 8

*ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*,
No. 17-CV-6788-FPG, 2023 WL 3558214 (W.D.N.Y. May 19, 2023) ....................... 13, 14, 17

**Rules**

Fed. R. Evid. 403 ............................................................................................................ 9

Fed. R. Evid. 701 .......................................................................................................... 15

Fed. R. Evid. 702 ........................................................................................... 1, 2, 5, 13, 15

Fed. R. Evid. 704 ........................................................................................................ 7, 14

## PRELIMINARY STATEMENT

The government respectfully submits this opposition to the defendants' motion to exclude or limit the testimony of certain of the government's proposed expert witnesses, namely ████████████████████████████████████████████. (ECF No. 706.)

At trial, the government plans to call several expert witnesses to educate the jury about complex topics relating to factual issues in dispute. The government's experts will offer opinions based on their superior knowledge, skill, and experience in the fields of sanctions compliance, integrated circuitry, software development, and cellular antennas, among others. The government will seek to make a tailored and efficient trial presentation that limits the amount of time experts testify to that which is required to provide the jury with the necessary background and context.

The defendants do not seriously dispute the qualifications of the government's experts or the relevance of their opinions. Instead, the defendants move to limit the scope of the government's proposed expert testimony by targeting testimony and opinions that are clearly proper and necessary to assist the jury to understand the evidence relating to the charged crimes charged. Moreover, the defendants rely on misplaced concerns and overstate claims of potential prejudice. For all these reasons, the Court should deny the defendants' motion.

## LEGAL STANDARD

An expert may be permitted to testify if he or she is qualified, reliable, and helpful. Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court charged district courts with a gatekeeping role with respect to expert testimony. 509 U.S. 579, 597 (1993). This inquiry is "guided" by Federal Rule of Evidence 702, *Daubert* 509 U.S. at 595-98, under which courts have discretion to admit expert testimony when: "(a) the expert's scientific, technical,

1

or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."   Fed. R. Evid. 702.

The twin requirements for the admissibility of expert testimony are evidentiary reliability and relevance.   *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 597).   With respect to reliability, the Court must focus on the methodology or reasoning employed by application of the factors in Rule 702 and the non-exhaustive lists of factors set forth in *Daubert*, namely: "'(1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.'"   *United States v. Pena*, No. 21-CR-176 (AMD), 2024 WL 4132379, at *2 (E.D.N.Y. Sept. 9, 2024) (quoting *Williams*, 506 F.3d at 160-61) (cleaned up).   With respect to relevance, the Court must determine whether the proffered testimony "is sufficiently tied to the facts of the case and whether it will aid the jury in resolving a factual dispute."   *Daubert*, 509 U.S. at 591.

## ARGUMENT

I. ███████████ **Proposed Expert Testimony Is Admissible**

The Fourth Superseding Indictment alleges defendant Huawei Technologies Co., Ltd. ("Huawei") violated OFAC-administrated sanctions against Iran; conspired to impede OFAC's enforcement of U.S. sanctions; and lied to banking partners and Congress about its

2

business in sanctioned countries like Iran and North Korea and compliance with OFAC-administered sanctions. (*See, e.g.*, ECF No. 689 ¶¶ 59-79.)

At trial, the government intends to call an OFAC official—███████—whose testimony would help the jury understand how the sanctions relevant to this case generally work, including how sanctions are promulgated, enforced, and excepted through licenses. (*See* Ex. A (█████ expert disclosure).)

█████, a 13-year OFAC veteran, is the ████████████████ in OFAC's Compliance Division. (*Id.* at 4.) OFAC's Compliance Division is generally responsible for helping the private sector comply with OFAC-administered sanctions by, among other things, setting standards for OFAC compliance programs and providing guidance. ██. ████ specific responsibilities include supervising the OFAC Compliance Division teams that respond to sanctions compliance queries about OFAC-administrated sanctions, including from U.S. and foreign financial institutions. (*Id.*) █████ also works closely with U.S. and foreign financial institutions to provide guidance on sanctions compliance questions, including banking operations, correspondent banking, and compliance interdiction processes. (*Id.*)

The defendants do not seriously question █████ qualifications nor the relevance of his proposed expert testimony. Rather, they only seek to limit the scope of the opinions he offers at trial. The defendants' arguments lack merit and should be rejected.

**A.      █████ Is Qualified to Testify About OFAC Compliance Programs**

The defendants argue █████ lacks the expertise necessary to opine about financial institutions' OFAC compliance programs. (ECF No. 706 at 5.) According to the defendants, █████ lacks the expertise to testify about how financial institutions establish and maintain OFAC compliance programs because he does not have experience working as a bank officer. (*Id.*) The defendants further argue that, for the same reason, he cannot testify about

3

whether and how financial institutions' OFAC compliance programs rely on the information provided to financial institutions by their clients.   (*Id.*)

The defendants are mistaken.   ████████ possesses the level of superior knowledge, experience, education, and skill required to help the jury understand evidence relating to financial institutions' OFAC compliance programs: he is one of the experts to whom bank officers turn with their questions about how to structure internal controls to comply with OFAC-administered sanctions.   (*See* Ex. A at 4.)   Among other things, bank officers consult him about compliance interdiction processes, which are internal controls that rely on information provided to financial institutions by their clients to detect and stop suspicious transactions.   ████████ is qualified to testify as an expert about establishing and maintaining financial institutions' OFAC compliance programs, including about how such programs rely on the information provided to financial institutions by their clients; he would be assisting the jury to understand the same types of matters about which he advises bank officers.

