UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v. –<br><br>HUAWEI TECHNOLOGIES CO., LTD., *et al.*,<br><br>Defendants. | 18 CR 457 (S-4) (AMD) (JAM)<br><br>UNREDACTED VERSION<br>[redacted] |

**DEFENDANTS HUAWEI TECHNOLOGIES CO., LTD., HUAWEI DEVICE CO., LTD., HUAWEI DEVICE USA INC., AND FUTUREWEI TECHNOLOGIES, INC.'S MOTION AND OBJECTIONS REGARDING TESTIMONY OF RULE 15 WITNESS, [redacted]**


David Bitkower
Matthew S. Hellman
Katya Jestin
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
(202) 639-6048
dbitkower@jenner.com

Douglas A. Axel
Michael A. Levy
Ellyce R. Cooper
Frank R. Volpe
Melissa Colón-Bosolet
Daniel J. Hay
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
(212) 839-5300
daxel@sidley.com

Brian M. Heberlig
Ryan P. Poscablo
Julia Gatto
William L. Drake
Jessica I. Rothschild
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
rposcablo@steptoe.com

*Counsel for Huawei Technologies Co., Ltd., Huawei Device Co., Ltd., Huawei Device USA Inc., and Futurewei Technologies, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. The Court Should Exclude Testimony the Government Elicited Through Improper Hypothetical and Speculative Questioning .......... 3

II. The Court Should Exclude the Client Acceptance Committee Forms and Attachments for Lack of Foundation. .......... 8

A. [redacted] Testimony Does Not Lay a Foundation. .......... 8

B. The Government's Newly Produced Certification Does Not Lay a Foundation. .......... 13

III. The CAC Forms, Attachments, and Related Testimony Include Multiple Levels of Inadmissible Hearsay .......... 15

IV. The Court Should Also Exclude the CAC Forms and Attachments Under Rule 403 .......... 17

V. The Court Should Exclude the Government's Designation of Testimony Elicited by the Presiding Judge .......... 20

CONCLUSION .......... 21

REQUEST FOR SEALING .......... 21

## TABLE OF AUTHORITIES

**CASES**


*Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196 (11th Cir. 1986)........................................

*Berkovich v. Hicks*, 922 F.2d 1018 (2d Cir. 1991) ........................................................................

*Boca Investerings Partnership v. United States*, 128 F. Supp. 2d 16 (D.D.C. 2000)........................

*Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19 (6th Cir. 1984)..............................................

*Cain v. Trans World Airlines, Inc.*, 549 F. Supp. 963 (S.D.N.Y. 1982)..........................................

*Mandal v. City of New York*, No. 02-cv-1234, 2006 WL 3405005 (S.D.N.Y. Nov. 26, 2006) ...............................................................................................................................

*Pearce v. E.F. Hutton Group, Inc.*, 653 F. Supp. 810 (D.D.C. 1987) ............................................

*Quercia v. United States*, 289 U.S. 466 (1933) ...............................................................................

*Reynolds v. American Airlines, Inc.*, No. 14-cv-2429, 2017 WL 6017355 (E.D.N.Y. Dec. 4, 2017).......................................................................................................................

*Rodriguez v. Modern Handling Equipment of New Jersey, Inc.*, 604 F. Supp. 2d 612 (S.D.N.Y. 2009) .........................................................................................................................

*United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-CIV-11117, 2021 WL 4772142 (S.D.N.Y. Oct. 13, 2021)........................................................

*United States v. Chang*, No. 18-cr-681, 2024 WL 3303717 (E.D.N.Y. July 3, 2024) ..........................................................................................................................................

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) .........................................................................

*United States v. Guo*, No. 23-cr-118, 2024 WL 1862022 (S.D.N.Y. Apr. 29, 2024).......................

*United States v. James*, 607 F. Supp. 3d 246 (E.D.N.Y. 2022) .......................................................

*United States v. Massino*, 319 F. Supp. 2d 295 (E.D.N.Y. 2004)....................................................

*United States v. Oates*, 560 F.2d 45 (2d Cir. 1977)..........................................................................

*United States v. Otufale*, 740 F. Supp. 3d 233 (E.D.N.Y. 2024) .....................................................

*United States v. Peraire-Bueno*, No. 24-cr-293, 2025 WL 2753560 (S.D.N.Y. Sept. 29, 2025) ...............................................................................................................................

*United States v. Russo*, 110 F.3d 948 (2d Cir. 1997).......................................................................

*Zaken v. Boerer*, 964 F.2d 1319 (2d Cir. 1992) ....................

**OTHER AUTHORITIES**

Fed. R. Civ. P. 28(b) ....................

Fed. R. Evid. 801(c) ....................

Fed. R. Evid. 802 ....................

Fed. R. Evid. 803(6)(A) ....................

Fed. R. Evid. 803(6)(B) ....................

Fed. R. Evid. 803(6)(C) ....................

Fed. R. Evid. 803(6)(D) ....................

Fed. R. Evid. 803(8)(A)(iii) ....................

Fed. R. Evid. 803(8)(B) ....................

Fed. R. Evid. 805 ....................

