NJM:AAS/ALJ
F. #2017R05903

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

HUAWEI TECHNOLOGIES CO., LTD., et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

18-CR-457 (S-4) (AMD)

**GOVERNMENT'S RESPONSE TO DEFENDANTS' TRIAL MOTION IN LIMINE TO ADMIT EVIDENCE FROM GOVERNTMENT'S OFAC WITNESS**

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

MARGARET A. MOESER
Chief
Money Laundering, Narcotics and Forfeiture Section
Criminal Division
U.S. Department of Justice

CHRISTIAN NAUVEL
Acting Chief
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

ALEXANDER A. SOLOMON
MEREDITH A. ARFA
ROBERT M. POLLACK
MATTHEW SKURNIK
MATTHEW SULLIVAN
Assistant U.S. Attorneys

TAYLOR G. STOUT
MORGAN J. COHEN
JASMIN SALEHI FASHAMI
Trial Attorneys

AARON L. JENNEN
Trial Attorney

(Of Counsel)

TABLE OF CONTENTS

TABLE OF AUTHORITIES ii

PRELIMINARY STATEMENT 1

BACKGROUND 3

I. The December 14, 2009 Letter 3

II. The April 20, 2010 Letter 4

III. The March 17, 2011 Letter 5

IV. The OFAC No Action Letter 6

V. OFAC's Records of Huawei-Related VSDs 6

ARGUMENT 6

I. Testimony Regarding Export Controls Violates the Court's Order 6

II. The Proffered Cross-Examination Would Yield Irrelevant Testimony 7

III. The Defendants Seek to Elicit Improper Testimony About Intent 11

IV. The VSD Evidence Will Confuse the Issues and Mislead the Jury, and it Is Unfairly Prejudicial. 13

V. The VSD Evidence Constitutes Impermissible Self-Serving Hearsay 14

VI. The VSD Evidence Is Improper "Prior Good Act" Evidence 14

CONCLUSION 15

# TABLE OF AUTHORITIES

**Cases**

*Manko v. United States*, No. 95-CIV-1611 (KMW), 1998 WL 391129, at *10 (S.D.N.Y. July 13, 1998) ..... 11

*United States v. Brandt*, 196 F.2d 653 (2d Cir. 1952) ..... 14

*United States v. Cert. Envt'l Servs., Inc.*, 753 F.3d 72 (2d Cir. 2014) ..... 14

*United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) ..... 17

*United States v. Klein*, No. 16-CR-442 (JMA), 2017 WL 1316999, at *8-10 (E.D.N.Y. Feb. 10, 2017) ..... 11

*United States v. Roldan*, 167 F.4th 569 (2d Cir. 2026) ..... 14

**Rules**

31 C.F.R. pt. 501, app. A, § II.A. (2025) ..... 12

31 C.F.R. pt. 501, app. A, § III (2025) ..... 12

Fed. R. Evid. 403 ..... 15

**PRELIMINARY STATEMENT**

The defendants have moved to conduct two lines of questioning during the cross-examination of Seth Bridge, the Chief of Policy and Implementation in the U.S. Department of Treasury's Office of Foreign Assets Control's ("OFAC") Compliance Division. ECF No. 868. Contrary to the defense's assertions, the government is not "advanc[ing] the [uncharged] narrative that Huawei violated U.S. sanctions and export control laws by exporting U.S.-origin goods to Iran." *Id* at 4. Consistent with the Court's August 19, 2026 HSD ruling, the government does not intend to argue to the jury that Huawei violated IEEPA by exporting U.S.-origin goods to Iran; instead, the charged IEEPA offenses pertain solely to the export of financial and telecommunications *services*.

