[redacted]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

[redacted]

**UNITED STATES OF AMERICA,**

– against –

**HUAWEI TECHNOLOGIES CO., LTD.**, *et al.*,

Defendants.

---------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

18-CR-457 (AMD) (JAM)

**ANN M. DONNELLY**, United States District Judge:[1]

Before the Court are the defendants' motions *in limine* (ECF No. 631 (HSD)), and the government's nineteenth motion in *limine* (ECF Nos. 629 (sealed), 646 (redacted), 678 (HSD), 711 (HSD)).[2, 3] As explained below, the Court denies the defendants' motions in *limine* and grants the government's motion *in limine* in part.

[1] The Court orders that this decision be designated as a Highly Sensitive Document ("HSD") pursuant to Amended Administrative Order 2021-02 and as Attorneys' Eyes Only ("AEO") pursuant to the protective order in this case (ECF No. 57), and docketed accordingly. The Court further orders the government and defense counsel to treat this decision with the protective procedures for Attorneys' Eyes Only Material detailed in the protective order. (*See* ECF No. 57 ¶¶ 16–18.)

The government and defense counsel are directed to propose redactions for a sealed version of this order to be provided to the defendants in this case. The parties are further directed to propose additional redactions for a version of this order to be filed on the public docket.

[2] The moving defendants are Huawei Technologies Co., Ltd. ("Huawei Tech"), Huawei Device Co., Ltd. ("Huawei Device"), Huawei Device USA, Inc. ("Huawei Device USA"), and Futurewei Technologies, Inc. ("Futurewei") (collectively, "Huawei"). Unless otherwise specified, the term "defendants" refers to these four entities.

[3] The government filed sealed HSD submissions in connection with its nineteenth motion *in limine*. (*See* ECF Nos. 678, 711.) The defendants filed sealed HSD responses (ECF Nos. 676, 699) and an HSD *ex parte* filing in opposition (ECF No. 677). Because HSD filings do not have ECF headers with page numbers, citations to page numbers within these documents refer to the filings' internal pagination.

[redacted]

## LEGAL STANDARD

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, trial." *McLeod v. Llano*, No. 17-CV-606, 2021 WL 1669732, at *2 (E.D.N.Y. Apr. 28, 2021) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). "*In limine* rulings are 'subject to change when the case unfolds.'" *Id.* (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)).

## DISCUSSION

### I. Government's Motion to Permit Certain Witnesses to Testify Under Pseudonyms or Initials and Preclude Cross-Examination of These Witnesses Regarding Certain Identifying Information, and to Admit Certain Statements

#### a. Motion to Permit Certain Witnesses to Testify Under Pseudonyms and Preclude Cross-Examination Regarding Identifying Information

The government moves for a protective order authorizing eleven witnesses (the "Protected Witnesses") to testify under aliases or using their initials; precluding defense counsel and the defendants from disseminating the Protected Witnesses' names; permitting other government witnesses to refer to the Protected Witnesses using pseudonyms; and instructing any defense witnesses, including the defendants, to use pseudonyms when referring to the Protected Witnesses. (*See* ECF No. 646 at 59–64; ECF No. 678 at 1–4; ECF No. 711 at 1–4.)[4] The government also moves for a protective order "precluding the defense from eliciting in open court identifying information for the Protected Witnesses, such as home and work addresses, telephone numbers, email addresses, and other specific identifying information (such as current employers), which could be used to locate the witnesses." (*Id.* at 60.) The government has

[4] After filing its motions *in limine*, the government filed a separate motion to permit an additional witness to testify under pseudonym, and to close the courtroom during three witness's testimony. (*See* ECF No. 789.) The Court reserves decision on that motion.

[redacted]

agreed to disclose the names of the Protected Witnesses to the defense, and to comply with its obligations under *Giglio* and 18 U.S.C. § 3500. (*See* ECF No. 646 at 59 n.15.) The defendants oppose. (*See* ECF Nos. 676, 699.)

"A defendant's constitutional right to confront witnesses includes the right to 'ask the witness who he is and where he lives,' because, 'when the credibility of a witness is in issue,' these questions are 'the very starting point in exposing falsehood and bringing out the truth through cross-examination.'" *United States v. Raniere*, No. 20-3520-CR, 2022 WL 17544087, at *6 (2d Cir. Dec. 9, 2022) (summary order) (quoting *Smith v. State of Illinois*, 390 U.S. 129, 131 (1968)). Nonetheless, "[t]rial judges have 'wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* at *6 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

Criminal defendants have two "central interests" in disclosing or eliciting identifying information about witnesses at trial. *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970) (discussing *Smith*, 390 U.S. 129 and *Alford v. United States*, 282 U.S. 687 (1931)). "First, the defense needs testimony as to a witness' [identity] on cross-examination so that the defense can obtain this information which may be helpful in investigating the witness out of court or in further cross-examination." *Raniere*, 2022 WL 17544087, at *6 (alteration in original) (quoting *Marti*, 421 F.2d at 1266). "Second, the defense may need the witness to reveal his address [or other identifying information] in court because knowledge of the [identifying information] by the jury might be important to its deliberations as to the witness' credibility or his knowledgeability." *Id.* (quoting *Marti*, 421 F.2d at 1266) (alteration in original).