The sole case on which the defendants rely, *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994), is inapposite.   In *Amuso*, the Second Circuit rejected the defendant's assertion that a law enforcement agent's expert testimony was used to improperly bolster the government witnesses' versions of events, where he "testified about a broad range of topics including common cosa nostra terminology necessary to explain tape recorded evidence, and the existence and structure of New York crime families—topics . . . previously . . . held to be proper subjects of expert opinion."   *Id.* at 1263-64.   Here, the proposed testimony would assist the jury in understanding the regulatory framework underpinning the victim bank witnesses' testimony about their OFAC compliance programs.

**B.** ████████ **Will Provide Background, Not Legal Conclusions**

At trial, the government will ask ████████ to explain how the sanctions relevant to this case generally work, including the relevant prohibitions against persons engaging in certain transactions or other dealings with Iran and North Korea and related requirements. (*See generally* Ex. A.) Such opinions are the proper subject of expert testimony because, among other things, they will "help [the] jury understand unfamiliar terms and concepts" in an otherwise complex case. *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (allowing the government's expert to testify about the requirements under certain federal securities laws and regulations). For this reason, courts permit parties to introduce expert testimony concerning regulatory prohibitions and requirements in cases involving OFAC sanctions and other federal regulatory regimes and programs. *See, e.g.*, *United States v. Jin*, No. 23-CR-91 (CKK), Mem. Op. and Order at 8-9 (ECF No. 125) (D.D.C. July 29, 2025) (allowing the government's sanctions expert to testify about the prohibitions and requirements under OFAC's North Korean Sanctions Regulations because "[t]his testimony will help the jury perform their role by informing them of the complex regulatory landscape at issue"); *In re Terrorist Attacks on September 11, 2001*, No. 03-MD-1570 (GBD) (SN), 2023 WL 3116763, at *28 (S.D.N.Y. Apr. 27, 2023) ("OFAC-related expert testimony has been admitted in other terrorism cases, and the Court will allow it here."); *Ramirez v. Trans Union, LLC*, No. 12-CV-632 (JSC), 2017 U.S. Dist. LEXIS 80636, at *4 (N.D. Cal. May 25, 2017) (permitting expert testimony regarding financial industry practices and OFAC requirements).

The defendants incorrectly claim such opinions qualify as impermissible legal conclusions. (ECF No. 706 at 7-8.) But this testimony will provide the jury with important context about how sanctions work, not with legal conclusions about whether the defendants violated them. Accordingly, this type of background information falls squarely within the scope of Federal Rule of Evidence 702 and thus would be the proper subject of expert testimony. *See,*

5

*e.g.*, *Bilzerian*, 926 F.2d at 1294 (allowing the government's expert to testify about the requirements under the federal securities laws where he did not give his opinion on whether the defendant's actions violated the federal securities laws).[1]

████████████ proposed testimony is entirely different from the testimony that courts excluded in the OFAC-related cases on which the defendants rely. *See, e.g., United States v. Banki*, No. 10-CR-08 (JFK), 2010 WL 1875690, at *4 (S.D.N.Y. May 10, 2010) (excluding expert witness opinion on whether the defendant "willfully violated" the International Economic Emergency Powers Act and OFAC regulations); *In re Bittrex, Inc.*, 674 B.R. 271, 295 (D. Del. 2025) (excluding expert witness opinion that the debtor "violated" OFAC regulations). The defendants also rely on *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) , and *Liberty Mut. Ins. Co. v. Day to Day Imps. Inc.*, No. 22-CV-02181 (AT) (RFT), 2025 WL 2117897 (S.D.N.Y. July 29, 2025) , but neither case concerns sanctions.

The defendants claim it would be impermissible for ████████ to opine that OFAC regulations prohibit a non-U.S. person from causing a U.S. bank to process dollar clearing transactions involving Iran. (ECF No. 706 at 8.) The cases on which the defendants rely say otherwise. *See Bilzerian*, 926 F.2d at 1294 ("The mere use of hypotheticals does not usurp the jury's function of applying the law to the facts of the case.") "It is well established that experts

---

[1] Even assuming *arguendo* that some aspects of ████████ proposed testimony did qualify as a legal conclusion (which they do not), the Court still should permit him to opine on these topics because his testimony will nonetheless assist the jury to understand a regulatory landscape that will be new to the jury. *See Bancor Grp. Inc. v. Rodriguez*, No. 22-CV-20201-GAYLES/TORRES, 2023 WL 6310233, at *28-29 (S.D. Fla. June 13, 2023) ("We find that the immensely complicated nature of the sanctions regime against the Venezuelan government justifies giving [the plaintiff's sanctions expert] some leeway to opine on the legal effect of the OFAC licenses at issue in this case, and so we decline to strike the testimony of a legal expert simply because his legal analysis yields a legal conclusion." (citing *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011))).