Pursuant to the Court's Orders of June 15, 2026 and June 25, 2026, the parties conducted a video-recorded deposition of [redacted] on July 16, 2026. *See* Ex. B (Transcript of July 16, 2026 Deposition of [redacted]). The parties subsequently simultaneously exchanged proposed designations for the deposition testimony they seek to introduce at trial. *See* Ex. C (Parties' Proposed Designations).[1] For the reasons set forth below, the Court should exclude the government's designations identified below and catalogued in the Appendix objecting to the government's proposed designations and exhibits (Ex. A).[2] Should the Court permit the government's designated testimony of [redacted], Huawei should be permitted to offer its own designated testimony as identified in Exhibit C. To the extent the Court denies Huawei's objections and admits any of the exhibits to which Huawei objects, the Court should admit Huawei's conditionally designated testimony as to those exhibits, as identified in the Appendix and Exhibit C.

## INTRODUCTION

A substantial part of the government's designated testimony from [redacted] Rule 15 deposition should be excluded because it rests not on [redacted] personal knowledge, but on speculation, on documents with which he was unfamiliar, and on the inadmissible, out-of-court statements of others.

[redacted] worked in the [redacted] office of [redacted], where, from 2014 to 2016, he was the local multinational-corporate relationship manager. That role brought him into some

---

[1] In the interest of allowing the Court sufficient time to review the briefing in advance of trial, the parties agreed to file simultaneous motions after exchanging designations, forgoing a separate exchange of objections. As a result, Huawei does not know to which of its proposed designations the government will object until the government files its simultaneous brief. If the government objects to Huawei's designated testimony, Huawei will address those objections in its response brief, which the parties have agreed to file on August 31, 2026.

[2] The government's proposed exhibits are attached as Ex. D-1 through Ex. D-22.

contact with Huawei's [redacted] interests, but it left him several steps removed from the conduct at the heart of this case: Huawei's Iran business and relationship with Skycom. Indeed, by [redacted] own testimony, "Skycom" "d[id]n't mean anything" to him. Tr. 137:3–9. Nor was [redacted] meaningfully involved in the Huawei-[redacted] relationship more broadly: in [redacted] own words—it would have been a "sin" for him to contact Huawei's main office directly, Tr. 61:25–62:1, and he was not part of "the decision to continue working with [Huawei]," Tr. 97:14–16.

Because [redacted] lacks personal knowledge of the relevant facts, the government resorted to hypothetical questions—what he would have done had Huawei "lied," and how a bank treats sanctions risk in the abstract (notwithstanding that [redacted] neither worked in compliance nor served on any risk committee). His answers to those speculative inquiries are inadmissible under settled Second Circuit law, which permits hypothetical questioning only of a witness with firsthand involvement in the relevant decision and bars questions that, as here, assume facts not in the record or, worse, assume the defendant's guilt.

The government also seeks to introduce through [redacted] two [redacted] Client Acceptance Committee forms with nearly two dozen attachments. But to place those documents before the jury, the government must establish that they are business records, and [redacted] could not do so. He could not say how, when, by whom, or under what practice these documents were created, compiled, or kept; for many, he could not even confirm that they were what the government represented them to be. A witness who can vouch for none of that cannot lay the foundation required by Rule 803(6).

Further, the forms recite, as though established fact, bare allegations against Huawei drawn from a range of unnamed sources. And they contain layer upon layer of hearsay: statements the

bank attributed to unidentified third parties whom the defense cannot cross-examine, or to unspecified employees of Huawei. The nearly two dozen attachments to those forms compound the problem, because the government offers them not for facts that [redacted] can testify to based on personal knowledge, but for the prejudicial content they contain. The attachments include—among other things—a *Reuters* newspaper article and a report of the House Intelligence Committee accusing Huawei of misconduct having nothing to do with the charges in this case. This is precisely the kind of material that the rule against hearsay and Rule 403 are meant to exclude from a criminal trial.

Finally, the government designated an exchange in which the presiding [redacted] judge—who described himself as an "investigating judge" whose role, by his own account, exceeds that of an American judge—personally questioned [redacted], inviting the jury to give that testimony weight it has not earned. None of this testimony would be admissible were [redacted] to take the stand at trial, and Rule 15 does not make it admissible merely because it arrives by deposition.

The Court should exclude the government's designations identified below and catalogued in the Appendix.

## ARGUMENT

### I. The Court Should Exclude Testimony the Government Elicited Through Improper Hypothetical and Speculative Questioning.

The government's proposed designations of [redacted] Rule 15 deposition rest in substantial part not on what [redacted] knew or personally observed, but upon his speculation based on assumed facts drawn out through improper hypothetical questioning. [redacted] was a relationship manager in the [redacted] office of [redacted] who supported the bank's relationship with Huawei's [redacted] subsidiary; he was not the institutional decisionmaker the government's questions consistently asked him to become, and by his own account he did not

operate with authority, deferring instead to the bank's "middle and . . . back office" and to sources he "d[id]n't have access to." Tr. 33:21–25. Yet across the designated testimony, the government attempted to accomplish two things that the Rules of Evidence prohibit. First, it asked [redacted] to assume the very facts at issue in this case—that Huawei "lied"—and then to speculate about the consequences that the assumed lies supposedly would have produced at the bank. Second, the government asked him to speculate about matters he admitted were outside of his personal knowledge: how [redacted], as an institution, considered certain topics; and what Huawei personnel in China with whom he had no interaction knew and intended. Defense counsel objected throughout. The Court should sustain those objections and exclude the designations identified below and catalogued in the Appendix.