The government has elicited limited testimony regarding Huawei's use of U.S. technology in Iran instead as background evidence to demonstrate its motivation for lying to banks and the U.S. government about its relationship with Skycom and interactions with the Iranian government. Specifically, the government will prove that, in December 2012, Reuters reported that Skycom had offered to sell U.S.-origin Hewlitt Packard equipment to Mobile Telecommunications Company of Iran ("MCI"), an Iranian state-owned company. Following that reporting, Huawei faced questions from its banks and the U.S. government about the nature of its relationship with Skycom and the Iranian government. In response, Huawei made repeated false statements about its relationship to Skycom and whether Huawei had provided equipment to the government of Iran. Limited testimony about Huawei's use of U.S. technology in Iran helps the jury to understand one of the reasons why Huawei lied about its relationship with Skycom and its interactions with the Iranian government. Indeed, the misrepresentations at issue include a categorical statement that Huawei "never provided *any* equipment to the Iranian government," let

alone U.S.-origin equipment. (S-4 ¶ 60.b.). The government may also seek to elicit testimony that the defendants used front companies to conceal the shipment of U.S.-origin goods to Iran to evade sanctions laws, including U.S. sanctions, thereby demonstrating their knowledge generally of such sanctions regimes. Finally, this limited testimony will serve "to prove the existence of the enterprise and its pattern of racketeering," including the fraud-based RICO predicates. Aug. 19, 2026 HSD Order 18-19.

As discussed below, both lines of the defense's proposed questioning are impermissible, and the defendants' motion *in limine* (the "Motion") should be denied. *First*, the defendants intend to cross-examine Bridge "to establish that identifying a U.S.-branded product in a sanctioned country does not, by itself, show an export control violation" of the Iranian Transactions Sanctions Regulations ("ITSR"). *Id.* at 4. This request is in direct contravention of the Court's September 2, 2026 Order (the "Order") granting in part the defendants' application to limit Mr. Bridge's testimony, which holds that Mr. Bridge "may not offer his opinions about what the ITSR . . require[s] or prohibit[s]". *See* ECF No. 829 at 5. *Second*, the defendants seek to "elicit testimony and evidence relating to Huawei's voluntary self-disclosure (the "VSD")"—a subject about which Mr. Bridge has no personal knowledge and which will far exceed the scope of the government's direct examination—"to OFAC during the charged conspiracy period regarding the provision of U.S. goods to Iran, and OFAC's subsequent issuance of a no action letter." ECF No. 868 at 5. The proffered evidence not only contravenes the Order but is also irrelevant to any of the charged offenses, unfairly prejudicial, and will confuse issues and mislead the jury. Further, much of the proffered evidence, including four letters by Huawei's outside counsel summarizing Huawei's own internal investigations, is quintessential inadmissible self-serving hearsay, and otherwise constitutes inappropriate "prior good act" evidence that is properly excluded.

## BACKGROUND

I. The December 14, 2009 Letter

On December 14, 2009, Chengdu Huawei Symantec Technologies Co. Ltd. ("Huawei Symantec") sent a voluntary self-disclosure ("VSD") by letter to OFAC. Def. Ex. A. In the VSD letter, Huawei Symantec—a Huawei entity that is not charged in this case—stated that Huawei Technologies Co. Ltd. ("Huawei") owned a 51 percent interest in Huawei Symantec while U.S. entity Symantec Corporation ("Symantec") owned the remaining 49 percent interest. *Id.* at 1. In the letter, Huawei Symantec advised OFAC that it was disclosing "suspected indirect sales of [Huawei Symantec] products by one or more third [party] OEM distributors to customers located in Iran and Sudan." *Id.*

According to Huawei Symantec, the parties "recognized from the outset of their joint venture discussions the importance of assuring strict compliance with the United States export controls and trade sanctions," and executed a memorandum of understanding to "(i) treat all of the products manufactured or distributed by [Huawei Symantec] as subject to . . . United States export controls and trade sanctions; and (ii) cause [Huawei] and [Huawei Symantec] to implement appropriate compliance programs and technology control plans." *Id.* at 3. The letter outlined the purported "detailed export compliance program" established by Huawei Symantec.

Huawei Symantec set forth a rough outline of "sales transaction that did not appear to have been handled in full conformance with the requirements of the Export Administration Regulations" from the Spring of 2009. *Id.* The letter advised that "one or more of its OEM distributors may have resold some [Huawei Symantec] and Symantec products to customers located in Iran and Sudan." *Id.* at 4. Huawei Symantec also disclosed three "preliminary findings" from its internal investigation: (1) Huawei Symantec had not conducted any direct sales with customers in Iran or Syria; (2) the products at issue were manufactured in China; and (3) that none

of "sales employees" were United States persons. *Id.* The letter was signed by Zhang Ping-an, Huawei Symantec's Chief Operating Officer. *Id.* at 5.