[redacted]

"When the government 'seeks to limit disclosure of identifying information in open court,' it 'must provide a reason for the limitation.'" *United States v. Daskal*, No. 21-CR-110, 2023 WL 9424080, at *2 (E.D.N.Y. July 12, 2023) (quoting *United States v. Marcus*, No. 05-CR-457, 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007)). "[T]he reason may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness." *Marti*, 421 F.2d at 1266. "Once the government has provided a valid reason, the defendant must 'demonstrate a particularized need for disclosure of the relevant information, which the court weighs against the risks to the witness.'" *Daskal*, 2023 WL 9424080, at *2 (quoting *Marcus*, 2007 WL 330388, at *1).

Seven of the eleven Protected Witnesses are "Iranian national[s] who previously worked in Iran for or with Skycom," and another one "worked for Skycom as a wireless engineer from around 2007 to 2009." (ECF No. 678 at 1–2; ECF No. 711 at 2.)[5] All eight of these witnesses live in the United States, but they have close family members who still live in Iran, and they are concerned that the Iranian government or the Islamic Revolutionary Guard Corps ("IRGC") will retaliate against them or their families if their identities are disclosed publicly. (*See* ECF No. 678 at 2–3; ECF No. 711 at 3.) Another three Protected Witnesses "are concerned the PRC government may retaliate against them or their families as punishment if they are perceived as cooperating with the United States government against PRC interests." (ECF No. 711 at 3.) Two of them have family members in China, and all three are concerned that they could be detained if they go to China after testifying at trial. (*See id.* at 3–4.) One of these witnesses is

[5] It is unclear from the government's briefing whether the eighth Protected Witness is an Iranian national. (*See* ECF No. 711 at 2–3.)

[redacted]

also "concerned that testifying against the defendants may subject him or his family to physical attacks and intimidation in the United States sponsored by the PRC government." (*Id.* at 4.)

The defendants say that the government "has not met its burden to specify the [Protected] Witness' legitimate safety concerns" because "the government fails to provide *evidence* of a threat." (ECF No. 676 at 2.) Relying exclusively on cases from other circuits, the defendants assert that "[c]ourts routinely require that the government substantiate any claimed threat to witness safety with evidence justifying a limitation on a defendant's confrontation rights." (ECF No. 676 at 2.) In this circuit, however, the nature of the witness' concerns is one of many factors that courts consider when determining whether to permit witnesses to testify under pseudonym. *See Daskal*, 2023 WL 9424080, at *3 ("[I]n assessing the weight of the witness's interest in some kind of limitation, courts in this Circuit have considered a wide range of factors such as the witness's safety, their need for protection from harassment, potential loss of employment, the explicit nature of likely testimony, whether the witness's concerns are generalized and speculative or actual and particular, whether alleged victims were children at the time of the sexual abuse, and the likelihood of significant media coverage.").[6] Moreover, some of the Protected Witnesses "have described intimidation by the Iranian government perpetrated against family members of persons who engage in activity displeasing to the Iranian government" (ECF

[6] In *United States v. Hernandez*, 2013 WL 3936185 (S.D.N.Y. July 29, 2013), Judge Castel granted the government's motion to allow an undercover DEA agent to testify under a pseudonym because the government "made specific representations regarding the Agent's legitimate concerns about his safety and efficacy if his identity is disclosed, none of which have been challenged." *Hernandez*, 2013 WL 3936185, at *3. These "specific representations" included that the undercover agent had been threatened before in connection with his undercover work, and had expressed concerns about his safety if his identity became public. *Id.* at *2. The witnesses in this case have similarly expressed concerns about their safety; while they have not described specific personal threats, Judge Castel did not require evidence that the undercover agent had been threatened in connection with the case on trial before permitting him to testify under pseudonym. *See id.* at *2–3. And the agent did not represent that he had actually been threatened in connection with the case; rather, he expressed "legitimate concerns about his safety and efficacy if his identity [wa]s disclosed." *Id.* at *3.