6

may offer opinions based on hypothetical questions proposed by the attorneys questioning them." *Offill*, 666 F.3d at 177 (affirming district court's discretion to allow the testimony of two government experts who gave opinions on the scope and meaning of certain legal terms and standards, including the meaning of the term "underwriter," criteria for securities registration, criteria for when investors can sell shares, and related issues). "Such testimony would be admissible even though the hypothetical question[] mirrored the defendant's conduct, subject of course to the limitations that the witness not testify as to the defendant's 'intent,' as precluded by Rule 704(b)." *Id.* (citing *Bilzerian*, 926 F.2d at 1294).

### C.      Expert Testimony About the Defendants' Licensing History Is Proper

At trial, ▮▮▮▮▮ will describe the licensing requirements and application process employed by OFAC.  (*See* Ex. A.)  He will also testify regarding the defendants' licensing history and will authenticate OFAC records, confirming that OFAC did not grant licenses to the defendants to export, sell, or supply, directly or indirectly, financial services or any other goods, technology, or services, including to Iran or North Korea.  (*Id.*)  It would be appropriate—and an efficient use of judicial resources—for ▮▮▮▮▮ to testify about the defendants' licensing history because he can explain how he conducted the search of OFAC's licensing database and provide context around the results.  *Jin*, Mem. Op. and Order (ECF No. 125 at 9-10) (permitting an OFAC official to testify as an expert about the defendant's licensing history, including whether the defendant "ever obtained a specific license from OFAC to export or re-export any item or service to North Korea").

The defendants further argue that ▮▮▮▮▮ should not be permitted to testify about the defendants' licensing history and that, if he is, then he should be required to testify as a fact witness.  (ECF No. 706 at 8-9.)  They claim allowing him to present straightforward factual material under the mantle of expertise would create "significant risk" that the jurors would grant

7

undue weight to his testimony.  (*Id.*)  The defendants' concerns are misplaced and overstated: there is no meaningful possibility that having ▉▉▉▉▉ testify about how he searched OFAC's licensing database will grant undue weight to the result, which is a simple, undisputed matter of fact.

Not surprisingly, the primary case on which the defendants rely—*United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2002) —concerns a very different scenario where a testifying case agent also functioned as a testifying expert for the government.   Unlike in *Dukagjini*, where the case agent conducted an entire investigation that potentially could be shrouded in an aura of special reliability because of his designation as an expert, ▉▉▉▉▉ would have merely conducted a search of a single electronic database, done in anticipation of his trial testimony.  Moreover, it is standard practice for experts to provide certain undisputed facts (here, the defendants' licensing history) about which they have direct knowledge by dint of the same employment that provides their expertise.  *See, e.g.*, *United States v. Won*, No. 18-CR-184 (RJD) (E.D.N.Y.) (ECF No. 155 at 2) (denying motion to exclude testimony of expert witness who provided an overview of a regulatory scheme and who "authenticate[d] records showing the registration history for the various individuals and entities at issue in th[e] case, including the defendant").

### D.      Testimony About North Korean Sanctions Is Relevant

The Fourth Superseding Indictment alleges Huawei lied to banking partners and Congress about its business in sanctioned countries, including specifically North Korea.  (ECF No. 689 ¶¶ 57, 61, 66, 77-79.)   Specifically, the Fourth Superseding Indictment alleges Huawei's banking partners asked Huawei about its business presence in North Korea to better understand the risk, both reputational and legal, in processing the Huawei's transactions.  (*Id.* ¶ 77.)   Huawei lied in response. (*See id.* ¶ 78.)   The Fourth Superseding Indictment further alleges that, for

internal documents referencing business dealings in sanctioned countries like North Korea, Huawei used coded language to conceal its involvement.  (*Id.* ¶¶ 66, 79.)

The defendants argue that, because the Fourth Superseding Indictment does not allege that Huawei violated U.S. sanctions against North Korea, then any testimony about such sanctions should be excluded as irrelevant and prejudicial.  (ECF No. 706 at 9-10.)  This argument fails.  Expert testimony about how U.S. sanctions against North Korea generally work is necessary for the jury to understand Huawei's motive for lying to its banking partners about its business in North Korea.   It is also important background to understand why a financial institution that was trying to manage reputational and legal risks would ask a company (like Huawei) about its activities in sanctioned countries (like North Korea).  Expert testimony about U.S. sanctions against North Korea is also probative of materiality, which is an element of the fraud counts charged in the indictment; such evidence renders it more likely that the information about which Huawei lied would be important to the financial institutions with which Huawei did business.

The defendants' Rule 403 concerns (*see* ECF No. 706 at 9-10) do not substantially outweigh the probative value of expert testimony about U.S. sanctions against North Korea. Providing background that aids the jury in its deliberations about whether Huawei lied to its banking partners and to Congress about its business in North Korea would not, as the defendants suggest, create confusion and inflame passions.   To the contrary, the context is critical to help the jury frame and understand the government's North Korea-related evidence.