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), precludes this testimony.[3] Under *Cuti*, a witness with firsthand knowledge may testify to what he would have done had he known certain facts. *Id.* at 458–59. But that narrow allowance comes with three limitations, each of which the government's designations disregard.

First, hypothetical questioning can be employed only with witnesses with firsthand involvement in the relevant decision, and the questions must focus on the witness's personal

[3] [redacted]. Courts throughout this circuit likewise adhere to the *Cuti* framework. *See United States v. James*, 607 F. Supp. 3d 246, 261 (E.D.N.Y. 2022) (allowing the government to ask "hypotheticals that fall within the scope permitted by the Second Circuit in *Cuti*" but not those "concerning their views and opinions regarding the 'correctness' or 'accuracy' of [d]efendant's billing"); *United States v. Guo*, No. 23-cr-118, 2024 WL 1862022, at *7 (S.D.N.Y. Apr. 29, 2024) ("The Government may ask witnesses hypothetical questions that fall within the *Cuti* framework if the proper foundation is established."); *United States v. Peraire-Bueno*, No. 24-cr-293, 2025 WL 2753560, at *3 (S.D.N.Y. Sept. 29, 2025) (allowing hypothetical questions to show materiality where such questioning complied with *Cuti*).

perception rather than call for speculation. *Id.* A witness with no involvement in the underlying transaction may not testify how a hypothetical fact would have affected a decision he did not make. *See United States v. Peraire-Bueno*, No. 24-cr-293, 2025 WL 2753560, at *4 (S.D.N.Y. Sept. 29, 2025) (denying government's motion to allow hypothetical questions to show materiality for witnesses who were not personally involved in the underlying transaction during the relevant time). Accordingly, although it could be permissible to ask a member of a bank's risk committee how a given fact might have changed that committee's decision, a relationship manager cannot answer for a committee he was not even a member of, much less had any authority over.

Second, a hypothetical may use only "facts that ha[ve] been independently established in the record." *Cuti*, 720 F.3d at 458. A question that presumes a fact not in the record—still less a contested fact the jury has yet to decide—is improper. *Id.*

Third, hypotheticals must "ma[k]e no assumption of guilt." *Id.* at 460. The *Cuti* trial court "took pains to limit the hypotheticals to the impact of the withheld information and barred the witnesses from speaking to the wrongfulness of the defendants' actions, leaving that analysis to the jury." *Id.* at 461. District courts in this circuit follow suit. *See United States v. Chang*, No. 18-cr-681, 2024 WL 3303717, at *9 (E.D.N.Y. July 3, 2024) (holding inadmissible hypothetical questions "ask[ing] the witnesses to assume guilt of a key aspect of the crimes charged"); *Peraire-Bueno*, 2025 WL 2753560, at *4 ("[T]o the extent 'the proper foundation is established for each question and that the[] questions are posed as hypotheticals without requiring the jury to assume the guilt of the defendant,' they are permitted." (citation omitted)).

Guilt-assuming and speculative hypotheticals are also independently prohibited by Rule 403. Such questions lack probative value because they are "conjectural and speculative, and are prone to being self-serving, subjective, and incapable of effective analysis by cross-examination."

*Cain v. Trans World Airlines, Inc.*, 549 F. Supp. 963, 968 (S.D.N.Y. 1982). And because they assume a hotly contested allegation as fact, they "trench too deeply into the presumption of innocence." *United States v. Russo*, 110 F.3d 948, 952 (2d Cir. 1997). The danger is especially acute with a bank witness, who will feel understandable pressure to answer such questions by extolling his employer's compliance controls and testifying that any incremental, additional hypothetical fact would have made a difference.

The government's designated testimony does not comply with these limitations and should be excluded. Consider first the many guilt-assuming hypotheticals in the designations. The starkest example comes near the end of the direct examination, when the government asked [redacted] to assume that Huawei has "lied" and then to narrate the imagined fallout:

> Q. With respect to Huawei, if you had learned that Huawei had lied to you with respect to its sanctions compliance, what effect, if any, would it have had with respect to the syndicated loan that was approved in 2014?
> MS. JESTIN: Objection. Hypothetical.
> A. So in my opinion there wouldn't be any life any more, it would be exploding immediately if this news would appear at the capital markets in London.

Tr. 99:21–100:4.

That exchange transgresses all of *Cuti*'s core limits. It does not ask [redacted] about *anything* he perceived or knew. Instead, it directs him to assume the central disputed fact of this case—that Huawei "lied"—which is not "independently established in the record" but rather, is the ultimate question reserved for the jury—and then to speculate how events would have unfolded from that hypothetical fact. *Cuti*, 720 F.3d at 458, 460–61. It openly assumes guilt. *Id.* And the answer it produced is precisely the conjectural, self-serving speculation—a loan "exploding immediately"—that Rule 403 exists to police. *Id.* at 458–59; *Cain*, 549 F. Supp. at 968–69.

The government drew from the same improper well earlier in the examination, again instructing [redacted] to assume that Huawei had "lied":

> Q. . . . What would you have done if you discovered that Huawei had lied to you in response to sanctions KYC questions such as those we just summarized in your conversation with [redacted]?
> MS. JESTIN: Objection.
> A. I would personally investigate everything again, but I would also circulate within the bank.

Tr. 53:6–14.