I. <u>The February 26, 2010 Letter</u>

Huawei Symantec, through counsel, submitted a second letter to OFAC on February 26, 2010,. Def. Ex. B. This letter asserted that "most" of Huawei Symantec's products are "legacy Huawei products" and "have little or no United States origin content . . . and may not, therefore be subject to the export control jurisdiction of the United States." *Id.* at 3. Notably, the letter asserted that "mitigating circumstances" were present, namely, that only two identified transactions had been completed and, "[a]s such, those transactions were isolated incidents, constituting a de minimis part of [Huawei Symantec's] overall business during the course of calendar year 2009 (both in terms of number of transactions, and in terms of dollar value)." *Id.* at 11-17.

II. <u>The April 20, 2010 Letter</u>

On April 20, 2010, Huawei Symantec, through counsel, submitted another letter arguing, for the first time, that "the transactions and activities reported in the February 26, 2010 voluntary self-disclosure letter did not involve any violation of the Iranian Transactions Regulations." *Id.* at 1-3. In support of that assertion, Huawei Symantec's counsel attached a "*de minimis* analysis," which purported to show that the U.S.-origin products at issue did not exceed the "10 percent threshold" for satisfying the ITSR's *de minimis* exception and, according to counsel, the exports of those products were therefore "not subject to the restrictions set forth in section 560.205(a) of the Iranian Transactions Regulations, as provided in sections 560.205(b)(2) and 560.420 of those Regulations." *Id.*

Attached as an exhibit was Huawei's *de minimis* analysis. *Id.* at 9-10. The "analysis" includes a rudimentary diagram and one sentence explanation of the "Huawei Solution" that purportedly included the OceanStor product. *Id.* Without any supporting documentation, it

stated the price of the OceanStor product and the "Total Contract Amount" for the MTN Irancell project purportedly using the OceanStor product. *Id.* The letter also included details about Huawei Symantec's internal investigation, including summaries of interviews of three Huawei Symantec employees. *Id.* at 5-6.

III. <u>The March 17, 2011 Letter</u>

On March 17, 2011, counsel for Huawei Symantec sent another letter to OFAC. Def. Ex. D. According to the letter, it was sent in response to a request for additional information from OFAC. *Id.* at 1. In the letter, counsel for Huawei Symantec stated:

> [T]he Office of Export Enforcement concluded that the transactions that were the subject to the voluntary self-disclosure (both to the Office of Export not Enforcement and to OFAC) did *not* constitute violations of the Export Administration Regulations, because (i) the H-S products in question were incorporated into complete telecommunications systems by [Huawei Symantec] OEM partner, Huawei Technologies Co. Ltd. ("Huawei"); and (ii) the [Huawei Symantec] products constituted only a minimal portion of the total Huawei telecommunications systems, well below the 10 percent *de minimis* threshold specified in section 734.4 of the Export Administration Regulations.

*Id.*[1]

The letter also provided additional details on the sale of the OceanStor product to MTN Irancell. *Id.* at 2-3. In pertinent part, Huawei Symantec claimed it was not "possible to identify the particular Huawei purchase orders and corresponding [Huawei Symantec] invoices for the specific OceanStor S-3100 data storage devices that were incorporated into the Huawei systems that were ultimately supplied to MTN Irancell." *Id.*

---

[1] Defendants have also included a May 12, 2010 letter from the U.S. Department of Commerce's Bureau of Industry Security Office of Export Enforcement. Def. Ex. G. While Huawei Symantec's letters to OFAC reference this letter, Mr. Bridge is not qualified to testify regarding another agency's determinations.

IV. The OFAC No Action Letter

On or about June 27, 2012, OFAC sent a "NO ACTION LETTER" to Huawei Symantec. Def. Ex. E. The letter stated: "This letter is notice that we are closing this file without taking any further action. A no-action determination represents a final determination regarding the investigation, unless OFAC later learns of other relevant facts." *Id.* The letter did not state why OFAC elected not to proceed.