[redacted]

No. 678 at 3); the government has also cited news reports substantiating that the Iranian government has targeted people in Iran and the U.S. who publicly criticize the regime, (*see* ECF No. 678 at 3–4; ECF No. 711 at 3), and that the Chinese government has targeted critics in China and the United States (*see* ECF No. 711 at 4).[7]

A court may permit a witness to testify using pseudonyms to protect the witness and her family, *see United States v. Dan Zhong*, No. 16-CR-614, 2018 WL 6173430, at *1 (E.D.N.Y. Nov. 26, 2018) (granting protective measures for victim-witnesses and their testifying family members where the government asserted that "the victims and/or their families potentially face[d] reprisals for their testimony"), and when a trial has garnered significant media attention and there is a risk of reprisals, *see United States v. Loera*, No. 09-CR-466, 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) (citing *Marti*, 421 F.2d at 1266). Ultimately, the government has provided a valid reason for the limitation they seek — that forcing the witnesses to testifying using their real names could endanger the witnesses and their families, and affect their willingness to testify.

The defendants argue that "[a]llowing the [Protected] Witnesses to testify pseudonymously would severely impair Huawei's ability to effectively cross-examine them." (ECF No. 676 at 5.) Most of their arguments are directed at Protected Witness [redacted];

[7] Citing *United States v. Nejad*, No. 18-CR-224, ECF No. 314 (S.D.N.Y. Apr. 14, 2020) and *United States v. Banki*, No. 10-CR-8, ECF No. 92 at 4 (S.D.N.Y. July 8, 2010), the defendants maintain that "the government often calls Iranian nationals as witnesses in criminal prosecutions, and they frequently testify publicly about Iran and their Iran-based conduct, without the need for a pseudonym or other protections." (ECF No. 676 at 3.) That may be, but in those cases, the government does not appear to have moved to permit the witnesses to testify under pseudonym. Here, on the other hand, the government has made that motion because the Protected Witnesses have legitimate concerns about reprisals against them and their families. As the government notes, the Iranian government has targeted critics inside the United States. (*See* ECF No. 711 at 3; *see also* Press Release, U.S. Dep't of Just., Staten Island Man Sentenced for Murder-for-Hire Plot and Stalking a Journalist and Prominent Critic of the Iranian Government (May 27, 2026).)

[redacted]

according to the defendants, "[e]very aspect of [[redacted]] identity — including his name — is at the center of the corresponding [International Emergency Economic Powers Act ('IEEPA')] charges, and Huawei needs to thoroughly cross-examine him regarding his identity to defend against them." (*Id.*)[8] But the defendants do not need to use a witness's given name in order to cross-examine him. If they are impeaching the witness's character for truthfulness, the impeachment material will not be in evidence. *See* Fed. R. Evid. 608(b). Or the government may stipulate to some of the evidence. If the evidence is admissible, one common practice in these cases to insert the pseudonym in relevant documents. The defendants recognize as much, but claim that the cross-examination "will be particularly document intensive, rendering it practically impossible to cross-examine [[redacted]] using a pseudonym." (ECF No. 676 at 5.) This is a logistical issue, not a substantive problem. The Court has reviewed the defendants' *ex parte* filing (ECF No. 677), which they submitted to "further illustrate the importance of cross-examining [[redacted]] with identity-specific documents" (ECF No. 676 at 5), and is not persuaded that using the witness's real name is necessary.[9]

Similarly, the defendants say that they must "thoroughly cross-examine" the Protected Witnesses "with documents bearing the [Protected] Witnesses' identifying information," and that "[p]ermitting the [Protected] Witnesses to testify anonymously and limiting cross-examination into discrete aspects of their identities would make effective cross-examination impossible." (ECF No. 676 at 6; *see also* ECF No. 699 at 3–4 (describing "workability problems" with permitting anonymous testimony). However, courts routinely require parties to redact portions of documents to protect witnesses. *See, e.g.*, *Zhong*, 2018 WL 6173430, at *2; *United States v.*

---

[8] The defendants refer to [redacted] as "[redacted]." (*See* ECF No. 676 at 5.)

[9] Nor will the Court permit the defendants to ask the witness about his current address, workplace, or other identifying information.

[redacted]

*Kelly*, No. 07-CR-374, 2008 WL 5068820, at *2 (E.D.N.Y. July 10, 2008); *United States v. Maxwell*, No. 20-CR-330, 2021 WL 5967913, at *1 (S.D.N.Y. Dec. 15, 2021); *cf. United States v. Samia*, No. 13-CR-521, 2017 WL 11441518, at *2 (S.D.N.Y. Oct. 6, 2017) (concluding that the redaction of names and contact information of witnesses testifying under pseudonym from documents on the public docket "does not violate the public's right of access to judicial proceedings and documents"). In short, the defendants — whose lawyers know the identities of the Protected Witnesses and can investigate them for impeachment purposes — have not shown that the jury needs to know the Protected Witnesses' identifying information to assess their credibility or knowledge. *See Marti*, 421 F.2d at 1266; *see also Daskal*, 2023 WL 9424080, at *5.