For the foregoing reasons, the Court should deny the defendants' motion and allow ████████ to provide the full scope of expert testimony noticed in his expert disclosure.

**II.** ████████ **and** ████████ **Proposed Expert Testimony Is Admissible**

Relying on parallel arguments, the defendants improperly seek to limit the scope of the expert testimony of ██████ and ████████, respectively, regarding a co-conspirator's misuse of a victim's technology.   The Court should reject these arguments.

### A. Factual Background

As alleged in the Fourth Superseding Indictment, Huawei used ████████ of Xiamen University as a proxy to obtain information about the proprietary technology of ████ ████ ("████") (████████ and ████ are identified in the Fourth Superseding Indictment as the "Professor" and "Company 6," respectively).

In or about December 2016, Huawei and ████████ entered into a contract calling for ████████ to develop prototype software for memory hardware.   That same month, ████████ contacted ████ seeking access to a prototype board containing ████'s proprietary chip (the "Board") for research purposes.   At no time did ████████ disclose to ████ the existence of his contract or his relationship with Huawei.   (ECF No. 689 ¶ 49.)

████ agreed to license a Board to ████████ in February 2017 pursuant to a written licensing agreement (the "Agreement").   ████ would not have agreed to provide a Board to ████████ had ████████ disclosed the existence of his relationship with Huawei, because Huawei was a direct competitor of ████ in the field of memory architecture.   (*Id.* ¶ 50.) In the Agreement, ████████ and ████ agreed that ████████ would not be allowed to (1) directly or indirectly transfer rights in or usage of the Board to third parties; (2) modify or create derivative works based on the Board; and (3) the disclose, divulge or publish the Board and its underlying technology.   (*Id.* ¶ 51.)



After receiving the Board from ████, █████████ provided Huawei with performance results of his testing of the Board.   This information would have assisted in Huawei's efforts to reverse engineer ██████ proprietary technology.   (*Id.* ¶ 54.)

In or about May 2017, █████████ informed ██████ that his team had accidentally damaged the Board.   Photographs provided by █████████ to ██████ revealed that the U34 chip and the R493 and R494 resistors on the Board, as well as the J4 connector, had been detached from the Board.   No wiring had been originally attached to either component, and in the photographs, neither the U34 chip nor the J4 connector were attached to any wiring.   As revealed by electronic messages, █████████ first tried unsuccessfully to have ██████ service the Board before later coordinating directly with multiple engineers at Huawei, including at least one engineer with expertise in memory hardware, who took possession of the Board and resoldered the U34 chip and the R493 and R494 resistors.   Electronic messages further reveal that Huawei attached wiring to both the U34 chip and the J4 connector before returning the Board to █████████.   When █████████ eventually returned the Board to ██████ in 2019 (during litigation between ██████ and Huawei), ██████ personnel observed that the U34 chip and the R493 and R494 resistors had been resoldered to the Board, and that both the Board's U34 chip and the J4 connector bore green wiring that had not been originally included on the Board and were not present in █████████ photographs of the damaged Board.

In their expert disclosures, █████████ and █████████ both explain the underlying technology of the Board and offer their opinions (based on their expertise with soldering and integrated circuits in █████████ case and with ██████ specific technology in █████████) regarding the alterations of the Board (based on the available physical evidence, including █████████ photographs of the Board and the Board itself).

11

Based on his experience in soldering, board rework, work with integrated circuits, and review of the physical evidence, ▓▓▓▓ (whom the government has retained as an expert) offers the expert opinions that (1) the U34 chip was "professionally and intentionally removed, rather than inadvertently detached," where the Board "does not exhibit indicia of accidental damage that would be expected if the damage in fact were accidental"; (2) based on the contrast between the soldering of the U34 chip and the R493 and R494 resistors on the Board and that of the other components, the U34 chip and the R493 and R494 resistors were "intentionally removed and then manually re-soldered to the Board"; (3) the J4 connector was either intentionally removed or detached as a result of heat used to manipulate the U34 chip; (4) "accessing the ▓▓▓▓ board's [J4] interface was unrelated to testing the [B]oard's . . . software and storage efficiency; (5) the "only purpose for accessing the U34 chip on the ▓▓▓▓ board would have been to access the J[4] interface, which in turn would have provided access to the [B]oard's [application-specific integrated circuit or] ASIC; and (6) "accessing the ASIC through the J[4] would have been the simplest way to reverse engineer the ASIC and would have saved significant research and development time and costs for a potential competitor developing a similar product."  (Ex. B ¶¶ 10-15 (▓▓▓▓ expert disclosure).)  ▓▓▓▓ further opines that the Board's implementation of ▓▓▓▓ intellectual property, including "multiple patents involving, among other functions, error correction, interfaces to components on the [B]oard, and the ability to use a host computer-based [flash translation layer]," constituted a trade secret.  (*Id.* ¶ 6.)