Once more, the question directs the witness to assume the contested fact and then to speculate about what he "would [] have done." That is a textbook guilt-assuming hypothetical, and the untethered answer confirms it. *See Cuti*, 720 F.3d at 460–61.

The government's more generic formulations fare no better. When it asked [redacted] "what would you do if you discovered that clients provided inaccurate information to you in response to compliance questions," Tr. 33:17–19, the witness could only speculate about a process he did not control—explaining that he "d[oes]n't operate alone," that a "middle and [] back office" had "access to sources that [he] do[es]n't have access to," and that he "would discuss the information with these departments." Tr. 33:21–34:4. That answer lays bare the reason the Second Circuit prohibits this mode of questioning: it calls for speculation about how others might act, based on facts not in evidence. *See Cuti*, 720 F.3d at 458–59.

The government did not confine itself to guilt-assuming hypotheticals. It also repeatedly asked [redacted] to speak not for himself but for [redacted] as an institution—a collective state of mind that was not his to report. It asked whether "a client['s] sanctions risk matter[s] to [redacted]," Tr. 34:21; whether "it [was] important to [redacted] that the information provided by Huawei . . . be accurate," Tr. 43:20–22; and whether "the bank must rely on the client to provide it with truthful and accurate information," Tr. 44:10–14. Each is a quintessential question about institutional state of mind, and [redacted] lacked the requisite personal knowledge to answer. As his own responses underscored, he lacked any basis to speak for the bank—qualifying his answers

as merely reflective of his "personal experience," Tr. 35:4–9, or conceding only "I think so," Tr. 44:15.

Compounding the problem, the government asked [redacted] to speculate about what Huawei's personnel in China knew and intended—matters he had no way to perceive or know. When the government pressed whether "Huawei in China was not giving answers," [redacted] candidly acknowledged the speculation the question invited: "This is what I believe, but I don't have the confirmation." Tr. 62:6–9. A witness's professed belief, expressly unmoored from any "confirmation," is the very definition of speculation. The government then sought to convert [redacted] generalized banking "experience" into an invitation for the jury to infer that Huawei's conduct was aberrant, asking [redacted] whether "it [is] normally easy or difficult to get information from a client regarding sanctions." Tr. 62:10–14. That testimony sheds no light on what Huawei actually did—which [redacted] confirmed he did not personally know—and serves only to prejudice the defendant. So too the government's requests that [redacted] opine on whether "Huawei [was] transparent with [him]," Tr. 59:15–17, and characterize his "communications" with Huawei's personnel "in general," Tr. 89:15–16—each of which called for speculation and characterization in place of fact.

In sum, the Court should exclude the hypothetical and speculative testimony the government seeks to introduce. A complete, line-by-line accounting of such testimony is set forth in the Appendix.

## II. The Court Should Exclude the Client Acceptance Committee Forms and Attachments for Lack of Foundation.

### A. [redacted] Testimony Does Not Lay a Foundation.

Through [redacted], the government moved to admit two [redacted] Client Acceptance Committee ("CAC") determination forms—the 2014 CAC form (Ex. D-3: GX-23316-R-1) and

the 2015 CAC form (Ex. D-12: GX-23605-R-1)—together with nearly two dozen attachments, including sanctioned-country questionnaires, an OFAC and export controls due diligence checklist, internal bank emails, news articles, and a House Intelligence Committee Report. *See, e.g.*, Tr. 69:2–4, 76:21–22, 82:9–10, 85:19–20. The defense objected each time on hearsay and foundation grounds. *See* Tr. 69:4, 82:11–14, 85:21–22. Those objections were well founded. These are out-of-court bank documents offered for their truth; to reach the jury they must qualify as records of a regularly conducted activity under Federal Rule of Evidence 803(6), but the government has not laid the foundation Rule 803(6) requires.[4]

To admit a document as a business record under Rule 803(6), the proponent must establish that the document was made "at or near the time" of the events it describes, "by—or from information transmitted by—someone with knowledge," kept in the course of a regularly conducted activity, and made as a regular practice of that activity. Fed. R. Evid. 803(6)(A)–(C). It must establish those conditions "by the testimony of the custodian or another qualified witness," or by a certification that complies with Rule 902(11). Fed. R. Evid. 803(6)(D). The government

[4] The House Intelligence Committee Report is separately inadmissible under Rule 803(8), which governs public investigative reports. That Rule admits "factual findings from a legally authorized investigation" only "in a civil case or against the government in a criminal case"—not, as here, against a criminal defendant. Fed. R. Evid. 803(8)(A)(iii). Nor may the government sidestep that limitation by recasting the report as a business record. *United States v. Oates*, 560 F.2d 45, 66–70 (2d Cir. 1977). And even if Rule 803(8) could reach the report, it would fail the Rule's trustworthiness or "factual findings" requirement, Fed. R. Evid. 803(8)(A)–(B): it is a congressional committee's politically freighted assessment that the bank's own file deemed "non-persuasive in lack of substantial evidence." GX-23605-R-1 at 6. *See, e.g.*, *Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 814 (D.D.C. 1987) ("Given the obviously political nature of Congress, it is questionable whether any report by a committee or subcommittee of that body could be admitted"; excluding House subcommittee report); *Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196, 1199 (11th Cir. 1986) (same; observing "[t]he subcommittee report did not contain the factual findings necessary to an objective investigation, but consisted of the rather heated conclusions of a politically motivated hearing"); *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22–23 (6th Cir. 1984) (same; further noting "[m]uch of" the report consisted of "the Committee's subjective conclusions . . . rather than factual findings").

seeks to carry that burden here through [redacted]—but during his examination, [redacted] could not lay a foundation for the documents the government put before him.