V. OFAC's Records of Huawei-Related VSDs

In response to defense's Rule 17 subpoena in this matter, OFAC produced to Huawei on May 27, 2026 a spreadsheet of all VSDs pertaining to Huawei and Huawei-related entities. Def. Ex. F. The spreadsheet identified 18 VSDs that pertained to Huawei and Huawei-related entities in its holdings. *Id.* The majority of the VSDs were made by unrelated third-party financial institutions, disclosing potential violations related to processing funds that potentially violated sanctions. *Id.* Relevant here, it included the VSD from Huawei Symantec. *Id.* at 4. While the basis for its no action determination was not included in the June 2012 No Action Letter, an explanation was provided in the "Summary" column of the spreadsheet:

> Huawei Symantec is not a U.S. person and there is no indication that a U.S. person exercised control or authority over any of the third party resellers involved in the de-minimis sales in Sudan or Iran. Therefore, OFAC Enforcement issued Huawei Symantec a No Action Letter.

*Id.*

## ARGUMENT

I. Testimony Regarding Export Controls Violates the Court's Order

The defendants argue that they should be allowed to cross-examine Mr. Bridge "regarding the complex factors that determine the existence of an export control violation under the ITSR." ECF No. 868 at 10. This is a reversal of position from their prior (successful) motion

to limit Mr. Bridge's testimony regarding "what th[e] sanctions regulations mean or what conduct they prohibit, because that is the Court's role, not an expert's." ECF No. 829 at 3 (internal quotations omitted). The proffered cross-examination should be precluded for the same reasons that the Court precluded the government from offering analogous testimony on direct examination.

Granting in pertinent part the defense's prior motion, the Court ordered that Mr. Bridge "may testify as to how the sanctions relevant to this case work generally, including how they are promulgated, enforced, and excepted through licenses" but "may not offer his opinions about what the ITSR" prohibits. *Id*. at 5. Thus, the proposed cross-examination runs afoul of the Order and should not be allowed. Notwithstanding defendants' conclusory statement that they do "not seek to question Bridge about what the law is or to ask Bridge whether any particular transaction did or did not comply with U.S. sanctions regulations," ECF No. 868 at 12, the requested cross-examination seeks to accomplish that very goal. The defense should be required to abide by the terms of the Court's ruling, which the defense sought in the first instance.

II. <u>The Proffered Cross-Examination Would Yield Irrelevant Testimony</u>

Both areas of proposed cross-examination should be precluded because any resulting testimony would be irrelevant.

*First*, testimony regarding export control regulations would be irrelevant and confusing, given that the government does not intend to prove a substantive violation of the U.S. export control laws. Rather, as explained above, the government has introduced limited evidence of Huawei's use of U.S.-origin equipment in Iran as background to explain one motivation for Huawei's lies to its banks and the U.S. government, as well as "to prove the existence of the enterprise and its pattern of racketeering," including the fraud-based RICO predicates. *See* Aug. 19, 2026 HSD Order at 18-19. The government may also seek to elicit testimony that the defendants used front companies to conceal the shipment of U.S.-origin goods to Iran to evade

sanctions laws, including U.S. sanctions, thereby demonstrating their knowledge generally of such sanctions regimes.

*Second*, the VSDs were submitted by a nonparty co-owned by a U.S. company. At the time of its decision, OFAC was considering the conduct of Huawei Symantec, not that of Huawei. Defendants argue that Huawei's 51 percent ownership of the joint venture necessarily means that Huawei Symantec's disclosure is attributable to Huawei, but Huawei Symantec characterized the relationship differently in its communications with OFAC. *See* Def. Ex. B at 4 ("[Huawei Symantec] products are currently distributed through a network of third party OEM distributors, including Huawei."); at 5 (Huawei Symantec "learned that some of the . . . products furnished to OEM distributors and resellers, specifically Huawei . . . may have ultimately been supplied to entities located in the embargoed countries."); at 6 ("[O]f the sales leads . . . certain of them were to be the responsibility of Huawei, in its role as OEM distributor of Huawei Symantec products"); at 7 ("Huawei…has cooperated with [Huawei Symantec's] investigation into the suspected diversion of [Huawei Symantec] products to Iran"); and at 11 ("[Huawei Symantec] has made diligent efforts to obtain from its OEM distributors, especially Huawei, information about each proposed or actual sale of [Huawei Symantec] products to those OEM distributors in which there has been any suggestion of possible resale of the [Huawei Symantec] products directly or indirectly to an embargoed country."). In sum, Huawei was not the disclosing party but rather—in the words of Huawei Symantec—a third-party distributor.[2]

---

[2] Huawei Symantec's repeated description of Huawei's role in these transactions, without referencing that of CMEC or Panda, also undercuts the defendants' claim that the evidence should be admitted to demonstrate that those two entities were not Huawei's front companies. ECF No. 868 at 15.