Finally, relying again on the "document-heavy" nature of the case, the defendants argue that they will be prejudiced if the Court grants the government's motion because "altering the evidence to replace the [Protected] Witnesses' names with pseudonyms . . . would inevitably highlight the [Protected] Witnesses' anonymity and prompt jurors to speculate that the name change reflects a Huawei-created safety concern or a threat related to Huawei's work in Iran." (ECF No. 676 at 6.) The Court will give the jury a limiting instruction that the use of initials or pseudonyms is common in cases that have garnered media attention. *See Marcus*, 2007 WL 330388, at *4 (granting application for witnesses to testify using their first names only, and explaining that "[t]he court will instruct the jury [that this is] only due to the sensitive nature of the conduct [the witnesses] will describe and the likelihood of embarrassing publicity."). Accordingly, the Court grants the motion.

**b. Government's Motions to Admit Statements**

In connection with its nineteenth motion *in limine*, the government also moves to admit three statements: (1) a November 18, 2009 email from [redacted], "a principal of Iranian

[redacted]

telecommunications company MobinNet;" (2) a statement that a coworker made to [redacted] [redacted], a Skycom employee, "regarding the Iranian government's use of Huawei's surveillance technology to quell domestic dissent"; and (3) [redacted] statement to a coworker "regarding Iranian intelligence agents' activities at an ongoing Huawei Tech project." (ECF No. 678 at 5; ECF No. 711 at 5–9.)

[redacted] November 2009 email to Huawei Tech employees was about "a project to build broadband infrastructure for the Government of Iran." (ECF No. 711 at 5.)[10] According to the government, "[p]ursuant to a written Request for Proposal/Procurement ('RFP'), MobinNet contracted with Huawei Tech to implement a fully operational, ready-to-use platform — referred to in the industry as a 'turnkey' solution — for the broadband project" that "included (1) implementing the system's wiretap ('Lawful Intercept.' 'LIG,' or 'LI') capabilities and (2) constructing server rooms in two separate locations in Tehran." (*Id.* (internal citations omitted).) In connection with that project, a Huawei Tech official emailed [redacted] and Parham Beheshti, a witness who worked for MobinNet, asking "to confirm whether access should be built into the system for the Ministry of Intelligence." (*Id.*) [redacted] responded:

> This is [a] TK [turnkey] project, and in the responsibility matrix [of the RFP] nowhere is it indicated that MobinNet has to confirm [the] LIG solution. [The] LIG solution for MobinNet has to be a solution which complies with the security agency requirements and you have to get this confirmation from [the] Ministry of Telecom VP of security. (Mr. Noroozi).
>
> No need to say, Mr. Noroozi had lots of meetings with Huawei before and you can arrange these meetings again.

[10] The defendants dispute this, and say that the email "pertains to Huawei's work to implement a nationwide civilian wireless broadband network for MobinNet." (ECF No. 699 at 4.)

[redacted]

(*Id.* at 6 (alterations in original).)[11]

Although the government offers different justifications for admitting this email (*see* ECF No. 711 at 5–8), the Court addresses only whether the email is an explanation or directive that is not offered for its truth, and concludes that the email is admissible for this purpose. "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999); *see also United States v. DeJesus*, 160 F. App'x 15, 18 (2d Cir. 2005) (upholding district court's admission of an "instruction" from a co-conspirator's lawyer to a witness as non-hearsay, citing *Bellomo*, 176 F.3d at 586). Further, "a statement offered to show its effect on the listener is not hearsay." *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *see also United States v. Bouterse*, 765 F. App'x 463, 468 (2d Cir. 2019) (summary order) ("[S]tatements not offered for their truth, but instead, for their effect on the listener or for context, may be introduced as non-hearsay statements.").

This email is not a directive in the traditional sense — [redacted] did not order or direct Huawei Tech to do anything. Rather, it appears that he was explaining, in the context of a business relationship, what each side's responsibilities were under the RFP, and that it was not his employer's responsibility to confirm whether "[the] LIG solution . . . complie[d] with the security agency requirements." (ECF No. 711 at 6.) The statement may come into evidence for the fact that it was said and for its effect on the listener. The same goes for the second paragraph, in which [redacted] told Huawei Tech how it could get the confirmation discussed in the first paragraph. That portion of the email is not admissible to prove that Huawei had "lots of

[11] The government "expects that Beheshti will testify that Noorozi was then the Ministry of Intelligence representative for the MobinNet project." (ECF No. 711 at 6.)