Based on his experience working with the applicable technology, ▓▓▓▓ (who was a ▓▓▓▓ executive at the time of the Agreement) offers the expert opinions that (1) accessing the Board's J4 interface was unrelated to the testing of the Board's functionality permitted under the Agreement, and (2) the only conceivable reason to access the J4 interface would be to access

12

the Board's ASIC for the purpose of reverse-engineering ███████ proprietary ASIC technology. (Ex. C ¶¶ 9-10 (███████ expert disclosure).)

**B.     ███████ Does Not Intend to Offer an Impermissible Legal Conclusion**

As an initial matter, the government does not intend to elicit ███████ testimony regarding whether the ████ technology misappropriated by ███████ and Huawei constituted a "trade secret," to avoid having ███████ offer a legal conclusion, although the government does plan to elicit facts that support that conclusion.   That said, the remainder of his proposed testimony would not only be admissible but also helpful to the jury.

In explaining the functionality and originality of ███████ architectural design as encompassed in the Board, ███████ testimony would help the jury understand "how unique or valuable [████]'s technology [was] within the industry."   *Scentsational Tech., LLC v. Pepsi, Inc.*, No. 13-CV-8645 (KBF), 2018 WL 1889763, at *7 (S.D.N.Y. Apr. 18, 2018); *see ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, No. 17-CV-6788-FPG, 2023 WL 3558214, at *4 (W.D.N.Y. May 19, 2023) ("The factors underlying the ultimate legal determinations of whether information is a trade secret . . . has occurred are appropriate subjects of expert testimony.").   At bottom, the testimony would provide the jury with the technical foundation without which the jury cannot intelligently apply the law to the facts.   That is precisely what Rule 702 contemplates.

**C.     ███████ Will Not Offer State-of-Mind Testimony**

███████ expert conclusion that the Board was not accidentally damaged, based on his analysis of the damage, does not constitute impermissible state-of-mind testimony.   (ECF No. 706 at 11-12.)

As an initial matter, nowhere in his expert disclosure does ███████ offer any opinion regarding the intent of Huawei or ███████ to misappropriate ████s proprietary

13

technology, or regarding the success of any such illegal scheme.    Nor does ██████ purport to label Huawei or ████████ as "coconspirators"; his expert disclosure does not even refer to Huawei or ██████.    To the contrary, his proposed testimony would help the jury understand the functionality of components of the Board, as well as certain physical characteristics of the Board at various points in time.    This testimony would assist the jury in contextualizing the conduct of Huawei and ██████ in assessing any potential liability.    *See ValveTech*, 2023 WL 3558214, at *4 ("The factors underlying the ultimate legal determinations of whether . . . misappropriation has occurred are appropriate subjects of expert testimony."); *Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19-CV-7092, 2023 WL 2933044, at *7 (N.D. Ill. Apr. 13, 2023) (experts may properly opine as to "dimensional similarities (or differences)" between a plaintiff's device and an alleged "knock-off" device to help the jury determine whether misappropriation has occurred).    Not surprisingly, none of the cases cited by the defense are apposite, as they all pertain to proposed expert testimony about the accused's state of mind.[2]

No more persuasive is the defense's assertion that ██████ methodology is unreliable.    Claiming an absence of "reliable methodology that would permit [██████] to infer intent or to distinguish between intentional removal and other explanations for the condition of the board" (ECF No. 706 at 18), the defendants argue there is a purported analytical gap that renders

---

[2]    Here, as with ██████, the defendants appear to conflate testimony about state of mind—that is, testimony about what someone else was thinking—with testimony about facts from which a jury could infer state of mind.    In the context of a stabbing, an impermissible question might be, "In your expert opinion, did the defendant intentionally stab the victim?"    A permissible question might include, however, "In your expert opinion, are the victim's wounds consistent with having accidentally walked into the knife?"    Certainly, the latter questions bear on the defendant's state of mind, but it is clearly permissible expert testimony.    *See United States v. Parasmo*, --- F.4th ---, 2026 WL 1391995, at *10 (2d Cir. May 19, 2026) ("Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state.    So long as the expert does not expressly state the inference and leaves it, even if obvious, for the jury to draw, his testimony is permissible." (internal quotation marks and citations omitted)).

14

the opinion unreliable.    However, ███████ opinions are appropriately grounded on his inspection of the physical evidence, coupled with "58 years of experience with soldering, board rework, and working with integrated circuits."    (Ex. B at 10); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 563 (S.D.N.Y. 2008) ("Of course, plaintiffs are correct that experts may apply their education, observation and experience in certain contexts and still be found to use a reliable method even without satisfying *Daubert*'s factors."); *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Expert engineering testimony may rest on scientific foundations, the examination of which invokes the *Daubert* factors directly, but may also rest on the personal knowledge or experience of the engineer.").