The deficiency is starkest with respect to the 2014 CAC form (Ex. D-3: GX-23316-R-1) and its attachments. [redacted] never testified to basic details about how these documents were made. To the contrary, he admitted he had "[no] role in gathering information" for the 2014 CAC form. And he did not know how the 2014 Client Acceptance Committee functioned, because that work was done by others in another office. *See, e.g.*, Tr. 57:6–7 ("I don't know what happened with my colleagues in [redacted] in China, because I wasn't there."). The most [redacted] could offer was that, in the [redacted], the form "went with a circular" rather than a physical meeting. Tr. 57:8–9. And, in discussing the 2015 CAC form, [redacted] suggested that "the information" in the 2014 form "was done by . . . the pilot banker in China," [redacted]—without further elaboration as to how or when that information was collected by [redacted], transmitted to [redacted], or recorded on the form. Tr. 98:9–13; *see also* Tr. 58:23–25, 59:1–5. Such sparse testimony revealed nothing about whether the form was made contemporaneously by someone with knowledge, or whether making it was the bank's regular practice—as Rule 803(6) requires.

Nor could [redacted] supply a foundation for the one CAC form he did help prepare: the 2015 form (Ex. D-12: GX-23605-R-1). [redacted] testified that "80 to 90 percent of [the form's] content . . . was populated from the information" from the 2014 form, which, again, purportedly came from [redacted] (who did not even sign the 2015 form). Tr. 98:9–13; *see also* Tr. 58:23–25, 59:1–5. Once more, [redacted] did not testify as to contemporaneity or supply any other rudimentary details about how the form was prepared—including whether it was prepared pursuant to the bank's regular practices. The form is not admissible as a business record on this foundation. *Cf. United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-CIV-11117,

2021 WL 4772142, at *4 (S.D.N.Y. Oct. 13, 2021) (holding banks' Suspicious Activity Reports inadmissible hearsay because they relied on uncorroborated secondhand information rather than verifiable firsthand knowledge).

The attachments fare worse still. The government's method was to have [redacted] read a document's title aloud and then ask whether it "appear[ed] to be" an attachment referenced in the CAC form—a method that drew repeated speculation objections and, more tellingly, a string of answers confirming that [redacted] lacked the requisite knowledge. He could offer only that GX-23316-R-4 (Ex. D-5) was "possibl[y]" the referenced attachment, though he couldn't "check it on the spot," Tr. 65:23; that as to GX-23316-R-6 (Ex. D-7) and R-7 (Ex. D-8) he "presume[d] so, but . . . can't check," Tr. 74:20, and "believe[d] so, but . . . cannot verify," Tr. 76:20; that GX-23316-R-10 (Ex. D-9) and R-11 (Ex. D-10) merely "seem[ed] so," Tr. 82:8; and that the 2015 attachments, GX-23605-R-2 (Ex. D-13) through R-10 (Ex. D-21), matched the government's description only insofar as he "think[s] so," Tr. 85:18. A witness who "presume[s]," "believe[s]," and "think[s] so" while conceding that he "cannot verify" has authenticated nothing and vouched for nothing. That is the antithesis of the "procedure, methodology, or accountability" a proponent must establish. *Reynolds v. Am. Airlines, Inc.*, No. 14-cv-2429, 2017 WL 6017355, at *3 (E.D.N.Y. Dec. 4, 2017).

Nowhere is the failure of foundation more apparent than with the OFAC and export controls due diligence checklist, GX-23316-R-3 (Ex. D-4). The government's entire effort to establish the requisite foundation consisted of having [redacted] read the title of the checklist and agree that it matched a title, "more or less," referenced elsewhere in the 2014 form:

> Q. What is the title of the document?
> A. "OFAC and export control due diligence checklist."
> Q. Is that the same title, more or less, that you just read into the record?
> MS. JESTIN: Objection.

A. Yes.
MR. SOLOMON: So at this time the government moves 23316-R-3 into evidence.
MS. JESTIN: Objection. Lack of foundation. Hearsay.

Tr. 68:21–69:4.

Reading a title into the record and commenting on its similarity to a reference in a document is not laying a foundation. [redacted] never testified to how or when the checklist was prepared, or that he knew anything about its contents—and he could not have, because the checklist's core subject, Huawei's relationship with Skycom, meant nothing to him. He confirmed as much on cross-examination:

> Q. You recall on direct the government mentioned the name of a company called Skycom[] . . . The name of that company doesn't mean anything to you, correct?
> A. No.
> Q. The government also asked you about something called an OFAC due diligence questionnaire[] . . . . And you didn't have anything to do with preparing that did you, [redacted]?
> A. No, in that time the pilot banker had to take the complete OFAC to his account.
> Q. That wasn't within your scope of responsibility, correct?
> A. Indeed.

Tr. 137:3–20.

A witness that far removed from a document cannot establish that it was made "at or near the time" of the events it describes, "by—or from information transmitted by—someone with knowledge," "kept in the course of a regularly conducted activity," and made as a "regular practice of that activity"—the showing Rule 803(6) requires. The checklist and the testimony reading it into the record should be excluded.