*Third*, whether or not a regulatory agency took particular action regarding the defendants or a related entity does not make it more or less likely that the defendants engaged in the charged conduct. *See*, *e.g.*, *Manko v. United States*, No. 95-CIV-1611 (KMW), 1998 WL 391129, at *10 (S.D.N.Y. July 13, 1998) (excluding evidence of an IRS civil settlement at a criminal trial on the grounds that "[t]he presentation of this evidence would focus the jury's attention on the functioning of the IRS civil bureaucracy . . . as opposed to the central question of whether the repurchase transactions in this case were fictitious or had economic substance"); *United States v. Klein*, No. 16-CR-442 (JMA), 2017 WL 1316999, at *8-10 (E.D.N.Y. Feb. 10, 2017) (excluding evidence of SEC's decision to charge only one person in second perpetrator's criminal securities fraud trial). Agencies evaluating potential regulatory actions consider different records and different substantive law than juries in criminal matters. OFAC's decision to not take action in response to certain voluntary (and largely uncorroborated) disclosures does not bear on whether the defendants engaged in the charged criminal conduct at all, where OFAC lacked the benefit of the evidence that has and will be presented to the jury, did not apply the same legal standards, and did not consider the same underlying conduct. Moreover, regulatory agencies routinely take actions—or decline to do so—for any number of reasons, including different enforcement priorities or resource constraints, completely unrelated to the culpability of the regulated entity. Nor should the defendants be permitted to invite jury nullification by insinuating that, considering the regulatory actions already taken or considered by certain U.S. government agencies, there is no need to convict the defendants in this case.

*Fourth*, the fact that OFAC issued a "no action letter" does not mean that it found no sanction violation had occurred. "Depending on the facts and circumstances of a particular case, an OFAC investigation may lead to" several outcomes, including taking no action:

> If OFAC determines that there is insufficient evidence to conclude that a violation has occurred and/or, based on an analysis of the General Factors outlined in Section III of these Guidelines, concludes that the conduct does not rise to a level warranting an administrative response, then no action will be taken. In those cases in which OFAC is aware that the Subject Person has knowledge of OFAC's investigation, OFAC generally will issue a letter to the Subject Person indicating that the investigation is being closed with no administrative action being taken. A no-action determination represents a final determination as to the apparent violation, unless OFAC later learns of additional related violations or other relevant facts.

31 C.F.R. pt. 501, app. A, § II.A. (2025). Moreover, the regulation provides that a no action letter is appropriate where there is an "apparent violation" but "there is insufficient evidence to conclude that a violation has occurred," or "the conduct does not rise to a level warranting an administrative response." *Id.*

Here, OFAC only provided a terse summary of its stated basis in response to the defendants' Rule 17 subpoena: there was "no indication that a U.S. person exercised control or authority over any of the third party resellers involved in the de-minimis sales in . . . Iran." Def. Ex. F at 4. The plain language of this stated basis does not necessarily mean that sanctions violations did not occur.

Moreover, OFAC's invocation of "de-minimis sales" further undercuts the proffered relevance, where the no action letter appears to rely on Huawei Symantec's arguments pertaining to the General Factors in February 2010. *See* Def. Ex. B at 16. In pertinent part, OFAC considers several "General Factors in determining the appropriate administrative action in response to an apparent violation of U.S. sanctions." 31 C.F.R. pt. 501, app. A, § III (2025). Those General Factors include whether the violation appears to be willful or reckless, the subject's awareness of the conduct, the actual or potential harm to the sanctions program at issue, the individual characteristics of the subject, whether the subject has a compliance program in place, any efforts at remediation, the subject's cooperation with OFAC, the timing of the violation in

relation to the implementation of the sanction at issue, whether other enforcement action by other governmental agencies has occurred, impact to specific and general deterrence, and "other factors that OFAC deems relevant on a case-by-case basis." *Id.*