[redacted]

meetings" with Mr. Noroozi and could arrange another meeting with him, and the Court will give a limiting instruction to that effect. It is, however, admissible for the fact that it was said and for its effect on the listener. *See Dupree*, 706 F.3d at 136. Accordingly, the government's motion to admit this statement is granted. The Court will instruct the jury that it may not consider the contents of the email for its truth, an instruction that the jury is presumed to follow. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993).

The government also asks the Court to admit two statements as excited utterances. (*See* ECF No. 678 at 5; ECF No. 711 at 8–9.) "The excited utterance exception to the rule against hearsay allows the admission of an out-of-court 'statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.'" *United States v. Johnson*, 117 F.4th 28, 46 (2d Cir. 2024) (quoting Fed. R. Evid. 803(2)), *cert. denied*, 146 S. Ct. 1628 (2026). "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998). "An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." *Id.*; *see also United States v. Jones*, 299 F.3d 103, 112 n.3 (2d Cir. 2002) (explaining that compared to the present sense impression exception to the hearsay rule, "the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission of a broader range of hearsay statements — *i.e.* those that 'relate to' the event" (quoting Fed. R. Evid. 803(2)).

"When a statement is offered as an excited utterance, the trial court must find two conditions: 'First, there must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer. Second, the statement of the declarant

[redacted]

must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought.'" *United States v. Obayagbona*, 627 F. Supp. 329, 338 (E.D.N.Y. 1985) (quoting McCormick, Evidence § 297, at 854–55 (Cleary, 3d ed. 1984)). The defendants argue that the statements are not excited utterances, because the events were not sufficiently startling, and that in any event, the declarants were not under the stress of the excitement caused by the events when they made the statements. (*See* ECF No. 676 at 7–9; ECF No. 699 at 10–11.) The Court addresses each statement in turn.

First, the government moves to admit [redacted] account of a conversation with his coworker at Skycom, who like [redacted] was Iranian. (ECF No. 678 at 1–2, 5.) The context for the conversation, according to the government, is a camera project "instituted during the time of pro-democracy protests in 2009 or 2010, to install high resolution cameras on towers with extreme zoom capabilities." (*Id.* at 2–3.) The government alleges that in connection with that project, the coworker "told [redacted] that the Iranian government was the ultimate end user of the Huawei camera project." (*Id.* at 5.) In particular, the government asserts, the coworker "arrived at work in a distraught state and immediately confided in [redacted] that "either earlier that day or the day before" he "had been escorted to a place with monitors that were depicting footage from cameras showing the streets where the pro-democracy protests were taking place." (*Id.*) In other words, he "had just learned he inadvertently had been providing critical assistance to his government's brutal crackdown of his own people." (*Id.*)

The Court is satisfied that the anticipated testimony qualifies as an excited utterance. The event that the coworker described — discovering that he had worked on a project that enabled the Iranian government to conduct surveillance of Iranians engaged in pro-democracy protests — was "sufficiently startling to render inoperative the normal reflective thought processes of an

[redacted]

observer," *Obayagbona*, 627 F. Supp. at 338, and the defendants do not offer any convincing argument to the contrary.

Nor is the Court persuaded by the defendants' objection that the co-worker did not make the statement while he was under the stress of excitement it caused. (*See* ECF No. 676 at 7–8.) In the defendants' view, "[t]he lapse of up to a full day eliminates any possibility that the co-worker remained 'under the stress of excitement' he may have experienced closer to the event." (*Id.* at 7 (quoting Fed. R. Evid. 803(2).) In fact, "the length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), under the stress of excitement caused by the event or condition." *Jones*, 299 F.3d at 112 (citation modified); *see also Mohamed v. Laz Parking*, 79 F. App'x 482, 483 (2d Cir. 2003) (summary order) ("While the length of time between the event and the utterance is a factor relevant to this determination, it is not singularly determinative."); *Zalewski v. City of New York*, No. 13-CV-7015, 2019 WL 8324447, at *2 (E.D.N.Y. Dec. 18, 2019) ("Several factors may be considered in determining whether a speaker was under the stress of excitement, including: the nature of the event, he [sic] time that lapsed between the startling event and the statement, the physical and psychological distance of the speaker from the startling event, and the appearance or demeanor of the speaker, as well as his behavior or condition."). "Rather, the key question governing admission is whether the declarant was, within the meaning of Rule 803(2), under the stress of excitement caused by the event or condition." *United States v. Fell*, 531 F.3d 197, 231 (2d Cir. 2008) (citation modified).