**D.    ███████ Opinions Are Proper Subjects of Expert Testimony**

As noted by the government during the April 23, 2026 status conference, many of the witnesses for which the government provided expert notice are primarily lay witnesses, and the government does not intend to have the Court qualify them as experts before the jury.    Rather, the government provided notice for such witnesses in an abundance of caution because they arguably may offer specialized opinion testimony within the meaning of Rules 701 and 702.    *See* Fed. R. Evid. 701(c) (precluding lay testimony in the form of an opinion based on "scientific, technical, or other specialized knowledge").    ███████ is one such witness.    As ███████ is a hybrid lay-expert witness whom the government may not qualify as an expert at trial, the government may permissibly elicit both lay and ostensibly specialized opinion testimony from him.

As an initial matter, the government does not contend that testimony about the way ███████ protected its intellectual property constitutes specialized testimony requiring ███████

15

qualification as an expert.    Rather, the government disclosed this proposed testimony, including ███████ views on the prohibitions contained in the licensing agreements, to provide necessary context for ████████ arguably expert opinion regarding ██████████ and Huawei's alterations to the Board.    Similarly, ██████████ recollections that the technology was proprietary and that ██████ considered its design and implementation of firmware to be trade secrets do not constitute improper expert testimony; they are not based on specialized knowledge, training, or expertise and would not be offered as conclusive proof of a legal issue.    Indeed, ██████ will not testify that ██████ technology at issue was a trade secret, but rather that ██████ viewed it as such, after developing and taking measures to protect the technology.

The defendants' arguments that ██████████ would impermissibly offer testimony about intent misfires for the same reasons its identical arguments failed for ██████████.    As with ████████████████ will not opine as to the mental state of Huawei or ████████████.    Rather, ██████████ specialized opinion that the only reason for accessing the J4 connector would be to access the ASIC or for reverse engineering purposes (and would be unrelated to the testing of the Board's functionality) is appropriately based on ██████████ "understanding of the ██████ board's design and functionality," as well as his "education, experience, and training."    (Ex. C ¶ 10); *see Kumho Tire Co., Ltd.*, 526 U.S. at 156. *Cf. Parasmo*, --- F.4th at ---, 2026 WL 1391995, at *10.

## III.        ████████████████ **Proposed Expert Testimony Is Admissible**

The Fourth Superseding Indictment alleges that defendants Huawei and FutureWei Technologies Inc. ("FutureWei") misappropriated the operating system source code for internet routers of ████████████. ("██████") and incorporated that source code into "Quidway" routers that FutureWei sold in the United States.    (ECF No. 689 ¶¶ 16-22.)

At trial, the government will call ████████████—who has 40 years of experience in the computer industry, including research, system design and development, consulting and

16

product development—to assist the jury to understand how software is developed.   (Ex. D at 7 ███████████ expert disclosure).)   He will provide a general explanation of how software is developed, including the creation of source code.   (*Id.* ¶¶ 1-4.)   Based on his experience and his examination of source codes that ███ and Huawei used to develop their respective router software, ████████ will opine that ████ and Huawei source codes contain similarities that would not be expected to result from independently developing the same technology, as well as specific indicia in Huawei's source code files indicating that it was not independently developed.   (*Id.* ¶¶ 5-13.)

The defendants do not challenge ████████ qualifications or the relevance of his testimony.   Rather, they seek to limit the scope of his testimony, including by excluding what they claim are legal conclusions, impermissible mental-state testimony, and inappropriate opinions. (ECF No. 706 at 17-18.)   The defendants' motion should be denied.

To avoid asking ████████ to offer an opinion that qualifies as a legal conclusion, the government will not elicit ████████ opinion about whether Huawei "misappropriated" ████ source code.   Instead, he will testify about the "facts and analysis which lead the jury toward [the] conclusion" that Huawei misappropriated ████ source code.   *ValveTech*, 2023 WL 3558214, at *12.    It is well established that "[t]he factors underlying the ultimate legal determinations of . . . whether misappropriation has occurred are appropriate subjects of expert testimony."   *Id.* at *12 (collecting cases).   The relevant factors an expert may properly analyze include the "similarities" and "differences" between a product and the alleged "knock-off copy." *Life Spine*, 2023 WL 2933044, at *7 (collecting cases).   For example, ████████ will testify that a comparative analysis of ████ and Huawei's source codes indicates that Huawei's ████████ ███████████████████████ ("████") source code was approximately 95% identical to

17

██████████ source code and that this level of identicality (and the specific ways in which the code was identical) is unusual between competitors and would not be expected to result from independently engineering the same technology. (*Compare* Ex. D ¶ 11 *with Highmark Dig., Inc. v. Casablanca Design Ctrs., Inc.*, No. 18-CV-6105 (SJO) (JPR), 2020 WL 2114940, at *28 (C.D. Cal. Mar. 26, 2020) (allowing expert to testify that defendants worked to reverse-engineer plaintiff's software code).)[3]

The defendants also seek to prevent ████████ from offering his opinion about why Huawei would include the word "████"—which is "████" spelled backward—in the comments to the source code for its router software. (ECF No. 706 at 18.) As the Court may be aware, comments are annotations embedded within the source code that are intended for use by human programmers (as opposed to machine compilers and interpreters). Their primary purpose is to help programmers understand the logic, intent, and context of the source code.