The testimony concerning the remaining attachments confirms the pattern: [redacted] could not describe how any of them was made. While he testified that certain Major Sanctioned Countries Questionnaires (Ex. D-18: GX-23605-R-7, Ex. D-20: GX-23605-R-9) were "created" by "[redacted]," Tr. 92:11–12, 92:24–25, he offered nothing about how, when, or from what information [redacted] made them—or whether [redacted] representations were recorded in the

form pursuant to the bank's regular practices. Even GX-23605-R-5 (Ex. D-16)—the Major Sanctioned Countries Questionnaire that [redacted] claimed responsibility for—cannot be shown on this record to have been made at or near the time, or from information transmitted by someone with knowledge in the regular course: [redacted] testified that it concerned "information to which [he] did not have access," which he "summarized" only after the fact, "[b]ased on the information that [he] obtained from [redacted] and phone calls and meetings with individuals from Huawei." Tr. 91:11–19. *Cf. Brutus Trading, LLC*, 2021 WL 4772142, at *4 (Suspicious Activity Reports inadmissible as mere "secondhand conduits of information").

In the end, what the record shows is a relationship manager speculating about the provenance of documents he was unfamiliar with and disclaiming knowledge of the very topics they address. That is not a business-records foundation; it is the absence of one.

**B. The Government's Newly Produced Certification Does Not Lay a Foundation.**

Six days ago, on August 14, 2026, the government produced for the first time a certification, executed by [redacted] Head of Dispute Resolution EMEA, that purports to certify 388,165 pages of [redacted] documents—including the CAC forms and their attachments—as business records under Federal Rule of Evidence 902(11). *See* Ex. E (Certification by [redacted]). The certification is nothing more than a blanket statement that all 388,165 pages were "made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of the Company, and they were made by the Company as a regular practice." *Id.* at 1. This barebones recitation of the elements of Rule 803(6) applied wholesale to hundreds of thousands of pages of distinct [redacted] documents—

particularly the CAC forms and attachments at issue here—cannot establish that these records satisfy the business-records exception.

For one, the certification cannot possibly be true. [redacted] cannot credibly swear, in a single stroke, to the contemporaneity and personal knowledge requirements for more than 388,000 pages of documents. He can say nothing, for instance, about the creation of the House Intelligence Committee Report (Ex. D-13: GX-23605-R-2) or *Reuters* article (Ex. D-10: GX-23316-R-11) appended to the CAC forms. His boilerplate contentions to the contrary are disproven by the testimony of [redacted] himself, the "person with knowledge" to whom the certification apparently refers: as detailed *supra*, [redacted] disclaimed knowledge of the CAC forms and their attachments.

For another, even if [redacted] could attest to the Rule 803(6) elements for some of the certified records, the certification does not identify the statements to which it refers and the statements that fall outside its scope within the 388,165 pages at issue. It draws no line at all. Respectfully, a certification that cannot direct the Court to the material the affiant could plausibly certify, across hundreds of thousands of pages, does no work. [redacted] boilerplate certification cannot carry the government's burden, as the offering party, to establish that Rule 803(6)'s elements are met for each record it seeks to admit.

At minimum, the government cannot rely on the certification without affording Huawei the "fair opportunity to challenge" it that Rule 902(11) guarantees. Fed. R. Evid. 902(11). On this record—a facially overbroad certification, produced on the eve of trial and contradicted by the government's own witness—that opportunity must include examination of [redacted]. Until then, the certification cannot establish a Rule 803(6) foundation, and the CAC forms, their attachments, and the testimony reading their contents into the record are inadmissible.

## III. The CAC Forms, Attachments, and Related Testimony Include Multiple Levels of Inadmissible Hearsay.

The same materials are inadmissible for the independent reason that they contain multiple levels of hearsay not subject to an exception. *See* Fed. R. Evid. 805; *Rodriguez v. Mod. Handling Equip. of N.J., Inc.*, 604 F. Supp. 2d 612, 623 (S.D.N.Y. 2009) (excluding hearsay in a business record that relied on statements from non-parties). And these forms are built almost entirely out of such statements—recounting what Huawei purportedly told the bank, quoting a Huawei treasury director, and appending outside documents including a *Reuters* article and a congressional report. Records that operate as "secondhand conduits of information" in this way are not admissible for the truth of their contents. *Brutus Trading, LLC*, 2021 WL 4772142, at *4; *see also Boca Investerings P'ship v. United States*, 128 F. Supp. 2d 16, 19–20 (D.D.C. 2000) (excluding a bank credit proposal where the proponent could not "point with any degree of certainty" to the source of "the most important information" it contained).

The sanctions section of the 2014 form illustrates the layering. Asked to read it into the record, [redacted] recited the following:

> A. "In 2010, Huawei was found attempt [sic] to sell HP computer equipment to Iran's largest mobile-phone operator. Mobile Telecommunications Co of Iran (known as MCI) through its related company Skycom, which violated US embargo rules. . . . According to SBO discussions with Huawei people, we believe this commitment has been carried out and followed strictly by Huawei. At least there is no further news on Huawei's new business with Iran since 2012. Besides, Huawei has confirmed to us that they did not conduct reexport of US technology, goods or software violating USD export control law or regulations."

Tr. 79:10–80:2.