In the February 26, 2010 letter, Huawei Symantec argued that there were "mitigating circumstances" pursuant to the regulation "directly applicable to the transactions" under consideration. Def. Ex. B at 11. Among other arguments, Huawei Symantec contended that the "transactions were isolated incidents, constituting a de minimis part of [Huawei Symantec's] overall business during the course of calendar year 2009 (both in terms of number of transactions, and in terms of dollar value)." *Id.* at 16. And this argument—that is, regarding the negligible *number* of sales, *not* the de minimis *percentage* of U.S.-origin content in the export at issue to which the defendants now point—appears to have carried the day. *See* Def. Ex. F at 4 (referring to the conduct at issue as "de-minimis sales").

*Finally*, the timing of the no action letter underscores the irrelevance of the desired testimony. OFAC sent the no action letter in June 2012. Def. Ex. E. In contrast, government witnesses Parham Beheshti and Babak Vahdati testified regarding U.S.-made products they observed at Huawei project sites prior to mid-2010. Tr. 247:1-4, 1623:20-21; 1631:17-18. Thus, with respect to the multitude of Skycom's Iran-related transactions occurring before June 2012, the OFAC no action letter, by definition, could not have bolstered Huawei's alleged belief that such transactions were permissible under the ITSR.

## III. The Defendants Seek to Elicit Improper Testimony About Intent

The Court should reject the defendants' efforts to use Mr. Bridge as a vehicle to admit unreliable and improper evidence about the defendants' intent. The defendants appear to argue that because (1) Huawei Symantec submitted letters from outside counsel in connection with the VSD which claimed that two transactions unrelated to the charged conduct here met the *de*

*minimis* exemption, and (2) OFAC subsequently took no action, then (3) the defendants relied upon this series of events to form the belief that the unrelated charged conduct was lawful. ECF No. 868 at 17. Mr. Bridge lacks competency to testify as to whether the defendants had "that good-faith belief," *id.*, and the proposed testimony is too attenuated from the issue of Huawei's intent to be reliable. If the defendants wish to elicit of their own mental state, they should call a competent witness (such as a Huawei representative) to provide such testimony, not shoehorn it in through the government's OFAC expert under the guide of cross-examination. *See United States v. Biaggi*, 909 F.2d 662, 694 (2d Cir. 1990).

The authority cited by the defense is inapposite. The defendants rely almost exclusively on *United States v. Cert. Envt'l Servs., Inc.*, 753 F.3d 72 (2d Cir. 2014), which is distinguishable from the instant facts.[3] ECF No. 868 13-14. In *Certified Environmental*, the defendants sought guidance from regulating agencies regarding regulations that they were later charged with violating. 753 F.3d at 88-91. That is not the case here. Huawei did not communicate with the regulating agency; a third party—Huawei Symantec—did. Moreover, Huawei Symantec did not—unlike the defendants in *Certified Environmental*—seek guidance as to whether the conduct they were engaging in was lawful and subsequently receive affirmative guidance from the regulatory agency. *Id.* Instead, Huawei Symantec disclosed what it initially believed were violations, before arguing that they were not violations and then receiving a notice of no action without any indication as to the basis for the determination. Rather than establishing that Huawei

[3] Defendants also cite to *United States v. Roldan*, 167 F.4th 569 (2d Cir. 2026) (suppression of statements made by a drug informant to law enforcement to bolster appellant's testimony that he thought he was working with law enforcement) and *United States v. Brandt*, 196 F.2d 653 (2d Cir. 1952) (involving the court's refusal "to charge on the import of certain honest disclosures appellants had made during an investigation by the postal authorities" without further elaboration). Those cases are inapplicable and therefore not discussed herein.

sought to ensure the legality of its conduct before engaging in it, this fact pattern establishes that a related joint venture may have run afoul of the regulations and an administrative agency elected not to pursue enforcement action at that time. Such a determination is entirely irrelevant to the issues in this trial.

In summary, the instant facts are not analogous, and Huawei's reliance on *Certified Environmental* is misplaced.