Thus, courts in this circuit have applied the excited utterance exception to a statement made twenty hours after a startling event, *see, e.g.*, *United States v. Asaro*, No. 14-CR-26, 2015 WL 5841804, at *11 (E.D.N.Y. Oct. 7, 2015), and the Second Circuit has cited with approval

[redacted]

cases applying it over eleven hours after a startling event, *see United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990) (collecting cases). In this case, based on the government's description of [redacted] anticipated testimony, including his anticipated testimony about the coworker's demeanor, it is fair to conclude that the coworker was still "under the stress of excitement caused by" discovering that he had played a part in governmental surveillance of protestors. *Fell*, 531 F.3d at 231; *see also United States v. Watson*, No. 23-CR-82, 2024 WL 4455773, at *1–3 (E.D.N.Y. May 31, 2024) (finding that a CFO's email, sent almost sixteen hours after the company's COO sent her a forged contract, was an excited utterance). The psychological effect of this discovery on someone in the coworker's position could be profound and long-lasting. There is, moreover, no suggestion that the coworker had motive to lie or fabricate the statement. *See United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003). Accordingly, the government's motion to admit this statement as an excited utterance is granted.

The same is not true of the government's motion to permit Beheshti to testify about a conversation he overheard between [redacted] and "another MobinNet principal" in connection with the broadband project discussed above, which included Huawei's construction of server rooms. (*See* ECF No. 711 at 8.) According to the government, Beheshti would testify that he "overheard [redacted] speaking in an animated manner with another MobinNet principal" and that [redacted] "stated he had observed Ministry of Intelligence personnel bringing their own servers into a central area in the Tehran server room, for the purpose of constructing a cabinet of 'Zaeim' servers for direct monitoring of broadband infrastructure." (*Id.*)[12] Beheshti will say that this was

[12] According to the government, "the Ministry of Intelligence is colloquially known in Iran as 'Zaeim' or 'Zaeem.'" (ECF No. 711 at 5.)

[redacted]

"an unexpected addition to the broadband infrastructure" and that "MobinNet urgently needed to work with Huawei to restructure the entire layout of the server room." (*Id.* at 8–9.)

[redacted] statement to his co-worker is not an excited utterance. The prospect of "Ministry of Intelligence personnel bringing their own servers into a central area in the Tehran server room," (*id.* at 8), is not in and of itself sufficiently startling. Nor is it clear when [redacted] saw the incident; Beheshti "surmises that the events had occurred earlier that same day," (*id.* at 9), but it is not clear why he made that assumption. In short, Beheshti heard [redacted] tell a coworker, at some point after [redacted] saw the additional servers, that they would have "immediate additional work obligations." (*Id.* at 9). This not an excited utterance under Rule 803(2). *Cf. United States v. Cooper*, No. 19-CR-159, 2019 WL 5394622, at *5 (E.D.N.Y. Oct. 22, 2019) ("This explanation suggests that [the declarant], motivated by a desire to put together a narrative, was relating an earlier event to a colleague rather than blurting out words in a state of excitement.") Accordingly, the government's motion to admit this statement is denied.

## II. Defendant's Motion to Exclude Evidence and Argument Regarding Huawei's Alleged Exportation of Telecommunications Equipment to Iran

The fourth superseding indictment charges the defendants with conspiring to defraud the United States "by impairing, impeding, obstructing and defeating, through deceitful and dishonest means, the lawful governmental functions and operations of OFAC;" conspiracy to violate IEEPA by causing the export of "banking and other financial services from the United States to Iran and the Government of Iran" and of "telecommunications services provided by Employee-1, a U.S. citizen, to Iran and the Government of Iran;" substantive violations of IEEPA based on the same; and money laundering conspiracy with the intent to promote the

[redacted]

IEEPA conspiracies. (ECF No. 689 ¶¶ 104–19.)[13] In a *Chalmers* disclosure dated January 9, 2026, the government disclosed to the defendants that with respect to these counts, it:

> [A]nticipates that witness testimony will establish that Skycom provided telecommunications services to state-owned Iranian telecommunications companies, obtained U.S. telecommunications equipment for the benefit of those companies, and used intermediary entities located in the PRC to purchase the U.S. telecommunications equipment, namely Panda International Information Technology Company ("Panda") and CMEC International Trading Co. Ltd. ("CMEC").