According to the defendants, ████████ should not be permitted to offer his expert opinion about the fact that "████" is an anagram for "████," which they contend should be obvious to any juror. (*Id.*) The defendants mischaracterize the nature and purpose of ████████ proposed testimony.

████████ will not simply stop at the observation that "████" is an anagram for "████." Rather, ████████ will draw on his experience in software development to offer expert

_____

[3]    To avoid asking ████████ to offer an opinion about the defendants' state of mind (*e.g.*, questions about what Huawei or its programmers knew, intended, or were trying to do) (ECF No. 706 at 18), the government expects to phrase questions to focus on actions or conduct and the objective results of such actions and conduct, rather than on ████████ interpretation of the intent underlying such actions or conduct. For example, rather than ask whether ████ proprietary headers were "intentionally removed" from Huawei's source code, (*id.*), the government would ask ████████ whether he had an understanding of the practical effect of removing such headers and if so, what that practical effect might be.

18

opinion that will assist the jury to understand the significance of using "███" in multiple comments to the source code (by multiple programmers) by explaining the context in which it was used and to whom the comments were attributed.    As set forth in his expert disclosure:



> ████████ is expected to testify regarding his observation that "████" is an anagram for "████," *i.e.*, "████" spelled backward.  He is expected to explain that the three comments above referencing ████ were made by Chinese programmers on December 27, 1999, and December 29, 1999 (programmer "Dszhao"), and January 17, 2000 (programmer "Lijian").  He also is expected to testify regarding his understanding of the comments. For example, ████████ is expected to testify that, based on his experience, "The following routines are added by dszhao for convience [sic] or to remain code compatibility with old ████ code" was a direction from "dszhao" to future programmers not to change the routines because they were needed to retain code compatibility with the misappropriated ████code.

(Ex. D ¶ 8.)   The defendants also argue it would be improper to opine about whether "████" was used "to avoid detection" because such testimony would speculate as to the coder's motive.   (ECF No. 706 at 18.)   The government could easily avoid inviting any speculation about motive by asking ████████ about his understanding as to the practical effect of using "████" as opposed to "████."[4]

IV.       ████████████  **Proposed Expert Testimony Is Admissible**

████████████ is the government's proffered expert regarding technical issues related to cellular antennas that will be critical to the jury's understanding of Huawei's conspiracy to steal trade secrets — and in particular, Huawei's theft of trade secrets from ████ — as alleged

---

[4]       The defendants also argue it would violate the Confrontation Clause were ████ ████ to base his opinions in this case on the analysis and conclusions of the neutral expert from the prior civil litigation between ████ and Huawei.  (ECF No. 706 at 19-20.)   The Court need not address the merits of the defendants' Confrontation Clause argument, because ████████ expert opinions will be based on his own experiences and examination of ████'s and Huawei's source codes, as well as other bases wholly independent of the neutral expert's analysis and conclusions.  (*See, e.g.*, Ex. D ¶¶ 8, 10-13.)   That is, contrary to the defendants' contention, ████ ████ opinions are not "based on" and do not "repeat, or serve as a conduit for the neutral expert's analyses and conclusions."   (ECF No. 706 at 19.)

in Count Two of the Fourth Superseding Indictment.  ██████████ primary opinions are that: (1) the information related to ████████ ██████████ ("████") technology — the type of cellular antenna technology at issue—that ██████ shared with Huawei beginning in September 2009 was not generally known in the industry at that time; (2) this information was useful and valuable; and (3) Huawei used and disclosed this information.  (*See* Ex. E ¶ 18 (████████ expert disclosure).) The defendants' motion does not dispute ██████████ qualifications or methodologies, but instead seeks to limit certain aspects of his testimony.  (ECF No. 706 at 20-23.)  As discussed below, the government does not intend to elicit improper expert testimony as to the issues raised by the defendants.  However, certain of the defendants' proposed restrictions on ██████████ testimony would improperly prevent him offering expert testimony that would properly aid the trier of fact.

*First*, the defendants argue that the government should not be permitted to use ████ ██████ as a "vehicle to provide a factual narration" regarding ██████ development of ████. (ECF No. 706 at 21 (quoting *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *3 (S.D.N.Y. July 28, 2017))).  The government has no intention of doing so.  But it does not follow that, as the defendants contend, "*[a]ny* testimony regarding ██████ alleged development of [████] is improper."  (ECF No. 706 at 27 (emphasis added).)  An "expert may and often must rely on facts," and may of course explain how facts and documents are "supportive of an opinion."  *Scentsational Techs., LLC*, 2018 WL 1889763, at *4.  Here, for example, ████ ██████ should be permitted to explain the meaning of documents disseminated by ██████ to Huawei pursuant to a nondisclosure agreement—such as reports containing simulation results which showed the benefits of the technology (*see* Ex. E ¶¶ 22-23, 78-83)—to contextualize ██████ progress in developing ████ (and the value to Huawei of these disclosures).  In short, ██████████ should be permitted to explain how certain facts and documents support his expert

20

opinions, including those relating to ███████ development of ███. Such testimony would not amount to improper factual narration.