That single passage—the Skycom recitation also analyzed under Rule 403, *infra*—is multi-layered hearsay. It stacks an unsourced finding that "Huawei was found [to] attempt to sell" embargoed equipment on Huawei's own out-of-court "statement," on the bank's account of unspecified "SBO discussions with Huawei people," and on what "Huawei has confirmed to us"—

not one level of which is attributable to any identified declarant whom the defense could cross-examine. *Id.* The rest of the form is similar. For instance, it embeds a passage recounting what an unidentified "SBO" learned in an "interview" and in "discussions with Huawei people," Tr. 79:17–24 (reading into record); Ex. D-3: GX-23316-R-1 at 13. These passages do not identify who at Huawei said what, when, to whom, or whether the recorded words are Huawei's own or the bank author's summary. The documents the form appends fare no better: the *Reuters* article is itself hearsay within hearsay, *Mandal v. City of New York*, No. 02-cv-1234, 2006 WL 3405005, at *1 (S.D.N.Y. Nov. 26, 2006) ("[N]ewspaper articles containing quoted remarks are hearsay within hearsay[.]") (collecting cases excluding newspaper articles on hearsay grounds), and the House Intelligence Committee Report is an additional out-of-court document offered for its truth, as discussed above.

[redacted] own testimony introduced hearsay of the same character. That is, a substantial part of the designated examination has him relaying out-of-court statements made to him by others. As just one example, [redacted] provides his account of "many phone calls with Huawei," and the "standard answer" he would receive on those phone calls, Tr. 59:19–60:1, in which he could not say who at Huawei told him what. A full accounting of [redacted] testimony conveying inner layer hearsay is set out in full in the Appendix.

None of these statements—whether recited in the CAC forms or relayed through [redacted] testimony—is admissible as a party-opponent admission under Rule 801(d)(2). Attributions such as "Huawei made a statement," "Huawei has confirmed to us," and so on, are too diffuse and unreliable to satisfy Rule 801(d)(2): they name no speaker and identify no role. *See Zaken v. Boerer*, 964 F.2d 1319, 1324 (2d Cir. 1992) (statement attributed to unidentified declarant did not satisfy Rule 801(d)(2)(D)). And, at least where specific quotations are not provided, it is not

*Huawei's* statement being offered—but a retrospective summary by [redacted] or another [redacted] employee. *See Berkovich v. Hicks*, 922 F.2d 1018, 1025 (2d Cir. 1991) (interview summary is the agent's recollection, not the witness's own statement); *United States v. Otufale*, 740 F. Supp. 3d 233, 248 (E.D.N.Y. 2024) (same). So the party-opponent exception does not apply.

In sum, these documents, and [redacted] testimony recounting their contents and the conversations behind them, are inadmissible hearsay at every level. The CAC forms, their attachments, and the related testimony should therefore be excluded, as catalogued in the Appendix.

**IV. The Court Should Also Exclude the CAC Forms and Attachments Under Rule 403.**

Independent of the government's failure to lay the requisite foundation and the layers of hearsay addressed above, the CAC forms and their attachments should be redacted or excluded (as set forth in the Appendix) under Rule 403. Evidence must be excluded where its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. These exhibits do not survive that balance. They would place before the jury a politically motivated congressional report accusing Huawei of a range of misconduct, a *Reuters* article that relies on multiple unidentified sources, and unproven allegations of the very sanctions conduct at issue, recited as fact in the body of the forms. Because the government's own witness could not establish any contemporaneous knowledge of these materials, much less that he read or relied on any of this material in determining to provide banking services to Huawei,[5] its probative value is nonexistent, and it is substantially outweighed by the risk of

[5] Indeed, [redacted] agreed in his testimony that he "suspect[ed]" the decision to retain Huawei was "a decision made in 2014." Tr. 98:14–18.

unfair prejudice. The defense objected on Rule 403 grounds each time the government offered these documents. *See* Tr. 66:2–7, 79:7, 82:11–14, 85:21–24.

Consider first the report of the House Permanent Select Committee on Intelligence, titled "Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE," and appended to both forms as GX-23316-R-2 and GX-23605-R-2. The report has no evident bearing on whether Huawei made the misrepresentations charged here, and [redacted] never engaged with its contents; when asked whether it was even an attachment to the 2014 form, he could say only "[p]resumably, yes. It had to be." Tr. 65:4. Nor is there testimony that anyone at [redacted] read the report or relied on it—indeed, the bank's own file deemed the report "non-persuasive in lack of substantial evidence" and "immaterial." Ex. D-3: GX-23316-R-1 at 9–10. What it would supply instead is a set of inflammatory conclusions untethered to the charged conduct—for example, that Huawei "pose[s] a security threat to the United States," Ex. D-13: GX-23605-R-2 at 45—the balance of which are catalogued in the Appendix. Such material serves only to invite the jury to convict Huawei of the charged offenses because the report portrays it as an enemy of the United States. *See United States v. Massino*, 319 F. Supp. 2d 295, 300 (E.D.N.Y. 2004) (excluding evidence under Rule 403 given the "enormous risk that the jury, despite a limiting instruction, would find" it "probative of the defendant's culpability").