IV. The VSD Evidence Will Confuse the Issues and Mislead the Jury, and it Is Unfairly Prejudicial.

Even if the Court were to find that evidence of a joint venture's VSD is somehow relevant, it should be excluded because its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, delaying the trial and misleading the jury. *See* Fed. R. Evid. 403. Huawei Symantec is not a party to the litigation and did not even appear on the pretrial list of relevant persons and entities. The midtrial injection of an unrelated third party will cause confusion and essentially result in a minitrial regarding Huawei Symantec's VSDs, the no action letter, and what, if any, meaning should be ascribed to OFAC's determination. In any ensuing minitrial, the parties would inevitably argue over whether Huawei Symantec's VSDs are attributable to the defendants, what constitutes the "export" against which the 10 percent *de minimis* threshold is measured, among other irrelevant legal and factual disputes.

To the extent they expect to elicit evidence that the no action determination taken in the context of another company *did* inform their decision-making, such evidence should come from someone with personal knowledge of the matter—not from the government's expert witness regarding unrelated sanctions issues. Requiring the government to delve into the basis for OFAC's decision not to pursue enforcement against a separate entity and to cause the jury to engage with whether the "de-minimis sales" reference in OFAC no action letter issued to a third party was

considered by OFAC as a mitigating factor or a finding that the conduct did not constitute a violation, is exactly the kind of confusing and distracting sideshow that demands preclusion under Rule 403.

Allowing the introduction of this evidence would also cause great prejudice to the government. The VSD and the subsequent letters from Huawei Symantec's counsel constitute a one-sided, self-serving story of the purported facts presented by a paid advocate of a third party. Introducing only that evidence of the circumstances that resulted in the disclosure, especially through the cross-examination of Mr. Bridge—a witness with no knowledge of the underlying information the defendants seek to introduce—prevents the government from testing the claims made in the VSD, including testing the credibility of Huawei's *de minimis* "analysis," which lacks any supporting documentation.

V. <u>The VSD Evidence Constitutes Impermissible Self-Serving Hearsay</u>

The defendants seek to admit pages upon pages of self-serving inadmissible hearsay. While the defendants claim that they are "not offering it for its truth," ECF No. 868 at 16, that appears to be precisely what they seek to do. The defendants ask to introduce evidence to show that Huawei made the VSD, that Huawei previously argued that its *de minimis* analysis showed the transactions at issue were not subject to sanctions, and that OFAC issued a no action letter relied upon by Huawei (not Huawei Symantec). The Court should preclude such self-serving hearsay in the guise of "state of mind" evidence.

VI. <u>The VSD Evidence Is Improper "Prior Good Act" Evidence</u>

The VSD evidence should also be precluded as "prior good act" evidence prohibited by Rule 404(b)(1). The defendants may not offer evidence of prior good acts to prove their innocence and that they would have acted in conformity therewith at the time of the charged events. *See United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021). The proposed evidence

also details other prohibited good act evidence, such as Huawei Symantec's compliance programs and its efforts at mitigation. Though the defendants state that they are not seeking to introduce improper character evidence, ECF No. 868 at 16-17, this assertion is belied by the evidence they seek to offer and their concession that they want to offer evidence of the VSD to contradict the assertions that the defendants engaged in a pattern of criminal activity. *Id.* at 17 n.6.; *see also* Defendants' Opening Statement (Tr. 225:15-17; Tr. 243:13-16).

## CONCLUSION

For the reasons set forth above, the Court should deny the defendants' motion *in limine* to cross examine Mr. Bridge regarding export control laws and the VSD evidence.

Dated: Brooklyn, New York
September 22, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By: /s/
Alexander A. Solomon
Meredith A. Arfa
Robert Pollack
Matthew Skurnik
Matthew F. Sullivan
Assistant United States Attorneys
(718) 254-7000

MARGARET A. MOESER
Chief, Money Laundering, Narcotics and Forfeiture Section,
Criminal Division,
U.S. Department of Justice

Taylor G. Stout
Morgan J. Cohen
Jasmin Salehi Fashami

Trial Attorneys

CHRISTIAN NAUVEL
Acting Chief, Counterintelligence and
Export Control Section,
National Security Division,
U.S. Department of Justice

Aaron L. Jennen
Trial Attorney