(*See* ECF No. 785 at 1.) And in a supplemental *Chalmers* disclosure dated February 18, 2026, the government further disclosed that:

> With respect to Huawei Tech's and Skycom's unlawful exportation of financial services — that is, the clearing of U.S. dollar-denominated transactions for, and for the benefit of, parties located in Iran — the government intends to admit evidence concerning the nature and purpose of these transactions. The government anticipates such evidence will include witness testimony and documents proving that Huawei Tech and Skycom used intermediary entities located in the PRC to purchase U.S. telecommunications equipment, namely Panda International Information Technology Company and CMEC International Trading Co. Ltd., for Huawei Tech's and Skycom's Iran-based telecommunications customers. Such evidence is also relevant to the bank and wire fraud charges, as Huawei Tech is alleged to have misrepresented to HSBC, among other things, that it would not use HSBC or its affiliates to process transactions regarding Huawei Tech's Iran-based business.

(*See id.* at 2.)

The defendants move to exclude evidence and argument that they exported telecommunications equipment to Iran. (ECF No. 631 at 1–7.) They argue that this is a "late attempt to materially expand the scope of [the government's] IEEPA and money laundering

---

[13] These are counts eight through thirteen of the fourth superseding indictment; they were counts ten through fifteen of the third superseding indictment. (*Compare* ECF No. 126 ¶¶ 111–26 *with* ECF No. 689 ¶¶ 104–19.)

[redacted]

theories to include Huawei's alleged exportation of U.S. telecommunications equipment to Iran." (*Id.* at 2–3.) In addition, they say, the evidence is "irrelevant to the conduct charged in the indictment," and is "nothing more than inadmissible character and propensity evidence offered for the purpose of attempting to prove Huawei committed other crimes beyond those charged in the Indictment." (*Id.* at 3.)

The government responds that "the scope of [its] trial proof as to the IEEPA and money laundering charges has not been impermissibly broadened," and that "evidence regarding procurement of U.S. telecommunications equipment exports constitutes direct evidence of the financial fraud, IEEPA, and money laundering charges." (ECF No. 785 at 3.) The government "will not prove or argue that the underlying procurement of U.S.-origin telecommunications equipment constituted an independent and separate basis for the jury to convict the defendants." (*Id.* at 6.) Rather, the government intends to introduce this evidence in part to prove the "nature and purpose" of the allegedly unlawful transactions underlying the IEEPA and money laundering charges. (*See id.* at 5–6.)

Evidence of uncharged criminal activity is admissible as direct evidence, and is not subject to Rule 404(b), "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)). "Relevant evidence is not confined to that which directly establishes an element of the crime . . . [b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events." *Gonzalez*, 110 F.3d at 941 (citation modified). Evidence that Huawei Tech and Skycom "used intermediary entities in the PRC to purchase, via U.S.-dollar transactions

[redacted]

unlawfully processed through the United States, telecommunications equipment, including U.S.-origin goods, for Huawei Tech and Skycom's Iran-based operations" and evidence that "among the telecommunications services unlawfully provided by Employee-1 to Huawei Tech and Skycom was the procurement of telecommunications equipment, including U.S.-origin goods, for Huawei Tech and Skycom's Iran-based operations," (ECF No. 785 at 5–6), is admissible background evidence for the IEEPA and money laundering charges, and completes the story of those crimes.

This evidence is also relevant to the bank and wire fraud charges. The fourth superseding indictment alleges that "various news organizations, including Reuters, reported that Skycom had sold and attempted to sell embargoed U.S.-origin goods to Iran in violation of U.S. law, and that HUAWEI in fact owned and operated Skycom," that Huawei denied those allegations in statements published by *Reuters*, and that victim financial institutions relied on those denials "in determining whether to continue their banking relationships with HUAWEI and its subsidiaries." (ECF No. 689 ¶ 71.) It also alleges that after *Reuters* published these articles, Huawei representatives and employees told victim financial institutions that "the allegations regarding HUAWEI's ownership and control of Skycom were false and that, in fact, HUAWEI did comply with applicable U.S. law, which includes the [Iranian Transactions and Sanctions Regulations ('ITSR')]." (*Id.* ¶ 72.) Therefore, evidence that Huawei Tech and Skycom used intermediaries in China to purchase U.S. telecommunications equipment for Huawei Tech's and Skycom's Iran-based telecommunications customers is relevant to the bank and wire fraud charges.