*Second*, the defendants argue that ████████ should not be permitted to testify as to the defendants' mental states. (ECF No. 706 at 21.) The government does not seek to elicit such improper testimony. The infrequent use of words such as "uncertainty" or "belief" in ███ ████████ expert report do not relate to his view on the defendants' *mens rea* or understanding of events but rather relate solely to his expert opinion regarding the status of Huawei's progress in developing parallel technology (as evidenced in internal Huawei correspondence and documents).

*Third*, the defendants argue that ████████ should not be permitted to offer any of the opinions stated in a reply report that he originally created during ███████ earlier civil litigation against Huawei. (*Id.*) The defendants contend that because the reply report was authored in connection with a different case (the civil litigation), and in response to expert opinions not implicated in this case, the opinions contained therein cannot assist the jury in this case.

████████ civil suit against Huawei alleged the theft of some of the same technology from the same victim, and concerned many of the same underlying facts, as those at issue in Counts Two and Three of the Fourth Superseding Indictment. Many of the opinions stated in ████████ reply report are therefore directly relevant to, and will be helpful to the jury's resolution of, the factual disputes in this case. Among other relevant issues, the reply report addressed whether ███████ technology was well known in the industry at the time it was shared with Huawei in 2009. (*See* Ex. E ¶¶ 30-52.) Specifically, the reply report disputed the defendants' claim that a particular academic paper published in 1999—entitled "Capacity Enhancement of Cellular Mobile Network Using a Dynamic Electrical Down-Tilting Antenna System" (*see id.* ¶ 3)— demonstrated that the technology was well known. (*See id.* ¶¶ 30-41.) Given that Huawei cited

this article in the civil litigation as evidence that the ▮▮ technology was previously well known, and (as ▮▮▮▮ opines) there is a general lack of evidence for that proposition otherwise, it is highly likely that the defendants will again claim that this particular paper demonstrates that the industry was generally aware of ▮ technology.

Moreover, Huawei has noticed its intent to offer expert testimony as to the same issues in this litigation as it did in the prior civil litigation; the reply report responds to this proposed expert testimony. For example, in the defendants' disclosure for ▮▮▮▮—their proffered expert regarding ▮▮-related technical issues—▮▮▮ states that he will opine that ▮ technology was "discussed in the published literature well before 2009 . . . under other names, including 'dynamic beamforming.'" (Ex. F.) This appears to refer to the same 1999 paper that ▮▮▮ discussed in his reply report. Thus, although the reply report was prepared during the civil litigation, ▮▮▮ opinions therein are relevant to issues raised by Huawei in this case and will assist the trier of fact, and ▮▮▮ should be permitted to offer the relevant opinions.[5]

---

[5] Two of the defendants' additional arguments are mooted, but the government believes are worth flagging for the Court.

*First,* the defendants argue that ▮▮▮ should not be permitted to opine on whether ▮▮▮ efforts to preserve the confidentiality of its proprietary ▮▮ technology were sufficient as a matter of law "to keep such information secret" and/or preserve its "independent economic value," 18 U.S.C. § 1893(3). (ECF No. 706 at 22.) This argument is moot, because the government has no intention to elicit such testimony.

*Second*, the defendants argue that ▮▮▮ should not be permitted to opine that ▮▮▮ ▮▮▮ former Chief Technology Officer who invented ▮▮, should have been listed as a co-inventor on the patent filed by a Huawei engineer, ▮▮▮, which misappropriated ▮▮. (ECF No. 706 at 22-23.) To be clear, the government does not intend to elicit opinion testimony on "the nuances of patent inventorship" or whether ▮▮ should have been listed as a co-inventor, but the fact that a Huawei employee claimed sole inventorship on a

## CONCLUSION

For the foregoing reasons, the government respectfully requests the Court deny the defendants' motion to exclude or limit the government's proposed expert testimony.

Dated:        Brooklyn, New York
              June 9, 2026

                                        JOSEPH NOCELLA, JR.
                                        United States Attorney
                                        Eastern District of New York

                              By:       /s/
                                        Alexander A. Solomon
                                        Meredith A. Arfa
                                        Robert M. Pollack
                                        Matthew Skurnik
                                        Matthew F. Sullivan
                                        Assistant United States Attorneys
                                        (718) 254-7000


                                        MARGARET A. MOESER
                                        Chief, Money Laundering, Narcotics and
                                        Forfeiture Section,
                                        Criminal Division,
                                        U.S. Department of Justice

                                        Taylor G. Stout
                                        Morgan Cohen
                                        Jasmin Salehi Fashami
                                        Trial Attorneys


                                        CHRISTIAN NAUVEL
                                        Acting Chief, Counterintelligence and Export
                                        Control Section,
                                        National Security Division,
                                        U.S. Department of Justice

---

patent incorporating trade secrets stolen from ███ is probative of the defendants' conspiracy to steal such trade secrets and is, contrary to defendants' conclusory say-so, "part of this case." (*Id.* at 23.)

23

Christopher Fenton
Trial Attorney

24