The *Reuters* article (Ex. D-10: GX-23316-R-11) presents the same problem. The government had [redacted] read the article's title into the record: "Exclusive: Huawei CFO linked to firm that offered HP gear to Iran." Tr. 81:6–13. The article identifies the "firm" as Skycom, names the chief financial officer as Meng Wanzhou, and describes Skycom's alleged attempt to sell embargoed Hewlett-Packard equipment to Iran's largest mobile-phone operator despite U.S.

trade sanctions. Ex. D-10: GX-23316-R-11 at 1. Skycom and Ms. Meng are at the center of this case. This document has no probative value that runs through [redacted]. He did not write it; he did not rely on it in his role as a relationship manager; the article's subject, Skycom, "doesn't mean anything to" him, Tr. 137:7–9; and he could say only that the document "seemed" to be an attachment referenced in the CAC form, Tr. 82:8. Admission of the article would put its uncharged accusations before the jury as though a news organization had already proved them. That prejudice substantially outweighs a probative value that, on this record, is negligible at best.

The CAC forms themselves present a related problem: they also recite, as established fact, uncharged conduct by Huawei related to Skycom. On the 2014 form (Ex. D-3: GX-23316-R-1), the government had [redacted] read aloud a passage—the Skycom passage quoted above—that drew an immediate Rule 403 objection, Tr. 79:7:

> A. "In 2010, Huawei was found attempt [sic] to sell HP computer equipment to Iran's largest mobile-phone operator. Mobile Telecommunications Co of Iran (known as MCI) through its related company Skycom, which violated US embargo rules. . . ."

Tr. 79:10–80:2.

That passage states as fact an issue adjacent to the charges in this case—whether Huawei used Skycom to evade U.S. sanctions—as though it were a settled finding in the bank's file. Like the guilt-assuming hypotheticals addressed above, such material is "conjectural and speculative," *Cain*, 549 F. Supp. at 968, and it trenches "too deeply into the presumption of innocence," *Russo*, 110 F.3d at 952. The forms also contain references to other alleged uncharged conduct, such as reporting on allegations that Huawei defrauded the government of Pakistan. *See* Ex. D-12: GX-23605-R-1 at 7–11, and other sanctioned regimes—Cuba, Syria, Sudan, Myanmar, and North Korea among them—that will serve only to unfairly prejudice the jury against Huawei. *Id.*; Ex. D-3: GX-23316-R-1 at 12–15.

All told, the probative value of these materials is—at most—slight, while the risk that the jury would treat the recited allegations as proof of Huawei's guilt is substantial. Consistent with the redactions and preclusions set forth in the Appendix, the Court should thus redact or exclude the House Intelligence Committee Report, the *Reuters* article, and the prejudicial passages of the CAC forms—together with the testimony reading their contents into the record.

## V. The Court Should Exclude the Government's Designation of Testimony Elicited by the Presiding Judge.

The government's designation of testimony elicited by the presiding judge presents a separate problem. The deposition was conducted in the [redacted] before Judge [redacted], who introduced himself as "an investigating judge in the court of [redacted]," Tr. 11:5–6, explained that in the [redacted] system "the investigating judge . . . has a bigger role," and announced that he would begin with "some questions from myself," Tr. 22:16–20. The defense does not contend that the judge's participation renders the deposition invalid; Rule 15(e) incorporates the civil rules governing depositions taken abroad, and those rules contemplate examination by a foreign judicial officer. *See* Fed. R. Civ. P. 28(b). The problem is narrower: the government has designated an exchange the judge elicited at the very end of the deposition, Tr. 189:19–191:5, and that designation should not be admitted.

Rule 403 requires its exclusion. The deposition was videotaped, and the jury will see and hear that these questions came from a judge—a foreign "investigating judge" whose role, by his own account, exceeds that of an American judge. Jurors accord a judge's words singular weight: "his lightest word or intimation is received with deference, and may prove controlling." *Quercia v. United States*, 289 U.S. 466, 470 (1933) (citations omitted). To present the jury with testimony visibly extracted by the [redacted] court's own questions is to invite it to treat that testimony as judicially sponsored and to credit it beyond its worth. That danger of unfair prejudice substantially

outweighs the marginal value of a single follow-up question—one the government was free to ask itself yet chose not to do so. *See* Fed. R. Evid. 403. The government should not be permitted to borrow the imprimatur of the court to place before the jury cherry-picked testimony it could have elicited through its own examination.

## CONCLUSION

The Court should exclude the exhibits and testimony described herein and catalogued in full in the Appendix.

## REQUEST FOR SEALING

For the same reasons set forth in the government's motion requesting the Rule 15 deposition of [redacted] (ECF No. 715 at 5), the defense respectfully requests leave to file this brief under seal.

Dated: August 20, 2026

Respectfully submitted,

/s/ *David Bitkower*
David Bitkower
Matthew S. Hellman
Katya Jestin
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
(202) 639-6048
dbitkower@jenner.com

/s/ *Douglas A. Axel*
Douglas A. Axel
Michael A. Levy
Ellyce R. Cooper
Frank R. Volpe
Melissa Colón-Bosolet
Daniel J. Hay
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
(212) 839-5300
daxel@sidley.com

/s/ *Brian M. Heberlig*
Brian M. Heberlig
Ryan P. Poscablo
Julia Gatto
William L. Drake
Jessica I. Rothschild
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
rposcablo@steptoe.com

*Counsel for Huawei Technologies Co., Ltd., Huawei Device USA Inc., Huawei Device Co., Ltd., and Futurewei Technologies, Inc.*