Moreover, "[i]t is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise." *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (per curiam). "Under

[redacted]

these circumstances, 'the admission of evidence of uncharged criminal activity is not considered other-crimes evidence subject to Federal Rule of Evidence 404(b).'" *United States v. Ashburn*, No. 11-CR-303, 2015 WL 588704, at *8 (E.D.N.Y. Feb. 11, 2015) (quoting *Baez*, 349 F.3d at 93–94); *see also United States v. Spicer*, No. 10-CR-657, 2013 WL 6007972, at *2 (E.D.N.Y. Nov. 12, 2013) (explaining that "the Second Circuit has held that crimes committed in furtherance of a racketeering enterprise do not fall within the ambit of Rule 404(b)" and collecting cases). Evidence that Huawei Tech and Skycom used intermediaries in China to purchase U.S. telecommunications equipment for Huawei Tech's and Skycom's Iran-based telecommunications customers is admissible to prove the existence of the enterprise and its pattern of racketeering activity. Finally, this evidence is not unduly prejudicial under Rule 403 because it is not more inflammatory than the charged crimes. *See Baez*, 349 F.3d at 94 (citing *United States v. Livoti*, 196 F. 3d 222, 326 (2d Cir. 1999)). Accordingly, the Court denies the defendants' motion.

## III. Defendant's Motion to Exclude Certain Evidence Regarding Iran and North Korea

The defendants move to exclude two categories of evidence: (1) "evidence concerning the United States' policy reasons for imposing the sanctions regimes at issue;" and (2) "evidence as to the Iranian government's purported use of Huawei products for repressive purposes." (ECF No. 631 at 8.) The defendants claim that both categories of evidence are "irrelevant and unduly prejudicial." (*Id.*)

### a. Evidence Concerning the Iranian Government's Use of Huawei Products for Repressive Purposes

The defendants ask the Court to exclude evidence that the Iranian government used Huawei equipment to repress dissent. (*See* ECF No. 631 at 10–11.) The defendants say that the evidence is not relevant, that it would "risk[] the jury convicting based on a mistaken sense that

[redacted]

Huawei should be punished for that conduct instead of its own," that its "prejudice far outstrips any probative value," and that it would mislead the jury. (*Id.* at 10–11, 13–15.)

The government responds that the evidence is "direct evidence of the financial fraud, IEEPA, and money laundering charges." (ECF No. 785 at 9.) The fourth superseding indictment alleges that Huawei Tech "assisted the Government of Iran by installing surveillance equipment, including surveillance equipment used to monitor, identify, and detain protestors during the anti-government demonstrations of 2009 in Tehran, Iran." (ECF No. 689 ⁋ 67.)[14] Subsequently, Huawei Tech's Chief Financial Officer made "numerous misrepresentations" to a representative from one of the victim financial institutions, including that "Huawei has never provided and will never provide any technology, product, or service for monitoring communications flow, tracking user locations, or filtering media contents in the Iranian market." (*Id.* ⁋ 74.) Evidence that Huawei Tech provided equipment to the Iranian government that the Iranian government then used to monitor its citizens is therefore relevant. The danger of unfair prejudice does not substantially outweigh the probative value of the proffered evidence, and this evidence will not confuse or mislead the jury. *See* Fed. R. Evid. 403. Accordingly, the Court denies the defendants' motion.

**b. Evidence Concerning the United States' Policy Reasons for Imposing Sanctions**

The defendants move to preclude evidence about the United States government's "rationale for imposing the applicable sanctions regimes" because it is not relevant, would "inevitably inflame the jury's feelings about Iran and North Korea," and would mislead the jury.

[14] The fourth superseding indictment also alleges that the *Wall Street Journal* and *Reuters* published articles claiming that Huawei Tech "assisted the Government of Iran to perform domestic surveillance, including providing equipment to track persons' locations and a surveillance system to monitor landline, mobile and internet communications," and that Huawei Tech issued a press release denying those claims. (ECF No. 689 ⁋ 70.)

[redacted]

(ECF No. 631 at 9–14.) The government does not intend to introduce evidence about the rationale for the relevant sanctions regimes; it "intends to restrict its presentation on the background of IEEPA, the [Iranian Transactions and Sanctions Regulations ('ITSR')], and the [North Korea Sanctions Regulations ('NKSR')] to the testimony of the noticed OFAC expert," who will testify about "the prohibitions and requirements encompassed in" IEEPA, the ITSR, and the NKSR. (ECF No. 785 at 2, 7–8.)[15] It is appropriate for an expert to testify as to "when the applicable sanction laws were enacted, issued or adopted, and the fact that they were made publicly available [and] their general content, in a manner that provides sufficient context for the jury to understand other evidence that will be introduced at trial." *United States v. Nejad*, 18-CR-224, ECF No. 210 at 4 (S.D.N.Y. Feb. 14, 2020). Accordingly, the defendants' motion is denied as moot.

**CONCLUSION**

For the above reasons, the government's motion *in limine* is granted in part and the defendants' motions *in limine* are denied.

**SO ORDERED.**

S/ Ann M. Donnelly
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
August 19, 2026

[15] The parties' motions on expert witnesses are currently pending before the Court.